## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **TERESA BEATTY, MICHAEL LLORENS, AND KARL WEISSINGER**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **NED LAMONT AND WILLIAM TONG**, <br><br> *Defendants*. | Civil Action No. 22-cv-380 <br><br><br><br> March 25, 2022 |

## <u>AMENDED COMPLAINT</u>

Plaintiffs Teresa Beatty, Michael Llorens, and Karl Weissinger bring this action on behalf of themselves, and a putative class of approximately 30,000 people similarly situated, for relief declaring the oppressive prison debt imposed upon them by the State of Connecticut to be invalid and in violation of the Excessive Fines Clause of the United States Constitution, and to permanently enjoin Governor Ned Lamont and Attorney General William Tong from ever using or enforcing the challenged laws.

### A.    The nature of this action.

1.    Since 1997, Connecticut has obligated people who have been incarcerated, and those who are currently incarcerated, to pay exorbitant amounts for each day they spend in prison.  Currently, Connecticut charges $249 per day, or $90,885 per year, for incarceration.  The resultant prison debt—imposed on people who are almost uniformly destitute, and two-thirds of whom are people of color—is crippling.  Even people who are held pretrial because they cannot afford bail face staggering bills upon sentencing.

2.    For people in prison, Connecticut's prison debt laws mean that the State can collect against nearly all their property at any time.  Once a person is released, prison debt

follows them for decades, decimating inheritances from deceased loved ones, proceeds from lawsuits (even for injuries sustained in prison), and, ultimately, anything a person leaves upon their death.  Even after a person serves their designated sentence, the prison debt laws punitively and arbitrarily impose an additional sentence, just in a different form.  While many have no idea of their crushing debt until the state suddenly seeks to claim it, nobody is exempt.  Each person sentenced to incarceration instantly owes Connecticut for the entire dollar value of their stay— whatever the State decides that dollar value is—once they walk through the prison gates.

3.      At the same time, people obligated to pay for their incarceration have no control over the factors driving their individual bills: how much the state's Department of Correction spends, and the number of people it imprisons.  As Connecticut spends more and more money incarcerating fewer and fewer people, each person's debt spirals upward.  Since 1997, when the laws challenged here took effect, Connecticut has gone from charging people $31,755 a year for their own incarceration to the present $90,885: a roughly 280% increase.  A person serving just one year's imprisonment today owes the State for more than what an in-state student would for two and a half years' attendance at the University of Connecticut, including housing, food, and books.

4.      Piling debts of this magnitude on people sentenced to imprisonment dangles lifelong poverty over the heads of the currently and formerly incarcerated, and violates the Excessive Fines Clause of the United States Constitution.  Accordingly, Ms. Beatty, Mr. Llorens, and Mr. Weissinger seek relief on behalf of themselves and the putative class to have the unlawful scheme stricken.

**B.    Jurisdiction and venue.**

5.    This Court has subject matter jurisdiction over this dispute by virtue of 28 U.S.C. § 1331 because all of the claims arise under the United States Constitution.

6.    Venue properly lies in this district in accordance with 28 U.S.C. § 1391(b)(2), as all events giving rise to the claims occurred within the District of Connecticut.

**C.    Defendants Lamont and Tong.**

7.    Defendant Ned Lamont is the current governor of Connecticut.

8.    As governor, Defendant Lamont oversees all of the state's executive branch departments and commissions.

9.    Defendant Lamont's authority extends to the state's Department of Correction, which administers Connecticut's prison debt scheme.  *See* Conn. Gen. Stat. § 18-85a(a).

10.    As governor, the defendant possesses the authority to enforce compliance by the Department of Correction with an order or judgment of this Court.

11.    Defendant William Tong is the current attorney general of Connecticut.

12.    As attorney general, Defendant Tong is separately elected from Defendant Lamont.

13.    As attorney general, Defendant Tong has the statutory authority to file collections actions against people owing prison debt.  *Id.* § 18-85a.  In addition, as the defense lawyer for the Department of Correction and its employees, *id.* § 5-141d(b), Defendant Tong has been a frequent user of prison debt as a means of offsetting his clients' liabilities for their own unlawful conduct.

**D.    Plaintiff Teresa Beatty.**

14.    Ms. Beatty is a fifty-eight-year-old resident of Stamford, Connecticut.

15.     Ms. Beatty was incarcerated by Connecticut between 2000 and 2002 for charges stemming from being caught with drugs.

16.     When it sentenced Ms. Beatty to incarceration, the Connecticut Superior Court declined to impose payment of a fine as part of her sentence, although the state's criminal code would have permitted the imposition of one up to $10,000.  *See id.* § 53a-41(3).

17.     Ms. Beatty is a lifelong resident of Stamford.  Like nearly 40% of the people currently held by the Department of Correction, Ms. Beatty is Black.

18.     Ms. Beatty is a certified nursing assistant and helps care for her older brother James, who is disabled.

19.     Ms. Beatty is one of five children of Minnie and James Mills, Senior.

20.     Mr. and Mrs. Mills worked hard and saved carefully all their lives. They were able to purchase a house in Stamford at 34 Raymond Street.

21.     Ms. Beatty, her brother James, two of her children, and one of her grandchildren live in the house at 34 Raymond Street.  Ms. Beatty and her brother have lived there almost their entire lives.

22.     Ms. Beatty cared for her mother in the years leading up to her death.  When Mrs. Mills passed away in 2020, Ms. Beatty knew that her mother had left her a portion of the house.

23.     Following her death, Mrs. Mills's will was opened for administration in the Connecticut Probate Court located in Stamford.

24.     In her will, Mrs. Mills made a number of specific bequests, and left the balance of her estate to four of her children in varying percentages.  Ms. Beatty is to receive 40%.

25.     The house at 34 Raymond Street is the only item remaining in Mrs. Mills's estate. It is valued at approximately $590,000.

26.     Because there are four beneficiaries to the house, the probate court will almost certainly order that it be sold and the proceeds be distributed to Ms. Beatty and her siblings.

27.     Ms. Beatty's share of the house's value will be approximately $230,000 before probate administrative expenses.

28.     Once the house is sold, she will have nowhere to live, so Ms. Beatty plans to use her inheritance to buy substitute housing.

29.     Though Ms. Beatty was briefly incarcerated nearly two decades ago, like many people, she had no idea that she apparently owed thousands of dollars for her stay in prison. Nevertheless, shortly after her mother's passing, Defendant Lamont's Department of Administrative Services filed a notice in the probate court alleging that Ms. Beatty owes Connecticut $83,762.26 for her time in custody.

30.     Defendant Lamont's purported claim to Ms. Beatty's inheritance includes $55,000 for the 452 days spanning state fiscal years 2000 and 2001, during which she sat in pretrial detention because she could not afford bail.

31.     Lamont's demand also includes $33,517 for her post-sentence incarceration, spanning fiscal years 2001 and 2002.

32.     Lamont's calculations of the cost for each fiscal year in which Ms. Beatty was incarcerated, however, do not match the figures that state officials designated as the assessed costs for those years.  For example, the Department of Administrative Services has calculated Ms. Beatty's debt for the fiscal years 2000 and 2001 at a rate of $123 and $122 per day, rather than at the actual assessed rate for those years, $99 and $96.

33.     Hence, absent relief from this Court, Ms. Beatty will lose $83,762.26 to Defendant Lamont in debt levied in violation of the constitution and calculated in an arbitrary way.

34.     While $83,762.26 will not make or break the state of Connecticut's multi-billion-dollar budget,[1] the loss will be devastating to Ms. Beatty.  Once her home is sold, she will desperately need the inheritance her mother left her in order to put a roof over her head.

**E.      Plaintiff Michael Llorens.**

35.     Mr. Llorens is a thirty-nine-year-old who grew up in New Britain, Connecticut.

36.     Mr. Llorens is serving a sentence for burglary at a prison in Brooklyn, Connecticut.

37.     Mr. Llorens was sentenced by the Connecticut Superior Court to three years' incarceration for the burglary conviction.

38.     That court decided against imposing payment of a fine as part of Mr. Llorens's sentence, although Connecticut's criminal code would have allowed the imposition of one up to $5,000.  Conn. Gen. Stat. § 53a-41(4).

39.     Mr. Llorens's sentence will be complete in September of this year.

40.     Each day of Mr. Llorens's confinement in prison is attributed to him as $249 in debt.

41.     He owes the government of Connecticut an astonishing $272,655 in prison debt for his three-year sentence.

---

[1] Keith M. Phaneuf, *Connecticut Coffers Swell to Record Levels Despite Vanishing Federal COVID Relief*, Hartford Courant (Jan. 19, 2022), https://www.courant.com/politics/hc-pol-coffers-covid-money-connecticut-20220119-w56pmp3n6zc5jesirlyyfyiaxe-story.html (reporting on consensus budget projections from the Office of Policy Management and the Office of Fiscal Analysis as of January 18, 2022).

42.     Hence, at any time, the defendants may proceed against Mr. Llorens for the $272,655 that state law purports him to owe for his incarceration.

43.     Additionally, Mr. Llorens has a pending brutality lawsuit against the municipal police employees who arrested him.  Because Mr. Llorens owes prison debt, Connecticut law enables Defendants Lamont and Tong to take a portion of the value of Mr. Llorens's lawsuit.

44.     Should Mr. Llorens win that lawsuit or attain a monetary settlement, the defendants will recoup either the $272,655 that they claim Mr. Llorens owes, or, half of his recovery, whichever is lesser.

**F.     Plaintiff Karl Weissinger**

45.     Mr. Weissinger is a thirty-one year-old from Lyme, Connecticut.

46.     From August 2014 to May 2016, Mr. Weissinger served a sentence of incarceration for larceny.

47.     Mr. Weissinger's incarceration was imposed by the Connecticut Superior Court, which decided against sentencing Mr. Weissinger to payment of a fine.

48.     In August 2017—more than a year after completion of his prison sentence— another driver rear-ended Mr. Weissinger's car as he was driving on Interstate 95.

49.     Mr. Weissinger sued the other driver for his injuries in the Connecticut Superior Court.

50.     After Mr. Weissinger filed suit, Defendant Lamont sent Mr. Weissinger's counsel a letter contending that Mr. Weissinger owes approximately $118,000 for his time in prison, and that Lamont claims a portion of any recovery that Mr. Weissinger makes in the car crash lawsuit.

51.     In late February of 2022, Mr. Weissinger and the other driver reached a settlement to resolve his claims, and according to Defendant Lamont, Mr. Weissinger must now pay half of that settlement amount to the State of Connecticut.

52.     Neither Mr. Weissinger, nor Mr. Llorens, nor Ms. Beatty challenge the lawfulness, duration, or conditions of their confinements in this action.

**G.     Connecticut automatically imposes prison debt upon everyone its courts sentence to incarceration.**

53.     Every person imprisoned by Connecticut after October 1997 owes the state "for the costs of such [person]'s incarceration." *Id.* § 18-85a(b).

54.     Each person's debt encompasses costs accrued in the past, as well as those that "the state will reasonably incur to incarcerate the [person] until [their] maximum release date." Conn. Agencies Regs. § 18-85a-1(a).  Hence, on their first day of incarceration, a person subject to the challenged statutes already owes the state for their entire sentence.

55.     Connecticut may collect any person's prison debt by:

(a) taking any property the person owns during their incarceration, Conn. Gen. Stat. § 18-85a(b);

(b) if the person is involved in a lawsuit, taking either the full debt amount, or 50% of any judgment or settlement that the person obtains, whichever is less, id. § 18-85b(a);

(c) taking the same from the person's inheritance, id. § 18-85b(b);

(d) seizing the entire debt from the person's estate upon their death, id. § 18-85c; or

(e) taking the person's lottery winnings.  Id. § 18-85a(b)(2).

**H.    Connecticut prison debt is calculated by multiplying two factors: the   state's daily cost of incarceration, and the number of days that the      debtor was, and will be, confined.**

56.    Defendant Lamont's Department of Correction is charged with calculating the amount of money owed by those it has imprisoned, and may direct Defendant Tong to file collections suits against debtors.  *Id.* § 18-85a.

57.    Lamont calculates the amount owed by each incarcerated person by multiplying two components: (1) "the average per capita cost, per diem, of all component facilities within the Department of Correction" for each state fiscal year in which the person was confined, and (2) the duration of the person's confinement during each fiscal year.  Conn. Agencies Regs. § 18-85a-1(a).

58.    For example, to determine the prison debt owed by a person who served a sentence from June 1, 2017 to August 1, 2019, Lamont or one of his employees would first locate the state's designated "average per capita cost, per diem" of imprisonment for each of the four fiscal years that the person's incarceration spanned: 2017 (June 1, 2017 to June 30, 2017), 2018 (July 1, 2017-June 30, 2018), 2019 (July 1, 2018 – June 30, 2019), and 2020 (July 1, 2019 to their release on August 1, 2019).  Lamont would then multiply the relevant daily rate by each day in the corresponding fiscal year that the person was incarcerated: 30 days in FY2017, 365 days in FY2018, 365 days in FY2019, and 30 days in FY2020.

59.    The incarcerated person "shall be responsible to pay" the resulting figure.  *Id.* § 18-85a-2.

60.    Notably, Connecticut charges people for time spent in pretrial detention on a charge resulting in a conviction.  So, a person who spends a year in prison awaiting trial because they could not afford to make bail will, upon conviction, immediately owe the state money for the year in which they were jailed because they didn't have enough money to afford bail.

I.      **The state's daily assessed cost of incarceration for each fiscal year is calculated in hindsight, after the state closes its books.**

61.     The "average per capita cost, per diem, of all component facilities within the Department of Correction" for any given fiscal year, *id.* § 18-85a-1(a), is frequently shorthanded as the state's "assessed cost" of incarceration, and will be so here.

62.     The assessed cost is designated by Lamont's Department of Correction for each fiscal year after its close, when all expenditures may be tallied.

63.     Hence, although a person automatically becomes obligated to pay "for the costs of such [person]'s incarceration" upon reporting to prison, Conn. Gen. Stat. § 18-85a(b), the person cannot know the *amount* of their debt until the governor has designated an assessed cost for each fiscal year in which the person was incarcerated.

64.     Lamont's correction department designates the assessed cost for each fiscal year with the assistance of Connecticut's bookkeeper, the Office of the State Comptroller.

65.     Lamont or his predecessors in office have established the assessed cost for a day of imprisonment during each of the fiscal years 1999 to 2020.

66.     To arrive at a fiscal year's suggested assessed cost, the Comptroller (1) sums all Department of Correction expenditures at the state's prisons during the fiscal year, (2) divides that sum by the daily average population of Connecticut's prisons during the fiscal year, and (3) divides that amount by 365 to arrive at a per-person, per-day cost.

67.     When calculating the number, the Department's total expenditures include all money spent on its 6,000 or so employees and its archipelago of prisons statewide.  The annual

figure includes the wages of its employees, the operating costs of every program or service at each prison, and the construction, maintenance, and renovation of buildings and grounds.[2]

68.     The second element in a fiscal year's assessed cost is the daily average population of Connecticut's prisons. This number determines the average per-person cost to be borne by people imprisoned during the fiscal year.

69.     The daily average population of Connecticut's prisons is reached by summing each prison's daily population count for all days of the fiscal year, and then dividing that number by 365 to arrive at an average number of people behind bars, systemwide, on any given day.

70.     In addition to being both automatic and inchoate at the time of sentencing, Connecticut prison debt has a further infirmity: the amount of the debt does not depend on the actions of the debtors themselves, but on those of third parties.  People obligated to pay for their incarceration have no say in either factor—expenditures or population—that drives their future debt levels.

### J.     Prison spending is the product of third-party decision making, by Connecticut's executive and legislative branches.

71.     The first assessed cost factor, spending, is a political decision by the executive and legislative branches.[3]

---

[2] The annual figure does not—mercifully for the proposed class here—include Connecticut's present or future pension and healthcare liabilities to current employees, which the state tracks as a single line item for all executive branch employees.

[3] Connecticut has stripped those imprisoned for a felony conviction of the ability to vote, Conn. Gen. Stat. § 9-46(a).Approximately 74% of people held in the state's prisons are there for such a conviction.  Accordingly, about three-quarters of the people imprisoned do not even have indirect, democratic influence over how much the legislative and executive branches decide to spend on incarceration.

72.     The state's legislature allocates an annual budget for the Department of Correction before the start of each fiscal year, and Defendant Lamont decides whether and how to keep its expenditures within that allocation.

73.     However, Lamont and his predecessors have been historically unable or unwilling to restrain corrections overtime spending, which has outsized effects on the people saddled with carceral debt.

74.     This outsized effect has been exacerbated during the Covid pandemic.  Between July 2020 and June 2021, overtime expenditures jumped by $13 million,[4] as coverage was needed for the swaths of prison employees who contracted the virus and were entitled to fourteen days' paid time off under a labor agreement between Lamont's government and the correction employees' labor union.[5]

75.     Those expenditures, alone, added around $1,500 to the debt of each person imprisoned during fiscal year 2020.

76.     The overtime expenditure problem is likely to be worse when the books close on the current fiscal year.  For example, the Department reported to the public on its website that roughly one of every six of its employees contracted COVID in January 2021 alone.  The people incarcerated during this fiscal year can only watch helplessly as their debt mounts.

---

[4] Conn. Office of Fiscal Analysis, FY 21 Agency Overtime Report (Aug. 25, 2021), *available at* https://cga.ct.gov/ofa/Documents/year/OT/2021OT-20210824_Agency%20Overtime%20Report%20FY%2021%20Q4.pdf).

[5] Conn. Office of Policy and Mgmt., General Notice No. 2020-03 ¶¶ 2, 4, 6 (June 18, 2020), *available at* https://portal.ct.gov/-/media/OPM/OLR/Notices/2020-03-Mandatory-COVID-19-Testing.pdf

77.     Overtime spending is only one example of how executive and legislative branch political decisions drive prison debt for those having no control over those decisions.  Another comes in the form of staffing levels.

78.     Between 2008 and the beginning of 2020, Connecticut's prison population fell by 48%.  Lamont and his predecessors in office, however, have decided year after year to keep the number of statutorily authorized correction positions roughly the same, decreasing them by just 12% over the same period.  People incarcerated during those years are stuck with the bill for those decisions.

   **K.     The number of people imprisoned—and hence, the number of debtors who must share the daily cost of prison—is also controlled by the third parties who administer the criminal justice system in Connecticut.**

79.     Third parties, rather than prison debtors themselves, are also responsible for the second factor used to tot up the debts: the number of people in prison.

80.     When those administering the criminal justice system in Connecticut–police, prosecutors, and judges—increase or decrease the number of people they charge with and sentence to imprisonment-bearing offenses, the assessed cost borne by every incarcerated person falls or rises proportionally.

81.     For example, during the first year of the COVID pandemic, the criminal division of Connecticut's superior court pushed off sentencings of convicted persons until 2021 and made unspoken adjustments to bail criteria that cut bond amounts and thus remanded far fewer people to pre-trial detention.

82.     As a result, the number of people held in prison by Defendant Lamont declined each month.  People reaching the end of their sentences were released from prison, but convicted

people and pretrial detainees stayed out.  Over the course of calendar year 2020, the number of people held in prison fell by about half.

83.     Those decisions by police, prosecutors, and judges—while unquestionably beneficial to the people who avoided the rampant COVID spread in Connecticut's prisons—materially increased the carceral debt of each person who was imprisoned during that time.  Even as the number of people in prison was *falling* by 50%, correction expenditures during that period *rose* by at least $13 million.

84.     For fiscal year 2020, the comptroller has calculated the assessed cost of incarceration at $249.  That daily rate is 11.3% higher than fiscal year 2019—as a direct result of the "significant reduction" in the number of people in Connecticut's prisons.  Memorandum from the Office of the State Comptroller to the Department of Correction 2 (Jan. 6, 2022).

85.     Hence, although the challenged statutes obligate them to pay for it, Connecticut's prison debtors have no control over the actions of those in the criminal justice system that drive their bills higher and higher.

**L.     The magnitude of each person's prison debt.**

86.     The result of Connecticut's having carte blanche to charge people for their own punishment is staggering.

87.     For fiscal year 2015, the assessed cost of incarceration is $145 per day, or $59,925 per year.

88.     For fiscal year 2016, the assessed cost of incarceration is $181 per day, or $66,065 per year.

89.     For fiscal year 2017, the assessed cost of incarceration is $185 per day, or $67,525 per year.

90.     For fiscal year 2018, the assessed cost of incarceration is $204 per day, or $74,460 per year.

91.     For fiscal year 2019, the assessed cost of incarceration is $224 per day, or $81,760 per year.

92.     For fiscal year 2020, the assessed cost of incarceration is $249 per day, or $90,885 per year.

93.     The assessed cost of incarceration for 2021 and 2022 has not yet been calculated.

94.     These numbers generate almost unthinkable indebtedness figures for each day of incarceration, saddling people with bills in the thousands and even millions.

95.     At the same time, the debt levels generated by the scheme have always dwarfed the maximum fines permitted by Connecticut's criminal code: $20,000 for the state's top-grade felonies, and $2,000 for the top-grade misdemeanors.  *See* Conn. Gen. Stat. §§ 53a-141, -142.

96.     At the inception of Connecticut's prison debt revenue grab, its assessed cost for just one year of prison was 1.6 times the maximum allowable felony fine, and 16 times the maximum misdemeanor fine.

97.     Today, the assessed cost for a single year of prison is *4.5 times* the maximum felony fine, and *45 times* the highest permissible misdemeanor fine.

**M.     How Lamont and Tong use prison debt.**

98.     Defendant Lamont and his predecessor have collected an average of $5.8 million annually from prison debtors over the last five fiscal years.

99.     The amount extracted from Connecticut's prison debtors does not go back into the prison system.  Instead, it is funneled into the State's general fund, for use in the state government's annual operating expenditures.

100.     In other words, the amounts clawed back from people like Ms. Beatty and Mr.

Llorens do not directly "pay" for their prison stays, and nonetheless represent a drop in the

bucket for the state's multi-billion-dollar annual expenditures.

101.     Lamont and his Department of Correction extract prison debt from incarcerated

and formerly incarcerated people in a variety of ways, including by directing Defendant Tong to

file debt collection actions in the state's court system.

102.     Tong routinely sues prison debtors for the full amount of these exorbitant debts,

confronting them with financial ruin, while collecting fractions of what is owed based on limited

means to pay.  In 2019, for example, Tong sued an incarcerated person for approximately $3

million, citing his past prison time and future sentence length.  Complaint at 2, *State v. Jonathan

Pape*, No. HHD-CV19-5061782-S (Conn. Super. Ct. Oct. 31, 2019).  Tong collected $4,247.40,

or approximately 1/1000th of the debt amount.  Return of Partial Execution at 1, *Pape*, No.

HHD-CV19-5061782-S (Oct. 19, 2021).

103.     Tong's debt collections suits are not just trifling.  Because Tong can at any time

sue an imprisoned debtor who has not yet finished their sentence for the anticipated costs of

incarceration, he can and does obtain judgments for millions of dollars.  But once Tong

transforms the state into a judgment creditor, Connecticut may execute on the judgment at any

time in the future, as any times as it wishes, for the rest of the debtor's life, with post-judgment

interest.  *See* Conn. Gen. Stat. § 52-350f.

104.     By way of illustration, the Attorney General filed a debt collection action against

an incarcerated person for all future assessed costs of their imprisonment, securing a $362,362

judgment in 2019 on that basis.  Judgment, *State v. Heard*, No. HHD-CV18-5051049-S (Conn.

Super. Ct. Apr. 22, 2019).  Having made Connecticut a judgment creditor of the incarcerated

16

person, Tong and his successors in office may execute against the person's assets again and again in the future, even though the person is currently penniless, which is arbitrarily punitive.

105.    In addition to acting as Defendant Lamont's debt collector, Defendant Tong also uses prison debt to shield the Department of Correction from the financial consequences of its own wrongdoing.

106.    Along with other endeavors, Tong represents Department of Correction employees in lawsuits filed by incarcerated or formerly incarcerated people who were injured while imprisoned.

107.    When doing so, Tong and his subordinates often collect or hold back prison debt to the maximum extent possible: either 50% of anything an injured person recovers in a lawsuit, or the total debt amount owed by the injured person, whichever is less.

108.    For example, during a recent lawsuit brought by an incarcerated woman forced to give birth to her baby in her cell after being denied medical care, Tong's employees frequently reminded the plaintiff that if she went to trial, they would claw back at least 50% of anything a jury were to award her.  According to her attorney, in light of this, she ultimately decided to settle for a much smaller amount.[6]

109.    By virtue of the state's unconstitutional prison debt scheme, Tong is thus able to give the Connecticut government up to a 50% discount on the damages awards and settlement amounts that it pays on behalf of its tortfeasor employees, even those who commit serious civil rights violations.

---

[6] Kelan Lyons and Jenna Carlesso, *State Settles Lawsuit with Woman who Delivered Her Baby in a Prison Toilet*, CT Mirror (Dec 1, 2020), https://ctmirror.org/2020/12/01/state-settles-lawsuit-with-woman-who-delivered-her-baby-in-a-prison-toilet/.

**N.       Class allegations.**

110.    Ms. Beatty, Mr. Llorens, and Mr. Weissinger bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following class of similarly situated persons: anyone owing prison debt to Connecticut by virtue of having been incarcerated by the state on or after October 1, 1997 (the "Class").

**O.       Numerosity and ascertainability: Fed. R. Civ. P. 23(a)(1).**

111.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The Class is so numerous that joinder of all Class members is impracticable.   The defendants impose prison debt on any person it has or does incarcerate from October 1, 1997 to present.  Based on publicly available data from the state government, since 2017 alone, about 25,000 people have cycled out of Connecticut's prisons.  The number of currently incarcerated class members, moreover, is approximately 9,000, so the Class can be reliably expected to exceed 30,000 people.

112.    Joinder is impracticable because of the large number of class members, because the class includes unidentifiable future members, and because a subset of the class members are incarcerated, which limits their ability to file and pursue individual lawsuits.

113.    The Class is ascertainable because its members can be readily identified using prison admissions, discharges, population data, and other information kept by the defendants in the usual course of business and within their control.  Plaintiffs anticipate providing appropriate notice to each Class member, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**P.      Commonality: Fed. R. Civ. P. 23(a)(2).**

114.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because it involves common questions of law and fact, including, without limitation, whether the prison debt imposed by the challenged statutes and regulations comprises an excessive fine prohibited by the Excessive Fines Clause of the United States Constitution.

**Q.      Typicality: Fed. R. Civ. P. 23(a)(3).**

115.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because the plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants Tong and Lamont.  The relief the plaintiffs seek is identical to the relief sought for the absent Class members.

**R.      Adequate representation: Fed. R. Civ. P. 23(a)(4).**

116.    The plaintiffs will fairly and adequately represent and protect the interests of the Class.  They have retained counsel with substantial experience in prosecuting class actions and civil rights litigation.

117.    The plaintiffs and their counsel are committed to vigorously prosecuting this action and have the financial resources to do so.  Neither the plaintiffs nor their counsel have interests adverse to those of the Class.

**S.      The defendants having acted or failed to act on generally applicable grounds: Fed. R. Civ. P. 23(b)(2).**

118.    This action satisfies the requirement of Fed. R. Civ. P. 23(b)(2) because Defendants Lamont and Tong have acted or failed to act on grounds generally applicable to the Class, thereby making final injunctive and/or corresponding declaratory relief to the Class as a whole, appropriate.

119.    In the alternative, this action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members.

120.    The plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.  The Court may, on motion of the plaintiffs or on its own determination, certify a class for claims sharing common legal questions, and utilize Rule 23(c)(5) to divide the Class into subclasses if need be.

**T.    The plaintiffs' count against the defendants.**

121.    The imposition and collection of carceral debt by the defendants is grossly disproportional to the gravity of the offenses for which the plaintiffs and all other similarly situated people were convicted, as the debt amounts depend on post-conviction occurrences, on the actions and decisions of third parties, and on future actions and decisions unknowable at the time of sentencing.

122.    The defendants' conduct in imposing the cost of incarceration against, and collecting it from, those it imprisons also offends the public policy of the United States in ways including, but not limited to:

>   (a) Rendering illusory the concept of having paid one's debt to society fair and square by lawfully serving a prison sentence;
>
>   (b) Disproportionally robbing wealth from people of color;
>
>   (c) Actively impeding people from building wealth after lawfully completing incarceration;

(d) Creating a wall against return to society for those leaving prison, and thus fostering a cycle of poverty that is difficult to escape;

(e) Negating the effect of state and federal tort and constitutional mandates by substantially reducing any incentive to seek legal recompense for injuries; and

(f) Reinforcing to state employees that they will be held harmless for breaking the law.

123.    Thereby, the challenged statutes and regulations violate the Excessive Fines Clause.  U.S. Const. amend. 8, cl. 3.

124.    Accordingly, the Court should declare the challenged statutes and regulations to be unconstitutional and current carceral debt to be invalid, and permanently enjoin defendants, Lamont and Tong, and anyone working for them or in concert with them, from ever enforcing said statutes and regulations.

## Prayer For Relief

Plaintiffs, on behalf of themselves and the putative class, respectfully request entry of a judgment:

(a)    declaring that the plaintiffs' and the Class members' prison debt is invalid, null, void and unenforceable;

(b)    declaring Conn. Gen. Stat. §§ 18-85a through -85c and their implementing regulations to be unconstitutional and void;

(c)    enjoining Defendant Lamont, and anyone working for him or in concert with him or his successors, from enforcing the challenged statutes through any means,

including but not limited to, his: issuing any formal or informal claim, notice, or

lien asserting the existence of a prison debt or directing Defendant Tong to collect

a prison debt;

(d)     enjoining Defendant Tong, and anyone working for or in concert with him or his

successors, from enforcing the challenged statutes through any means, including

but not limited to, his: filing collections actions against any person, holding back

judgment or settlement proceeds in cases he defends, or representing to any

person or court that a debt imposed via the challenged statutes exists or is valid;

(e)     ordering the defendants to reimburse the plaintiffs their reasonable litigation costs

and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(f)     granting any other relief it deems just and proper.

Respectfully submitted,

By:   _/s/ David A. Slossberg_____
         David A. Slossberg (# ct13116)
         Erica O. Nolan (# ct31097)
         HURWITZ SAGARIN SLOSSBERG & KNUFF LLC
         147 North Broad Street
         Milford, CT  06460
         (203) 877-8000
         DSlossberg@hssklaw.com
         ENolan@hssklaw.com
                                     and

By:   _/s/ Dan Barrett_____
         Dan Barrett (# ct29816)
         Elana Bildner (# ct30379)
         ACLU Foundation of Connecticut
         765 Asylum Avenue
         Hartford, CT  06105
         (860) 471-8471
         e-filings@acluct.org