## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TERESA BEATTY, MICHAEL LLORENS and KARL WEISSINGER, | : : : | Case No. 3:22-cv-00380-JAM |
| *Plaintiffs*, | : : | |
| v. | : : | |
| NED LAMONT AND WILLIAM TONG, | : : | |
| *Defendants*. | : : | July 22, 2022 |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

### I.  PRELIMINARY STATEMENT

Plaintiffs Teresa Beatty, Michael Llorens, and Karl Weissinger (collectively, the "Plaintiffs") submit this memorandum of law in opposition to the Motion to Dismiss (the "Motion") filed by Defendants Ned Lamont and William Tong (collectively, "Defendants"). ECF No. 23. Defendants seek to dismiss Plaintiffs' Amended Complaint dated March 25, 2022 (ECF No. 11) (the "Amended Complaint" or "Am. Compl.") for lack of standing, mootness, ripeness, and Eleventh Amendment challenges pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, Defendants' Motion should be denied.

### II.  FACTS

Ms. Beatty, Mr. Llorens, and Mr. Weissinger have all served time in Connecticut prison. ECF No. 11, Am. Compl. ¶¶ 15 (Beatty), 36 (Weissinger), 46 (Llorens). They have therefore found themselves face-to-face with Connecticut's prison debt statutes, Conn. Gen. Stat. § 18-85a *et seq.*, in which the State imposes a lien on a person for every day of a person's incarceration.

The lien is not optional, abstract, or theoretical; each convicted person owes the cost of their entire prison stay from the time they are convicted. *Id.* ¶ 54. The Attorney General is the designated enforcement authority for the statutes. *Id.* ¶ 56. He routinely brings actions to collect from the incarcerated and formerly incarcerated. *Id.* ¶¶ 101-04. He also enforces prison debt obligations by withholding lawsuit proceeds from civil rights judgments or settlements. *Id.* ¶¶ 105-09. As both the language of the statutory scheme and Tong's enforcement of it make clear, each convicted person owes the money immediately, and for every successive day they spend in prison. The current rate is $90,885 per year. *Id.* ¶ 1.

### **The Prison Debt Statutes**

Prison debt is primarily codified in three interrelated sections of Connecticut's code: Conn. Gen. Stat. § 18-85a, Conn. Gen. Stat. § 18-85b, and Conn. Gen. Stat. § 18-85c.

Conn. Gen. Stat. § 18-85a is titled "Assessment for costs of incarceration. State's claim against inmate's property for repayment of costs of incarceration. Exempt property. Program Fees. Regulations." In no uncertain terms, it states that Connecticut "shall have a claim against each inmate for the costs of such inmate's incarceration." Conn. Gen. Stat. § 18-85a(b). The Attorney General is the designated enforcement authority. *Id.* ("In addition to other remedies available at law, the Attorney General, on request of the Commissioner of Correction, may bring an action in the superior court for the judicial district of Hartford to enforce such claim [. . .].").

The remainder of Conn. Gen. Stat. § 18-85a lists different types of assets and how they may be taken to satisfy the lien. For the currently incarcerated or those within two years of release, "[a]ny property owned by such inmate may be used to satisfy such claim," with some exceptions. One of these is "property acquired by such inmate after the inmate is released from incarceration,"

"but not including property so acquired that is subject to provisions of section 18-85b, [and] 18-85c." *Id.*

Conn. Gen. Stat. § 18-85b is titled "State's claim against proceeds of person's cause of action or person's inheritance for repayment of costs of incarceration." It has two portions: § 18-85b(a) deals with lawsuit proceeds, and § 18-85b(b) deals with inheritance. Both portions explain that "within twenty years from the date [a] person is released from incarceration," the State "shall have a lien" "in the amount of the costs of incarceration or fifty percent of the proceeds" of a person's lawsuit or inheritance. Conn. Gen. Stat. § 18-85b(a), § 18-85b(b). Throughout, the language is mandatory. For lawsuit proceeds, "[t]he state's lien shall constitute **an irrevocable direction** to the attorney for such person to pay the Commissioner of Correction or the commissioner's designee." *Id.* § 18-85b(a) (emphasis added). For inheritance, "[t]he Court of Probate **shall** accept any such lien notice filed by the commissioner or the commissioner's designee with the court" and "**shall** order distribution in accordance therewith." *Id.* § 18-85b(b). The mandatory nature of these liens is underscored by the lien notices, proofs of claim, and collections complaints filed by the State, which dictate a person "is liable" to Connecticut.

Finally, Conn. Gen. Stat. § 18-85c involves the estates of incarcerated people. It states that for "any person obligated to pay the costs of such person's incarceration under section 18-85a," "the state shall have a claim against such person's estate for all costs of incarceration" up to 20 years after that person's release. It goes on to list certain limiting factors and exemptions.

While Defendant Tong is specifically listed in the prison debt statutes as responsible for enforcement, the Department of Administrative Services ("DAS") takes primary responsibility for prison debt collection short of lawsuits. *See, e.g.*, Am. Compl. ¶¶ 29, 32 (describing notices filed by DAS in probate court related to Ms. Beatty); Section 18-85a-4(b) of the Regulations of

Connecticut State Agencies (stating that prison debt "shall be collected with the assistance of the Department of Administrative Services and in accordance with a memorandum of understanding between the Department of Correction" and DAS).

**The Amendments**

On May 7, 2022, Public Act 2022-118 was signed into law. It contains certain amendments to the prison debt statutes, codified in four sections: 457 (change to § 18-85a); 458 (change to § 18-85b); 454 (change to § 18-85b); and 455 (change to § 18-85c).[1]

The two amendments to Conn. Gen. Stat. § 18-85b are incompatible on their face. Specifically, Section 458 repeals and replaces § 18-85b entirely, and purports to narrow the range of people from whose lawsuits the State may collect prison debt (everyone except those convicted of certain serious felonies). Section 458 is "[e]ffective from passage" on May 7, 2022, and "applicable to costs of incarceration incurred, before, on or after the effective date of this section." Notably, the amendment does not touch Ms. Beatty, since it is only to the portion of § 18-85b that deals with lawsuit proceeds, not inheritances.

But several pages earlier, Section 454 of the Act *also* repeals and replaces § 18-85b entirely. It makes a minor correction regarding child support obligations, but does not reflect any of the other changes. It also has no retroactivity language. Section 454 takes effect July 1, 2022. Thus, it overwrites the amended version of Conn. Gen. Stat. § 18-85b operative from passage and undoes any substantive change.

Finally, Section 457 repeals and replaces § 18-85a entirely. In doing so, it adds language that "up to fifty thousand dollars of other assets shall be exempt" for people whose assets fall "under this section," that is, § 18-85a.

---

[1] The amendment to § 18-85c is a minor change to a child support citation.

4

**Procedural History**

Plaintiffs filed this lawsuit on March 14, 2022, ECF No. 1, and amended their complaint on March 29, 2022. ECF No. 11. After the amendments to the prison debt statutes went into effect on May 7, 2022, the parties conferred and filed a joint motion to modify the scheduling order. ECF No. 20. During that conference and in subsequent correspondence—given the drafting inconsistencies Plaintiffs identified—Plaintiffs asked Defendants to stipulate to the effect of the amendments. They would not do so. Notwithstanding Defendants' representation of the amendments' net effect to this Court, glaringly absent is proof that they have committed themselves to that position elsewhere: they have not provided the Court with evidence that they have rescinded or reduced their demand of Mr. Weissinger (they have not), nor produced a filing from *In re Mills* in which the state reduces its claim against Ms. Beatty's inheritance or notifies the probate court of its contention that she may owe nothing (there is none).

Defendants filed their Motion to Dismiss on June 17, 2022. ECF No. 23. The same day, they filed a Motion to Stay Discovery, ECF No. 24, which Plaintiffs opposed. ECF No. 25.

## III.   LEGAL STANDARDS

"When considering a motion to dismiss pursuant to Rule 12(b)(1), the [C]ourt must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000). Under Rule 12(b)(6), "[a] plaintiff must allege only enough facts to state a claim to relief that is plausible on its face." *Brunson v. Duffy*, 14 F. Supp. 3d 287, 290 (S.D.N.Y. 2014) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)) (internal quotation marks omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether a pleading meets this standard,

the Court must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in the

plaintiff's favor." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir.

2017). On a Rule 12(b)(1) motion, the Court may consider evidence, including affidavits or

exhibits submitted by the parties, and is not limited to the face of the complaint. *Atl. Mut. Ins. Co.*

*v. Balfour Maclaine Int'l*, 968 F.2d 196, 198 (2d Cir. 1992).

## IV.   SUBJECT MATTER JURISDICTION PURSUANT TO FED. R. CIV. P. 12(B)(1)

### A.   Plaintiffs Have Established That All Named Plaintiffs Have Standing and That Their Claims Are Ripe for Adjudication.

"[T]he question of standing is whether the litigant is entitled to have the court decide the

merits of the dispute or of particular issues." *Macedonia Church v. Lancaster Hotel Ltd.*

*Partnership*, 498 F. Supp. 2d 494, 496 (D. Conn. 2007) (internal citation omitted). In order to

satisfy the requirements of Article III, Plaintiffs must show: (1) that they have suffered an 'injury

in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

hypothetical; (2) the injury is fairly traceable to the challenged action of Defendants; and (3) it is

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of Earth, Inc. v. Laidlaw Environmental Srvcs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

"Ripeness is peculiarly a question of timing and the doctrine 'prevents courts from

declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless

the resolution of an actual dispute requires it.'" *Philadelphia Indemnity Ins. Co. v. Enterprise*

*Builders, Inc.*, 520 F.Supp.3d 156, 160 (D. Conn. Feb. 22, 2021) (*quoting Ollie v. Univ. of*

*Connecticut*, 364 F.Supp.3d 143, 148 (D. Conn. Feb. 4, 2019)). "Constitutional ripeness" turns on

the first element of standing; "to say a plaintiff's claim is constitutionally unripe is to say the

plaintiff's claimed injury, if any, is not actual or imminent, but instead conjectural or hypothetical."

*Ollie*, 364 F.Supp.3d at 149 (*quoting Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013)).

Defendants repeatedly assert that Plaintiffs' claims are too speculative to establish standing and ripeness, arguing that "a claimed injury is not imminent for standing purposes if it is premised on the exercise of discretion by state actors." ECF No. 23-1, p. 12. This ignores the mandatory language of the carceral lien statutes, which states that "the state **shall** have a claim against each inmate for the costs of such inmate's incarceration under this section . . . for which the state has not been reimbursed." Conn. Gen. Stat. § 18-85a(b) (emphasis added); *see also* § 18-85b(a) ("In the case of causes of action of any person obligated to pay the costs of such person's incarceration under section 18-85a and regulations adopted in accordance with said section . . . the claim of the state **shall be a lien** against the proceeds therefrom[.]") (emphasis added).

Indeed, the State repeatedly asserts in its collection actions that the lien is mandatory, rather than permissive.[2] A typical complaint in a collections action filed by Defendant Tong simply states, "The Defendant *is liable* to the State of Connecticut (the Plaintiff herein) for the costs of his incarceration," cites the applicable prison debt statute, and then demands an amount. *See, e.g.*, Complaint at 1, *State v. Leopizzo*, No. HHD-CV-15-6062600-2 (Conn. Super. Ct. Sep. 30, 2015)

---

[2] *See* State of Connecticut's Mem. of Law in Support of Motion to Strike Special Defenses at 4, *State v. Sebben*, No. HHD-CV15-5039364-S (Conn. Super. Ct. Nov. 13, 2017) ("During the course of the instant action, the Defendant refers to lawsuits against inmates for the costs of their incarceration as 'billing' inmates. However, *all* inmates are *statutorily* liable for such costs, and the State brings suit against those who have assets not exempted under the provisions of Section 18-85a *et seq*.") (emphasis in original); *id.* at p. 7 n.4 ("[T]he current practice of the DOC is to pursue recovery of incarceration costs against inmates with nonexempt assets of $5,000.00 or more, inheritance and lawsuit recoveries in accordance with Section 18-85b, and State and municipal pensions in accordance with Section 18-85a and 52-321a(b), where the Plaintiff has become aware of such assets.") (attached hereto as **Exhibit A**); State of Connecticut's Motion for Summ. J. at 10, *State v. Sebben*, No. HHD-CV15-5039364-S (Conn. Super. Ct. June 29, 2018) ("Section 18-85a et seq. imposes a nonconsensual statutory liability upon all inmates for costs of their incarceration and does not carve out an exception for those inmates who entered into plea bargain agreements."); *id.* at p. 11 ("In fact, all inmates are statutorily liable for the costs of their incarceration, *see* Conn. Gen. Stat. § 18-85a and regulations §§ 18-85a-1 and 2. It may be that only six inmates were sued during the time Defendant was incarcerated, because lawsuits for costs of incarceration are only brought against inmates for whom the DOC has identified sufficient nonexempt assets.") (attached hereto as **Exhibit B**).

(attached as **Exhibit C**); Complaint at 1, *State v. Webel*, No. HHD-CV-15-6062680-S (Conn. Super. Ct. Oct. 5, 2015) (attached as **Exhibit D**). If those bare facts suffice for Defendant Tong to file a debt collection suit in the state courts, they readily prove that Mr. Weissinger and his co-plaintiffs are "injured by the threatened enforcement" of the debt statutes at issue here. *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019) (rejecting Defendant Tong's claim that because he had not yet made an "overt threat to enforce" the challenged statute, the plaintiff had to wait for him to sue).

In advancing this argument, Defendants seem to be trying to create confusion between the existence of the statutory debt, and any attempt to enforce it. Plaintiffs are harmed by the very existence of these mandatory, arbitrary, and excessive liens, by remaining under the threat of enforcement for 20 years after release from prison. While that is harm enough, the actual garnishment of money and assets only adds insult to injury. Moreover, even the enforcement mechanisms themselves are mandatory and confer standing. By way of example, although Defendants claim that Plaintiff Beatty's injury is based only on "a notice the DAS filed in Probate Court of a lien pursuant to Conn. Gen. Stat. § 18-85b(b);" ECF No. 23-1, p. 12; the pertinent provision of the statute provides that "[t]he Court of Probate **shall** accept any such lien notice . . . [and] **shall** order distribution in accordance therewith." Conn. Gen. Stat. § 18-85b(b) (emphases added). A copy of Ms. Beatty's Proof of Claim is attached hereto as **Exhibit E**. This provision makes clear that the State's claim is on Ms. Beatty's inheritance, not on the estate as a whole, and thus is not contingent on the sale of her mother's home. The chain of contingencies Defendants concoct has no bearing on Ms. Beatty's debt—no matter how the estate itself resolves, Ms. Beatty is on the hook for either $83,762.26 or half of her inheritance. And it is of no moment that the

probate proceedings have not been completed; the Proof of Claim has been filed and the probate court is compelled by state statute to comply.

Additionally, with regards to Mr. Weissinger, Defendants' contention that Plaintiffs need to allege "the amount of Plaintiff Weissinger's settlement" and "assertions as to the other claims that may exist as to its proceeds" in order to establish standing is equally unavailing. *See* ECF No. 23-1 at p. 14. When it comes to lawsuit proceeds, the lien "**shall** constitute an **irrevocable direction** to the attorney for such person to pay the Commissioner of Correction . . . in accordance with its terms . . . ." Conn. Gen. Stat. § 18-85b(a) (emphasis added). And as this Court has made clear with regard to carceral liens relating to lawsuits, "[t]he proper time to raise a challenge to the Connecticut costs of incarceration statute would be when the State of Connecticut is enforcing it against a settlement or award of damages[.]" *Paschal v. Santili*, No. 3:16-cv-1690(JCH), 2017 WL 2908867, at *2 (D. Conn. July 6, 2017); *see also Bonilla v. Semple*, No. 3:15-cv-1614(VAB), 2016 WL 4582038, at *2 (D. Conn. Sept. 1, 2016) (addressing a challenge to section 18-85b after settlement of a section 1983 action and after "the Connecticut Department of Administrative Services demanded that [the plaintiff] give them roughly half of the settlement proceeds under a 'cost of incarceration' lien"). It is undisputed that Mr. Weissinger has received a Notice of Lien from the Department of Administrative Services, a copy of which is attached hereto as **Exhibit F**, and the Amended Complaint alleges that:

- After Mr. Weissinger filed suit, Defendant Lamont sent Mr. Weissinger's counsel a letter contending that Mr. Weissinger owes approximately $118,000 for his time in prison, and that Lamont claims a portion of any recovery that Mr. Weissinger makes in the car crash lawsuit. Am. Compl. ¶ 50.

- In late February of 2022, Mr. Weissinger and the other driver reached a settlement to resolve his claims, and according to Defendant Lamont, Mr. Weissinger must now pay half of that settlement amount to the State of Connecticut. Am. Compl. ¶ 51.

Thus, as with Ms. Beatty, Mr. Weissinger has standing to pursue his claim. They are injured for standing purposes "even when future contingencies of one kind or another" might alter the ultimate outcome of their predicament; for Article III purposes they need not show that they will "likely achieve a desired result," but that they have "a sufficient nexus to the challenged action in the form of a personal stake in the litigation." *Tong*, 930 F.3d at 71. They are faced with losing inheritance and settlement proceeds, respectively, which are manifestly personal stakes in this litigation.

Similarly, Mr. Llorens has standing. As alleged in the Amended Complaint, Mr. Llorens has a pending brutality lawsuit against the municipal police employees who arrested him, but is well-aware of the State's claim that he owes $272,655 in prison debt. Am. Compl. ¶¶ 41-44. The existence of this lien substantially affects Mr. Llorens' ability to resolve his pending case, by settlement or otherwise, because he is unsure how to value his claim to account for the looming threat of the lien (either his entire recovery or fifty percent of it). As such, Mr. Llorens' present and ongoing harm threatens his ability to properly pursue his pending lawsuit. *See Tong*, 930 F.3d at 71 ("When courts consider whether the threatened enforcement of a law creates an injury for the purposes of standing, 'an actual . . . enforcement action is not a prerequisite to challenging the law'; a pre-enforcement challenge is sufficient.") (*citing Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Although Defendants rely on the *Paschal* case in an attempt to defeat Mr. Llorens' standing, the issue of pre-enforcement standing was not raised or addressed in *Paschal*. Because the existence of the lien significantly impacts Mr. Llorens' ability to litigate his pending lawsuit, he has an "actual and imminent" harm to redress, and thus has standing to bring this claim.[3]

---

[3] Mr. Llorens' fears are far from irrational. Defendant Tong's office routinely uses the threat of prison debt as free-wheeling leverage, even when representing employees in individual capacity. *See* Memorandum in Opposition to Plaintiff's Application for Prejudgment Remedy at 5, *Baltas v. Frenis*, 3:18-cv-01168 (D. Conn. Nov. 13, 2018) (AAG arguing that "[i]n this case, the plaintiff owes the State of Connecticut for the costs of his incarceration and would need to recover at least half of $722,906 at trial in order to receive any money from the State of Connecticut"); Am Compl. ¶ 108 (describing AAG use of prison debt as leverage in settlement talks for civil rights claim).

Lastly, and as an apparent throwaway argument, Defendants contend that "Plaintiffs must establish standing to challenge each aspect of the statutory and regulatory scheme they ask this Court to invalidate[.]" ECF No. 23-1, p. 15. While it is not clear exactly what they are arguing, Plaintiffs' best guess is that Defendants would require Plaintiffs to assert claims under each subsection of the carceral lien statute in order to challenge its constitutionality as a whole. Not surprisingly, Defendants do not cite a single binding case in support of this novel theory. Insofar as Plaintiffs cite two, non-carceral lien, New York District Court cases, they are inapposite. *See, e.g.*, *Lamar Advertising of Penn, LLC v. Town of Orchard Park, N.Y.*, 2008 WL 781865 (W.D.N.Y. Feb. 25, 2008) (U.S. magistrate judge's report and recommendation on motion for summary judgment, rather than motion to dismiss, as to whether the plaintiff "can *prove* rather than merely allege—its standing" to challenge to the validity of municipal signage ordinances (emphasis in original)); *Butler v. Obama*, 814 F.Supp.2d 230, 240 (E.D.N.Y. Sept. 30, 2011) (holding that the plaintiff could not rely on provisions of the Affordable Care Act <u>that were not being challenged</u> in order to establish standing to challenge the individual mandate provision).

Even if this Court were to agree with Defendants that Plaintiffs must establish standing to challenge each aspect of the statutory scheme, Plaintiffs have sufficiently done so. The prison debt scheme is established by Section 18-85a(a), which authorizes the Commissioner of Correction to adopt regulations "concerning the assessment of inmates of correctional institutions or facilities for the costs of their incarceration." Conn. Gen. Stat. § 18-85a(a). The challenged statutes are interwoven: § 18-85a sets out the lien obligation generally and then lists how it can be enforced against assets of current prisoners. Meanwhile, § 18-85b and § 18-85c explain how the lien can be enforced against lawsuit proceeds, inheritances, and estates. In doing so, they explicitly refer back to § 18-85a, explaining how the lien is imposed on "a cause of action," "inheritance," or "death,"

respectively, "of any person obligated to pay the costs of such person's incarceration **under section 18-85a**;" Conn. Gen. Stat. § 18-85b(a), § 18-85b(b), § 18-85c. (emphasis added). The three statutes thus represent a single statutory scheme, and Plaintiffs are challenging the constitutionality of that scheme as a whole. *See* Am. Compl. ¶¶ 54, 55, 124.

In sum, each of the named Plaintiffs has alleged sufficient facts to establish that they have standing to bring their ripe claims, such that the Court should deny Defendants' Motion to Dismiss on these grounds.

**B. The Recent Amendments to the Challenged Statutes Do Not Render Plaintiffs' Claims for Injunctive Relief Moot.**

  1. <u>The Conflicting Provisions of the Amendments to the Challenged Statutes Should, Standing Alone, Preclude a Finding of Mootness.</u>

Defendants also argue that Plaintiffs claims should be dismissed by this Court because recent amendments to the challenged laws have rendered Plaintiffs' claims moot. "Mootness is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies; a case is moot if 'the parties lack a legally cognizable interest in the outcome' of the case. . . .  This occurs 'when interim relief or events have eradicated the effects of the defendant's act or omission and there is no reasonable expectation that the alleged violation will recur.'" *In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010) (citations omitted).

While the burden of establishing standing falls on the plaintiff, "[b]y contrast, the burden of showing mootness logically falls on a defendant[.]" *Mhany Management, Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (*citing Friends of the Earth,* 528 U.S. at 191-92) (internal quotation marks omitted).

Seemingly conceding that the amendments to Conn. Gen. Stat. § 18-85b do not moot Ms. Beatty's claim, Defendants claim that "[e]ven if Plaintiff Llorens or Plaintiff Weissinger had met

their burden to establish standing (they did not), the amendments to the challenged laws render their claims moot." ECF No. 23-1, p. 16. As discussed above, Public Act 22-118 contains two seemingly conflicting provisions that appear to amend Conn. Gen. Stat. § 18-85b effective upon signature in May, and then "repeal and replace" that very amendment on July 1, 2022.

The legislature's use of "repealed and replaced" yields an inescapable result for Defendants here, whatever they conjure as the legislature's intent in overwriting the May measure with the July one. The July measure "repeals the prior version of the amended statute," that is, the version in effect starting in May, leaving it a nullity. *State v. Bischoff*, 258 A.3d 14, 21 n.5 (Conn. 2021) (collecting cases holding that effect of Connecticut's "unique" practice of repealing-and-replacing rather than amending is complete supersedence of the affected statutory section). Accordingly, while Plaintiffs Weissinger and Llorens are not among the narrowed group of people the legislature thought should still pay prison debt, as drafted, Plaintiffs are *all* still on the hook for prison debt liability from their lawsuit and inheritance proceeds.

    2.   <u>The Language Adding an Additional, Limited $50,000 Exemption Does Not Moot Plaintiffs' Claims.</u>

Additionally, Defendants argue that the amendments to § 18-85a(b) in Section 457 independently moot Plaintiffs' claims because the amendment provides that "in addition to" other previously existing exemptions, "up to fifty thousand dollars of other assets shall be exempt" from assessed costs of incarceration. ECF No. 23-1, p. 17. Defendants' assurances are misplaced. First, all three Plaintiffs' prison debt has been pegged by the State at far more than $50,000. It is Defendants' burden to show mootness, *Mhany Management*, 819 F.3d at 603, and they have not and cannot show that, even if this exception applied to all three Plaintiffs, they would suddenly be free of their liens.

Second, the amendment to § 18-85a states that it applies to people whose assets fall "under this section"; *i.e.*, § 18-85a. Plaintiffs' assets fall under § 18-85b. Accordingly, while all three Plaintiffs very much wish the $50,000 safe harbor applied to them, it would appear not to. Notably, in its individual efforts to recoup Ms. Beatty's inheritance and Mr. Weissinger's lawsuit proceeds, the State has made zero indication that this or any other amendments have wiped their liens. For example, the State has not filed anything in probate court stating that Ms. Beatty is covered by the $50,000 safe harbor, nor has Mr. Weissenger received anything saying he no longer owes because of the (attempted) change to § 18-85b.

Third, this again confuses the underlying unconstitutionality of the lien with matters of enforcement. The statutes have always contained certain limitations to enforcement, such as those exemptions present in Conn. Gen. Stat. §§ 52-352b and 52-352d for inmates, and child support payments, attorneys' fees, costs of hospitalization, and payments of compensation to crime victims for formerly incarcerated individuals. *See* Conn. Gen. Stat. §§ 18-85a(b), 18-85b(a). The $50,000 exemption is just an addition to the list. Plaintiffs challenge the ability of the State to collect the carceral debt at all, regardless of any exemptions that may apply. Short of the legislature invalidating the prison debt statutes entirely—which it decidedly did not do—Plaintiffs' challenge is not moot.[4]

---

[4] Perhaps implicitly acknowledging that they cannot meet the formidable standard under the voluntary cessation doctrine, Defendants have not raised this issue with the Court. However, given the uncompelled amendment of the statutes after the instant lawsuit was filed, the voluntary cessation doctrine could reasonably be applied to Defendants' mootness argument. "A government defendant claiming mootness on the basis of voluntary cessation bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Dark Storm Industries LLC v. Cuomo*, 471 F.Supp.3d 482, 494 (N.D.N.Y. Jul. 8, 2020) (*citing Mhany Mgmt.*, 819 F.3d at 603). As evidenced by the lack of any supporting affidavits demonstrating a public commitment to their "understanding" of the conflicting statutory provisions, Defendants cannot meet the formidable burden to establish that the State will not resume the challenged conduct, such that Plaintiffs' claims are not moot.

**C. The Eleventh Amendment Does Not Bar Plaintiffs' Claims, as Defendant Tong Is a Proper Defendant Against Whom Plaintiffs Seek Prospective Injunctive Relief.**

      1. <u>Defendant Tong Is a Proper Defendant Pursuant to the *Ex parte Young* Exception.</u>

Defendants also invoke Eleventh Amendment immunity. However, a plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers in their official capacities, provided that the complaint (a) "alleges an ongoing violation of federal law" and (b) "seeks relief properly characterized as prospective." *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (*citing Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002)); *see also Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 392 (2d Cir. 2022) (same). To be a proper *Ex parte Young* defendant, this Court has made clear that "the official being sued must have (1) a particular duty to enforce the law in question and (2) a demonstrated willingness to exercise that duty." *Urso v. Lamont*, No. 3:20-CV-00529(KAD), 2021 WL 5919819, at *5 (D. Conn. Dec. 15, 2021). Because Defendant Tong is tasked with the specific statutory duty to enforce the carceral debt statutes and has demonstrated his willingness to do so by way of collections actions and otherwise, Defendants' argument as to Defendant Tong must fail.[5]

As to Defendant Tong, Defendants ignore the explicit statutory provision authorizing that the "Attorney General, on request of the Commissioner of Correction, may bring an action in the superior court for the judicial district of Hartford to enforce such claim[.]" Conn. Gen. Stat. § 18-85a(b). "The actual enforcement connection may be found either in the challenged statute itself or the general laws of the state." *HealthNow N.Y., Inc. v. New York*, 739 F. Supp. 2d 286, 295 (W.D.N.Y. 2010) (*citing Ex parte Young*, 209 U.S. at 157); *see also In re Dairy Mart Convenience*

---

[5] Plaintiffs concede that the Eleventh Amendment would bar its claims against Defendant Lamont as the Governor. As Plaintiffs seek only declaratory and injunctive relief as to the ongoing unconstitutional actions of state officials, Plaintiffs will amend the complaint to join the Commissioner of Correction and/or the Commissioner of Administrative Services, to ensure that any declaration or injunction issued by this Court will be enforceable against the relevant state officials.

*Stores, Inc.*, 411 F.3d 367, 373 (2d Cir. 2005) ("So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act."). Defendants mischaracterize the precedents they cite by overemphasizing the importance of a decision-making role to an *Ex parte Young* analysis, when, in reality, the analysis—particularly in the Second Circuit—turns on (1) the enforcement authority of the named defendant, and (2) the defendant's demonstrated willingness to enforce the challenged statute. *See Kelly v. New York State Civil Service Commission*, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015). By definition, a state officer like Tong who is "expressly directed to see to . . . enforcement" of a challenged statute has the requisite connection to it to overcome Eleventh Amendment immunity. *Ex parte Young*, 209 U.S. at 157.

The cases Defendants cite all involve state officers without this connection—whether in the statute at issue, or the law more generally. *See, e.g.*, *Chrysafis v. James*, 534 F.Supp.3d 272, (E.D.N.Y. 2021) (no *Ex parte Young* exception in New York case where "neither [statute at issue] itself nor the Attorney General's general authority under [sections of] N.Y. Executive Law . . . . charges her with a particular duty to enforce Part A of [the statute]"); *Whole Women's Health v. Jackson*, 142 S.Ct. 522, 534 (2021) (no exception where Texas Attorney General granted no enforcement authority as to S.B. 8); *Kuck v. Danaher*, 822 F.Supp.2d 109, 142 (D. Conn. 2011) (no exception where governor had no enforcement authority vis-à-vis Board of Firearms Permit Examiners).

In addition, Defendants' emphasis that the Attorney General *may* act on the request of the Commissioner of Correction is misplaced. The question is whether the Attorney General has, "by the law of the state, so far as concerns [the challenged statutes], *any* duty with regard to the enforcement of the same." *Chrysafis*, 534 F.Supp.3d at 289 (emphasis added); *see also Ex parte Young*, 209 U.S. at 157 ("The fact that the state officer, by virtue of his office, has *some* connection

16

with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." (Emphasis added)). He does.

Because the Attorney General has the requisite enforcement duties under *Ex parte Young*, Defendants' contentions that his general duty to defend actions against the State or its employees is not sufficient, nor did he have any involvement with the proceedings of the named Plaintiffs, are meaningless. ECF No. 23-1, p. 22. "The question is not whether the Attorney General would be obligated, if the plaintiffs at a future time institute suit against the state, to defend that suit, but rather whether he is obligated to enforce the statute here attacked." *Chrysafis*, 534 F.Supp.3d at 292 (*citing Johnson v. Rockefeller*, 58 F.R.D. 42, 46 (S.D.N.Y. 1973)) (internal quotation marks omitted); *see also Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F.Supp.3d 50, 68 n.9 (E.D.N.Y. 2018) ("While a sufficiently close connection between a defendant and enforcement of a government act or policy under *Ex parte Young* is required, 'personal involvement' is not.") Conn. Gen. Stat. § 18-85a makes the Attorney General the designated enforcement authority: the one who brings suit to collect the costs of incarceration. This is the "particular duty to enforce the law in question" that the Second Circuit requires. *See HealthNow N.Y.*, 739 F.Supp.2d at 294.

Plaintiffs have also sufficiently pled that Defendant Tong has a "demonstrated willingness to exercise that duty," as he and his employees routinely bring collections actions against those individuals who they claim owe carceral debt. For the period of January 2015 through August 2020, the Attorney General authorized his employees to bring more than 60 collections actions against incarcerated and formerly incarcerated individuals they claim owe the costs of incarceration. A chart evidencing such collections actions is appended hereto as **Exhibit G**.[6]

---

[6]Prior to the commencement of this suit, in accordance with Connecticut's Freedom of Information Act, counsel for Plaintiffs requested relevant records from the Attorney General and the Department of Administrative Services

Indeed, Defendant Tong's actions to enforce the statutes go even further. In the course of defending *individual* state employees who have been indemnified, Tong's office routinely collects money from lawsuit proceeds for carceral debt.  In a recent case, for example, Tong's office represented a former corrections employee sued in his individual capacity. The plaintiff won and a jury awarded damages, after which Tong's office unilaterally reserved half the money to pay the plaintiff's prison debt. *Williams v. Marinelli*, 987 F.3d 188, 194 (2d Cir. 2021) (explaining that "the Assistant Attorney General who had defended Marinelli at trial informed Williams's attorney by email that the State would pay the judgment on Marinelli's behalf, making payments as follows: . . . (2) $142,430 to the Connecticut Department of Administrative Services in partial fulfillment of Williams's statutory obligation to reimburse Connecticut for the cost of his incarceration; and (3) $142,430 to Williams." ). This is not an outlier. Tong's office routinely demands—or waives— prison debt money owed to the State. *See, e.g.*, Status Report, *Morgan v. Semple*, 3:16-cv-00225(VAB), ECF No. 170 (D. Conn. Jan. 15, 2021) (in prison case, noting agreement "to resolve the case for a payment of $40,000 to Mr. Morgan in exchange for [*inter alia*] an agreement by the state not to pursue any outstanding liens"). Tong's employees even raise prison debt as an affirmative defense. *See, e.g.*, Answer, *Sumler v. Chapdelaine*, 3:16-cv-01600(RNC), ECF No. 19 (Sept. 21, 2017) (raising cost of incarceration lien as defense to prison civil rights claim).

As Plaintiffs have established that Defendant Tong, in his official capacity as the Attorney General for the State of Connecticut, is the proper defendant in this action, *Ex parte Young* does not bar Plaintiffs' claims.

---

regarding all actions filed to recover the costs of incarceration pursuant to Conn. Gen. Stat. 18-85a *et seq*. Exhibit G was subsequently produced in response to such public records requests.

2.  <u>The Relief Sought by Plaintiffs Is Prospective Declaratory and Injunctive Relief and Is Not Retrospective.</u>

Defendants also argue that they are immune from Plaintiffs' claims because Plaintiffs seek retrospective and not prospective relief, in violation of *Ex parte Young*. ECF No. 23-1, pp. 23-28. To determine whether relief is prospective or retrospective, a court should "conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland*, 535 U.S. at 645 (holding that relief is prospective so long as a court does not "impose *upon the State* a monetary loss resulting from a past breach of a legal duty") (emphasis in original; internal quotation marks and citation omitted).

This Court has already squarely rejected the same argument that Defendants now make regarding Conn. Gen. Stat. § 18-85b in *Bonilla v. Semple*, 2016 WL 4582038, at *3-4, which Defendants acknowledge but ask the Court to ignore. *See* ECF No. 23-1, p. 25 n.16. In *Bonilla*, the Court held:

> In this lawsuit, Mr. Bonilla does not seek the equivalent of a monetary award from the State of Connecticut. Instead, he seeks the answer to a legal question as to whether a payment is necessary. He has posed this question before any money has changed hands. Thus, Mr. Bonilla seeks an order restraining state officials from enforcing a statute that is allegedly inconsistent with federal law, which is prospective.

*Bonilla*, 2016 WL 4582038, at *4. The case at hand is directly on point with the procedural posture the Court addressed in *Bonilla*, as none of the named Plaintiffs are seeking to have money returned to them that has already been collected by the State. Plaintiffs are seeking a ruling from this Court as to the constitutionality of the carceral debt statutes and whether the State is entitled to collect the debt at all, as well as a permanent injunction restraining Defendants from collecting it.

Defendants point to the Second Circuit's decision in *Marinelli*, 987 F.3d at 188, in urging this Court to reach a different conclusion than that of *Bonilla*, arguing that the "'practical effect' of the relief Plaintiffs demand would be similar to the effect of unfreezing the assets in an inmate trust account." ECF No. 23-1, p. 26. In *Marinelli*, unlike here, the carceral debt had already been paid, forcibly, and the Second Circuit upheld the District Court's decision that the State's collection of the costs of incarceration was preempted by 42 U.S.C. § 1983. *Marinelli*, 987 F.3d at 195. In rejecting the defendant's Eleventh Amendment argument, the Court aptly noted that no monetary relief was sought from the State, as the defendant was a former corrections employee sued in his individual capacity, "nor would the declaratory relief granted by the district court operate in effect as a damages award against the State." *Id.* at 197. Nothing the Second Circuit said or did not say in *Marinelli* comes close to supporting Defendants' position here.

Thus, despite Defendants' claim that "Plaintiffs ask this Court to deprive the state of its present entitlement to future payment and—as a result—their claims fall squarely on the retroactive side of the line" . . . with "real economic impact on the state," *see* ECF No. 23-1, p. 24, the Second Circuit has explicitly held that "relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury." *Vega v. Semple*, 963 F.3d 259, 282 (2d Cir. 2020) (*citing Papasan v. Allain*, 478 U.S. 265, 278 (1986)).

Finally, it is important to note that Defendants' arguments under Rule 12(b)(1) are internally inconsistent: While first arguing that Plaintiffs' claims are not ripe because they have been brought prior to money actually changing hands, Defendants then argue that Plaintiffs' claims are effectively seeking retrospective relief as "essentially equivalent in economic terms to the

award of damages for past conduct[.]" ECF No. 23-1, p. 24. Under Defendants' view of the law, there would be no plaintiff who could <u>ever</u> challenge the current statutory scheme.

**D.  Plaintiffs Properly Bring Their Claims Under the Eighth Amendment.**

At the close of their brief, Defendants make a throwaway assertion that to the extent Plaintiffs were charged for their pretrial detention, the Eighth Amendment does not apply. That contention mischaracterizes the facts at issue.

The prison debt imposed upon Plaintiffs is solely a post-conviction fee, and therefore entirely within the purview of the Eighth Amendment. Plaintiffs in this cause are universally post-conviction individuals contesting the excessive fees imposed upon them *pursuant to their convictions*. *See* Am. Compl. ¶¶ 2, 16, 37, 47. In this state, prison debt is assessed only against people adjudged guilty following a conviction. Connecticut does not place such liens upon the property of non-convicted persons, nor on pretrial detainees prior to conviction.

Because they all involve pretrial plaintiffs challenging conditions of pretrial detainment, the cases cited by Defendants are beside the point. *See Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983) (pretrial detainee challenging medical treatment); *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (pretrial detainee challenging conditions of confinement); *Covino v. Vermont Dept. of Corrections*, 933 F.2d 128, 129 (2d Cir. 1991) (pretrial detainee challenging cell transfer); *Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 250 (4th Cir. 2005) (pretrial detainee challenging constitutionality of jail charge). As the Second Circuit has held, forfeitures "imposed at the culmination of a criminal proceeding that required the conviction of underlying felony, and could not have been imposed upon an innocent party" constitute a fine within the meaning of the Eighth Amendment's Excessive Fines Clause. *United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016) (internal citation omitted). That the State includes the days spent in pretrial

detention in its tally of debt imposed post-conviction only illustrates the exorbitance of its policy; this method of calculation does not shield Defendants from Eighth Amendment review.[7]

## V.     LEGAL SUFFICIENCY UNDER FED. R. CIV. P. 12(B)(6)

### A.  Connecticut Prison Debt Violates the Excessive Fines Clause.

The Excessive Fines Clause forbids "excessive fines imposed," U.S. Const. amend. 8, cl. 2, meaning that it acts an outer limit to the severity of any "payment to a sovereign as punishment for some offense." *Browning-Ferris Indus. of Vt. v. Kelco Disposal*, 492 U.S. 257, 265 (1989). No party disputes that Connecticut is a "sovereign" for those purposes, or that Plaintiffs' statutory obligations to remit their inheritances or lawsuit proceeds represents "payment."

To determine whether those payments comprise a "fine" that is "excessive," this Court looks to each element in turn. "At the first stage, [it] determine[s] whether" the penalty at issue "constitutes 'a fine'" because the extraction "may be characterized, at least in part, as 'punitive.'" *Viloski*, 814 F.3d at 108-09.  If the answer is affirmative, then the Court asks whether the penalty is excessive. *Id.* at 108. Connecticut prison debt satisfies both inquiries, so Defendants' motion must be denied.

    1.  Connecticut Prison Debt Is a 'Fine' for Purposes of the Clause, Because It Is Imposed at the Culmination of a Criminal Proceeding, Does Not Apply to Innocent Parties, and the Convicted Person Is Personally Liable for the Debt.

Penalties challenged as Excessive Fines Clause violations occupy one of two poles.  At one end lie "purely 'remedial' forfeitures," those "intended not to punish the defendant but to compensate the [g]overnment for a loss or to restore property to its rightful owner"; they are not 'fines' for purposes of the Clause. *Id.* at 109. On the other end lie "non-remedial forfeitures— uncompensated takings of property—[that] clearly serve retributive goals." *United States v.*

---

[7] Even if Defendants were correct, their contention would not result in any dismissal of Plaintiffs' claims but simply limit the ability of some of the plaintiffs to challenge a portion of their debt.

*Private Sanitation Indus. Ass'n of Nassau/Suffolk*, 44 F.3d 1082, 1088 (2d Cir. 1995) (Heaney, J., dissenting). Penalties in this second category "constitute punishment for an offense," *United States v. Bajakajian*, 524 U.S. 321, 328 (1998), and are therefore 'fines.'

Significantly for the Connecticut prison debt regime, *any* measure of punishment, retribution, or deterrence renders a penalty a 'fine,' even if the penalty also has a remedial or non-punitive purpose. *Austin v. United States*, 509 U.S. 602, 621-22 (1993). The rule of *Austin* means that a penalty by any name or in any form—civil or criminal, *in personam* or *in rem*—is "a 'fine' for Eighth Amendment purposes" if it comprises "punishment *even in part*." *Bajakajian*, 524 U.S. at 331 n.6 (emphasis added).

To apply *Austin* and detect whether a challenged penalty "may be characterized, at least in part, as punitive," *von Hofe v. United States*, 492 F.3d 175, 182 (2d Cir. 2007), courts look to hallmarks like the challenger's having been made "personally liable" for it, *Viloski*, 814 F.3d at 109, or the penalty's having been levied as "part of a criminal prosecution," *United States v. An Antique Platter of Gold*, 184 F.3d 131, 139 (2d Cir. 1999), or having been "imposed at the culmination of a criminal proceeding that required a conviction of the underlying felony," or the penalty's not being able to be "imposed upon an innocent party." *Bajakajian*, 524 U.S. at 328. When the penalty is levied against a person in connection with a criminal sentence, there is "no threshold question concerning the applicability of" the Clause; such a penalty "is clearly a form of monetary punishment." *Alexander v. United States*, 509 U.S. 544, 558, 559 n.4 (1993).

The same clarity exists as to Connecticut prison debt. It is automatically imposed upon people who are imprisoned by the State.  Conn. Gen. Stat. § 18-85a(b); Conn. Agencies Regs. § 18-85a-2. And under Connecticut law, there is only one route to imprisonment: after conviction, by order of superior court committing the person to the State's prison system, Conn. Gen. Stat.

§ 54-92a. No person who has *not* been convicted of a crime and imprisoned owes the debt; that is, the challenged debts are "imposed at the culmination of a criminal proceeding that required a conviction" and may not be "imposed upon an innocent party." *Bajakajian*, 524 U.S. at 328. Under the first prong of the Excessive Fines Clause inquiry, the debts Plaintiffs challenge here are punitive at least in part, and are therefore 'fines' for purposes of the Clause.

But in the lone instance in which Defendants address *Austin*'s inquiry at all, they ignore its one-drop-of-poison rule and contend that the challenged statutes' "primar[y] inten[t]" to reimburse Connecticut for the costs of imprisoning Ms. Beatty and her co-plaintiffs render them non-punitive. ECF No. 23-1, p. 36. *Austin*'s bright line rule specifically forbids that conclusion. The only sanctions that are non-punitive for Clause purposes are those serving "*solely* a remedial purpose." *Austin*, 509 U.S. at 622, 610 (emphasis added). Defendants' appeal to a partial reimbursement motivation merely repeats the error of other defendants who failed to appreciate *Austin*'s rule. In *Bajakajian*, for example, the United States tried the same deflection, contending that the criminal forfeiture order contested there "also serve[d] important remedial purposes," even though it was imposed at the culmination of a criminal proceeding. *Bajakajian*, 524 U.S. at 329 (internal quotation omitted). That court rejected the argument, just as this one should: "Even if the Government were correct in claiming that the forfeiture of respondent's currency is remedial in some way, the forfeiture would still be punitive in part . . . This is sufficient to bring [it] within the purview of the Excessive Fines Clause." *Id.* at 329 n.4.

2.   Each and Every Argument Defendants Raise to Avoid *Austin* Is Baseless.

Defendants spend almost all of their merits argument trying to avoid *Austin*, *Alexander*, and *Bajakajian* in a variety of ways. They argue that the punishment inquiry silently requires historical proof that the challenged penalty would have been viewed as punishment in 1791; they

cite fragments from cases dealing with subjects *other* than the Excessive Fines Clause to purportedly demonstrate that the challenged statutes are not 'punishment;' and they contend that Connecticut prison debt is actually a remedial forfeiture. Not one of these arguments is correct.

   **a. No Case Tightens the 'Punishment' Test by Requiring Proof of Sentiments in 1791, and at Any Rate, an Unrelated Massachusetts Decision Is Inapposite.**

Defendants' first gambit is to contend that the governing "understood at least in part as punishment" test actually has an unwritten, additional qualifier. *Austin*, 509 U.S. at 610. According to them, they may avoid having their prison debt system deemed a 'fine' unless Plaintiffs demonstrate that prison debt was understood as punishment in 1791. But Defendants are wrong on the role of independence-era legal history in this dispute, because Clause challenges need not examine history in order to satisfy *Austin*. And, at any rate, Defendants themselves produce nothing from the late 18th century to suggest that making people pay the entire per capita annual cost of prison was then viewed as non-punitive.

As support for their proposal to end-run binding precedent, Defendants selectively quote the fourth footnote of *Browning-Ferris*, the first modern Clause case.  At issue in *Browning-Ferris* was whether the Clause applied at all to damages awards in civil litigation between private parties. 492 U.S. at 263-64. To answer the question, the court had to determine "what was meant by the term 'fines.'" *Id.* at 264-65. It surveyed American legal history to conclude that 'fines' mean any "payment to a sovereign as punishment for some offense." *Id.* at 265.

According to Defendants, though, footnote four of *Browning-Ferris* stands for the proposition that the first element of any Excessive Fines Clause application is not whether the challenged penalty may be understood "at least in part, as punishment," *Austin*, 509 U.S. at 618, but whether it would have been understood as such "at the time the Eighth Amendment was

ratified[,]" ECF No. 23-1, p. 31 (internal quotations omitted), rendering conditions in 1791 the *sine qua non* of a claim. However, the footnote in question—reproduced in full—distinguishes questions of whether the Clause *applies at all* in new contexts from questions about whether the Clause *is violated* where it does:

> The same basic mode of inquiry should be applied in considering the scope of the Excessive Fines Clause as is proper in other Eighth Amendment contexts. We look to the origins of the Clause and the purposes which directed its framers. The applicability of the Eighth Amendment always has turned on its original meaning, as demonstrated by its historical derivation." *Ingraham [v. Wright]*, 430 U.S. [651,] 670-671, n.39 [(1977)]. **We emphasize, however, that this historical emphasis concerns the question of when the Eighth Amendment is to be applied; as the Court's jurisprudence under the Cruel and Unusual Punishments Clause indicates, its approach has not relied on history to the same extent when considering the scope of the Amendment.** *See Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion) ("The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society").

*Browning-Ferris*, 492 U.S. at 264 n.4 (emphasis added). Only in the first situation—extending the Clause's ambit beyond a punitive payment to the government—must a challenger show historical evidence.

Post-*Browning-Ferris* cases confirm the understanding that history is not a necessary part of the 'fine' analysis. *Austin* itself examined the challenged statute's language and the 1984 legislative debate over its passage, in addition to history. 509 U.S. at 619-20. And *Bajakajian* conducted no historical inquiry at all. To detect punitiveness, the court reviewed the language of the challenged statute and concluded that its direction that property be forfeited by a guilty party at the conclusion of a criminal proceeding gave it "little trouble concluding that the forfeiture of currency ordered by [the statute] constitutes punishment." *Bajakajian,* 524 U.S. at 328. Neither did *Alexander*, in which the court held that the Clause automatically applies to *in personam* criminal forfeiture penalties like the ones at issue here. 509 U.S. at 558. Plaintiffs' situation is the same. They advance their Excessive Fines Clause claim squarely inside of its bailiwick, *i.e.*, as

26

applied to Conn. Gen. Stat. § 18-85a's obligation that they pay "a sovereign" as an automatic statutory consequence "for some offense." *Browning-Ferris*, 492 U.S. at 265. They need not demonstrate any period-correct abhorrence of the prison debt scheme they ask to be stricken here.

The trouble for Defendants does not end with their backwards reading of a footnote. Even if historical conjecture could silently overrule *Austin*, Defendants approach the question at far too general a level. Defendants do not contend that any revolutionary-era government indebted its captives to the tune of their per person share of the penal system's annual budget for each year of confinement, as Connecticut now does. Instead, they point to a decision referencing a single Massachusetts Bay Colony measure authorizing specific charges for jail food, entry, and discharge. But asking whether founding-era governments engaged in *any* form of a practice—however mild—contravenes the text of the Eighth Amendment, which delimits the abusive outer limits to the otherwise-lawful practices of imprisonment, bail, and monetary penalties.[8]

Further, the case Defendants rely on, *Souza v. Bristol County Sheriff*, 918 N.E.2d 823 (Mass. 2010), did not address or decide any Excessive Fines Clause question at all. Instead, it affirmed judgment in favor of county jail prisoners on the basis that their jailer acted *ultra vires* when imposing certain fees upon them, the total cost of running the system not being one of them. *See id.* at 825 (enumerating a $5 daily "cost of care" fee, plus haircut and General Equivalency Diploma fees). In doing so, the Massachusetts high court briefly reviewed in a footnote the statutes that the sheriff unsuccessfully relied on. Those statutes included one dating from the 1690s authorizing charges for "diet" and for entry and discharge fees. *Id.* at 829 n.9. But the rest of the footnote documents other measures enacted by Massachusetts "to *prohibit* sheriffs from charging and collecting different fees," including an 1859 statute. *Id.* (emphasis added). So, while that

---

[8] "*Excessive* bail shall not be required, nor *excessive* fines imposed, nor *cruel and unusual* punishments inflicted." U.S. Const. amend. 8 (emphases added).

miniature sketch of Massachusetts history suggests the early existence of limited prison debt practices there, it also shows a history in which a colonizer's extraction of prison fees was deemed unacceptable after independence: hardly proof that Connecticut's neighbors viewed prison debt as something other than punishment.

Finally, Defendants' historical contentions whistle past the fact that broad operating-cost prison debt statutes like the ones challenged here have a very recent provenance. The first was enacted by Michigan in 1984, and even 20 years later, the wave of copycat enactments "seldom required [incarcerated people] to pay the full costs of their incarceration," as Connecticut's do. Joshua Michtom, *Making Prisoners Pay for Their Stay*, 13 B.U. Pub. Int. L.J. 187, 189 (2004); *see also* Leah A. Plunkett, *Captive Markets*, 65 Hastings L.J. 57, 67 (2013) ("Outside of limited contexts such as work release, however, up until the early 1970s, fees charged to offenders were rare," but "during the 1980s, these practices changed dramatically."). Defendants' historical contentions thus do nothing to meet their burden of demonstrating entitlement to dismissal.

### b. Defendants Cannot Avoid the Excessive Fines Clause by Casting Prison Debt as a Remedial Forfeiture.

Defendants' second *Austin* avoidance claim is that Connecticut's prison debt regime lies on the opposite pole of monetary penalties: remedial forfeitures, punishment-free measures that merely "compensate the [g]overnment for a loss or restore property to its rightful owner." *See* ECF No. 23-1, pp. 33-38. Even leaving aside *Austin*'s holding, Defendants' contention is baseless.

### i. *Alexander* and *Bajakajian* Established that Forfeitures Imposed via Criminal Proceedings for which a Person Is Individually Liable Are Always Punitive.

The immediate, fatal problem for Defendants' remedial forfeiture argument is *Alexander* and *Bajakajian*. Those cases established that—as a category, regardless of details—forfeitures for

which that person is singly liable and which are imposed upon the guilty at the culmination of criminal proceedings are punitive (and therefore, a 'fine'), period.

*Alexander* first articulated this rule. In that case, Ferris Alexander was convicted of various tax, obscenity, and RICO offenses and was ordered to forfeit "certain assets that were directly related to his racketeering activity." 509 U.S. at 546. He raised an Excessive Fines Clause objection, which provision the Supreme Court deemed obvious in its application. "The *in personam* criminal forfeiture at issue here is clearly a form of monetary punishment no different, for Eighth Amendment purposes, from a traditional 'fine.'" *Id.* at 558, *see also id.* at 559 n.4 (repeating that as regards personal liability for penalties imposed as a result of a criminal conviction, there is "no threshold question concerning the applicability" of the Clause).

*Bajakajian* elaborated, explaining that monetary penalties imposed directly upon a person in connection with a criminal proceeding have been "part of the punishment imposed for felonies and treason in the Middle Ages and at common law." 524 U.S. at 332. And so the court enunciated what *Alexander* treated as self-evident: deprivations "imposed at the culmination of a criminal proceeding" which "require[] conviction of an underlying felony" and "cannot be imposed upon an innocent owner" of property are 'fines' as the Clause knows them. *Id.* at 328. *Compare Viloski*, 814 F.3d at 109 (applying *Bajakajian* to turn aside a government argument that a forfeiture "expressly linked to specific offenses" and imposed by a criminal proceeding could be deemed remedial), *with*, *e.g.*, *Ford Motor Credit v. N.Y.C. Police Dep't*, 394 F.Supp.2d 600, 618 (S.D.N.Y. 2005) (no 'fine' in administrative fee on seized vehicles where fine "applied universally, regardless of whether any given lienholder had responsibility for the allegedly illicit activity").

Defendants present no argument that *Alexander* and *Bajakajian* should be overruled, but instead press an argument that the 'losses' for which their prison debt system supposedly

compensates the State government are the "Plaintiffs' actions that resulted in their incarceration"—that is, their conviction conduct. ECF No. 23-1, p. 40.

But their theory requires viewing the State's 'loss' as being the cost of *lawful* conduct. When incarcerated, a person's availing themself of the shelter, food, and heating in prison is a direct, intended consequence of the superior court sentence ordering them to prison. Plaintiffs' service of their incarceration sentences represented compliance with Connecticut's penal code, not a deviation from it. So, unlike every remedial forfeiture case, the 'loss' for which Connecticut claims to compensate itself is attributable to the plaintiffs' obedience to the law, and their citations to remedial forfeiture cases are *non sequiturs. See United States v. Ortiz*, 182 F.3d 902, 902 (2d Cir. 1999) (summary order) (disgorgement of drug proceeds); *Abrahams v. Conn. Dep't of Social Servs.*, No. 3:16-cv-552(CSH), 2018 WL 995106, at *10 (D. Conn. Feb. 21, 2018) (recovery of the amounts "fraudulently obtained from the state of Connecticut").

Their theory also unavoidably shifts the spotlight to Defendants' choices in operating their government. When the amount of an alleged remedial forfeiture depends upon the actions *of the government itself*, that is an irrebuttable indicator that the purported loss cannot be attributed to the debtor. Connecticut's prison debt laws place control over the amount of debt in the hands of the State, by pegging the daily debt imposition to "the average per capita cost, per diem, of all component facilities within the Department of Correction" for each state fiscal year in which the person was confined. Conn. Agencies Regs. § 18-85a-1(a). That daily debt figure, in turn, is reached by dividing (1) the State's expenditures on its prison system in each fiscal year, (2) by the daily average number of people the State decided to imprison in that period, and finally (3) dividing the resulting figure by 365. Am. Compl. ¶¶ 66-69. Plaintiffs and everyone like them have zero control over Connecticut's political decisions to spend more or less on prisons, including

staffing levels and costly overtime. *Id.* ¶¶ 71-78. Nor do they have any control over Connecticut police, prosecutors, and judges in their decisions to charge imprisonment-bearing offenses, seek incarceration or the length thereof, or sentence people to prison. *Id.* ¶¶ 79-109. And, of course, incarcerated people lack a say in the number of days they would be responsible to pay Connecticut, since they are not at liberty to declare their sentences served and walk through the prison gates. Simply put, Connecticut cannot blame the Plaintiffs for a debt-generating occurrence over which it exercises sole and plenary control.

A different way to identify the 'loss' on which Connecticut prison debt is based is for the Court to look at a person's sentencing, and inquire whether the 'loss' for which a purported remedial forfeiture is claimed was known on that day. At the time of sentencing, any criminal defendant's "actions that [will] result[] in their incarceration"—that is, their conviction conduct, ECF No. 23-1, p. 40—is a fixed star having either been allocuted to as part of a plea agreement, or, proven at trial. It has been the subject of a pre-sentence report and dueling motions from the prosecution and defense, each jockeying for a greater or lesser punishment based upon it. Thus, the person who stole money or damaged property can be assigned a sentence that may include restitution for the monetary costs of that conduct. *See* Conn. Gen. Stat. § 53a-28(c).[9] On the other side of sentencing day, by contrast, lie future unknowns disconnected to the conduct that placed that person before the Superior Court. On the day that any given person reports to prison, Defendant Lamont will not have yet set daily rates of incarceration for each fiscal year of their incarceration, and, of course, the prisoner will not know how many days for which they will owe once reductions, parole and good time become available and perhaps granted.

---

[9] That prison debt exists *in addition to* Connecticut's criminal restitution statute is yet another data point highlighting how untenable the Defendants' theory of 'reimbursement' is. The State's legislature has already provided for a restitutionary sentence "based on easily ascertainable damages for injury or loss of property, actual expenses incurred for treatment for injury to persons and lost wages resulting from injury." Conn. Gen. Stat. § 53a-28(c).

Further, *Austin* shut down the idea that free-form deprivations of money and property as a consequence for a criminal act can bear any relation to a societal cost for the act. "The forfeiture of property is a penalty that has absolutely no correlation to any damages sustained by society or to the cost of enforcing the law." *Austin*, 509 U.S. at 621 (internal quotation omitted).[10] Any loss-payback for a criminal act must be calculated as restitution, tied tightly "to the bedrock principle that restitution should reflect the consequences of the defendant's own conduct," calculated according to proof of a victim's losses, as part of the criminal proceeding. *Paroline v. United States*, 572 U.S. 434, 454-55 (2014).[11] *Cf. State v. Thornton*, 739 A.2d 271, 274 (Conn. App. Ct. 1999) (reversing restitution order requiring the defendant "to set aside moneys for the possibility that in the future, the victim may require" counseling, and explaining that there is no allowance for guessing about future losses or for "crystal ball-gazing in determining restitution"). That is not what Conn. Gen. Stat. § 18-85a pretends to do. It simply lays claim to the present and future assets of anyone Connecticut incarcerates, tying the amount of the forfeiture to the State's future spending, prosecution, and sentencing decisions in aggregate.

---

[10] Monetary penalties are not 'fines' when wrongdoing (or contraband status) can be attributed to the property (not its owner) based upon its movement in commerce, ownership, or status as contraband: whether it was imported into the United States "contrary to law" when its provenance and value was misrepresented on customs forms, *Platter of Gold*, 184 F.3d at 135-6, or it "provided services to Iran in violation of the Iranian Transactions Regulations," *United States v. Assa Co.*, 934 F.3d 185, 187 (2d Cir. 2019), was slated to be "export[ed] . . . out of the United States . . . in violation of" arms export controls, *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 84 (2d Cir. 2011) (internal quotation omitted), or was foreign patrimony. *United States v. Davis*, 648 F.3d 84, 87 (2d Cir. 2011) (Pissaro's *Le Marché aux Poissons*). Prison did not prospectively render Mr. Llorens's lawsuit proceeds—like Ms. Beatty's inheritance or Mr. Weissinger's settlement—tainted by their conviction conduct.

[11] *Paroline* is particularly instructive for being the only case to address a third-party causation-of-loss theory as unmoored as Defendants' here. Paroline was convicted of distributing a single-digit number of child pornography images depicting a person referred to pseudonymously as Amy. The relevant statute permitted the district court to order restitution for distress caused Amy by distribution of her childhood images; Amy sought restitution of $3.4 million, 572 U.S. at 442, reflecting not just Paroline's distribution of her images, but "the entire aggregately caused" distress generated by all past and future distributions of it, whether involving Paroline or not. *Id.* at 454. The Supreme Court explained that Amy's theory of loss was beyond the traditional boundaries of loss causation because "each possessor of [her] images would bear the consequences of the many thousands who possessed these images," *id.* at 453, making each "liable for the combined consequences of the acts of not 2, 5, or even 100 independently acting offenders, but instead, a number that may reach into the thousands." *Id.* at 454. The theory was "so severe it might raise questions under the Excessive Fines Clause." *Id.* at 455-56.

In short, far from being the "result of Plaintiffs' actions that resulted in their incarceration," the costs heaped on Plaintiffs would be more accurately described as "the results of how Defendants decided to operate their state government." Connecticut prison debt could thus not be deemed a remedial forfeiture even if *Austin*, *Alexander*, and *Bajakajian* had never been decided.

### c. Defendants' Citations to Cases that Do Not Apply *Austin*–or Do Not Involve the Excessive Fines Clause at All—are Irrelevant.

Defendants' final effort to escape the conclusion that prison debt is a 'fine' lies in volume. But a closer read of the 30-something cases they cite reveals that many of them are unreported, *pro se* decisions; some do not involve the Excessive Fines Clause at all; and the ones that do either apply the wrong standard or discuss 'fines' in dicta. Not one provides a basis to avoid the conclusion that Connecticut prison debt comprises a 'fine' for purposes of the Clause's first prong.

#### i. The Double Jeopardy and Ex Post Facto Clause Cases Cited by Defendants Are Irrelevant and Misleading.

The first group of such cases that Defendants either mistakenly or misleadingly cite rely on the Double Jeopardy and Ex Post Facto Clauses' test for 'punishment,' which is far stricter than the Excessive Fines one. The Double Jeopardy Clause prevents people "from being twice punished for the same offen[s]e," *Witte v. United States*, 515 U.S. 389, 396 (1995) (internal quotation omitted), so claims under it begin with an assessment of whether a challenged sanction comprises "*criminal* punishment." *Marcus v. Hess*, 317 U.S. 537, 549 (1943) (emphasis added). The Ex Post Facto Clause is similarly predicated, as it guards against measures that "retroactively . . . increase the punishment for criminal acts." *California Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (internal quotation omitted).

To trigger the Double Jeopardy Clause, a penalty must be shown via "only the clearest proof" to be 'punishment' in either intent or effect. *Hudson v. United States*, 522 U.S. 93, 100

(1997) (internal quotation omitted). The 'clearest proof' standard is the opposite of the Excessive Fines 'punishment' analysis: for Double Jeopardy, a mixed remedial and deterrent purpose or effect is insufficient to find 'punishment,' while for Excessive Fines, the same mixed purpose compels the conclusion. *Compare id.* at 105 ("[T]he mere presence" of deterrence "is insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals.") *with Austin*, 509 U.S. at 610 ("We need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause.").

As the Excessive Fines Clause is "a constitutional provision which we never have understood as parallel to, or even related to, the Double Jeopardy Clause," *United States v. Ursery*, 518 U.S. 267, 286-87 (1996), cases dealing with the latter therefore have nothing to do with the former. A challenged penalty can very well be 'punishment' for Excessive Fines purposes without comprising 'punishment' for Double Jeopardy ones, as illustrated by *Ursery* and *Austin*. Both cases challenged the same controlled substances statute, 21 U.S.C. § 881(a), and its authorization of property seizures. Ursery and his fellow respondent challenged it under the Double Jeopardy Clause, 518 U.S. at 271, 272, while Austin litigated under the Excessive Fines Clause. 509 U.S. at 604. Sure enough, the *Ursery* decision held that the statute was not 'punishment' for Double Jeopardy purposes, 518 U.S. at 292, while the *Austin* decision held that it was for purposes of the Excessive Fines Clause. 509 U.S. at 622.

Defendants also cite cases that wrongly apply the Double Jeopardy test to an Excessive Fines Claim, in contravention of *Austin* and *Hudson*. They cite a *pro se* Eighth Circuit table decision doing just that, for example, *Blaise v. McKinney*, 187 F.3d 640, 640 (8th Cir. 1999) (table), but leave unmentioned a precedential decision from the same court faithfully keeping the two definitions of punishment separate. *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014)

(holding that a $1.3m False Claims Act award was "not punishment barred by the Double Jeopardy Clause," but was indeed "punitive for the purposes of the Excessive Fines Clause"). Defendants similarly cite a case wrongly applying Double Jeopardy cases to an Excessive Fines claim over prison fees, *In re Metcalf*, 963 P.2d 911, 919 (Wash. Ct. App. 1998), without making plain that a later Ninth Circuit decision explicitly identified the error and held—based on *Austin*—that the very same fees were 'fines' for Clause purposes. *Wright v. Riveland*, 219 F.3d 905, 916 (9th Cir. 2000).

ii.     <u>Cases that Did Not Address or Decide Any Excessive Fines Clause Issue Cannot Help Defendants Avoid the Obvious.</u>

No more useful or persuasive are cases identified by Defendants that quote from decisions in which the Clause was not raised or decided; in which a court decided a Clause claim without applying *Austin*; or in which a court summarily decided such a claim without any analysis at all. *See*, *e.g.*, *United States v. Village of Island Park*, 2008 WL 4790724, at *6 (E.D.N.Y. Nov. 3, 2008) (discussing False Claims Act's damages provisions, but relying solely on cases in which no litigant raised—and no court applied—the Excessive Fines Clause); *United States v. Bornstein*, 423 U.S. 303 (1976) (statutory interpretation challenge); *Marcus v. Hess*, 317 U.S. 537, 548 (1943) (Double Jeopardy challenge); *Stevens v. Vermont Agency of Nat. Res.*, 162 F.3d 195, 207 (2d Cir. 1998) (statutory interpretation challenge)).[12]

Other cases are irrelevant because they do not involve Excessive Fines Clause claim *at all*. *See Stockwell v. United States*, 80 U.S. 531, 541, 550 (1871) (deciding only statutory interpretation arguments); *Merritt v. Shuttle, Inc.*, 13 F.Supp.2d 371, 383 (E.D.N.Y. 1998) (*pro se* plaintiff

---

[12] Worse for the Defendants' citation to irrelevant False Claims Act cases is their failure to acknowledge that all four circuits to have entertained Excessive Fines Clause challenges to that Act have applied *Austin* to conclude that the Act's penalties indeed comprise a 'fine.' *Yates v. Pinellas Hematology & Oncology*, 21 F.4th 1288, 1308 (11th Cir. 2021) ("FCA monetary awards are, at least, partially punitive," and thus "constitute fines for the purposes of the Excessive Fines Clause"); *Drakeford v. Tuomey*, 792 F.3d 364, 388 (4th Cir. 2015) (similar); *Aleff*, 772 F.3d at 512 (similar); *United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001) (similar).

35

pleaded an Excessive Fines Clause violation but failed to allege that he had been assessed any monetary penalty); *Alexander v. Comm'r of Admin. Servs*, 2003 WL 22853652, at *4 (Conn. Super. Ct. Nov. 12, 2003) (Equal Protection claim), *affirmed*, 862 A.2d 851, 855 (Conn. App. Ct. 2004) (same); *State v. Strickland*, 2002 WL 31761963, at *4 (Conn. Super. Ct. Nov. 19, 2002) (discussing punishment solely as regarded the defendant's claim that prison debt represented a bill of attainder).

Two other cases cited by Defendants provide no precedential value, although they contain mention of the Clause. In *United States v. Puello*, No. 92-cv-5040, 2016 WL 660879, at *3 (E.D.N.Y. Feb. 18, 2016), the court devoted a lone sentence to the Clause in denying reconsideration of a summary judgment decision that itself cited a single Depression-era case in which no constitutional issue was litigated.[13] And in *State v. Sebben*, No. HHD-CV15-5039364-S, 2018 WL 8582120, at *2 (Conn. Super. Ct. Apr. 19, 2018), the superior court uttered a single sentence striking a *pro se* Clause defense to prison debt collection without citing any case law.

     iii.   <u>Cases Cited by Defendants Concerning the Excessive Fines Clause and Prison Debt Address 'Fines' in Dicta, or Are Incorrect, Conclusory Summaries.</u>

Finally, Defendants cite a few cases involving challenges to modest prison fees that do purport to apply the Clause. But none reached the *Austin* analysis, and therefore none is persuasive authority. First, Defendants cobble together quotations from *Tillman v. Lebanon County Correctional Facility*, a Third Circuit case, as standing for the proposition that the prison debt laws challenged here are not 'fines.' ECF No. 23-1, pp. 34-35. But in that case, the Third Circuit expressly declined to rule on the Excessive Fines Clause's first prong—fine or not?—and instead

---

[13] Ruling on Motion for Summ. J. [ECF # 81], *United States v. Puello*, No. 92-cv-5040, at 10-11 (E.D.N.Y. Jan. 15, 2002) (*citing United States v. Wurts*, 303 U.S. 414, 416 (1938) (in which the respondent raised only a statute of limitations defense against collection)).

jumped directly to the second prong. The court made observations about what it viewed as the reimbursement motivation behind the jail fees at issue, said nothing about *Bajakajian*, noted that the challenged fees might be partially punitive, then simply announced: "We need not reach that issue." *Tillman*, 221 F.3d 410, 420 (3d Cir. 2000).

The same dicta problems abound in *LeDuc v. Tilley,* No. 3:05-cv-157(MRK), 2005 WL 1475334, at *6 (D. Conn. June 22, 2005), in which this Court expressly concluded that it "need not at this time decide" the *pro se* plaintiff's Clause claim because no proper defendant was named. *See also United States v. Leone* 813 F.App'x 665, 669 (2d Cir. 2020) (summary order finding Clause objections unripe because defendant could seek exemption and had not). Meanwhile, *Hooks v. Kentucky*, 2016 WL 4180003, at *3 (W.D.Ky. Aug. 5, 2016), an unreported *pro se* case, did not conduct the 'fine' analysis at all commanded by *Austin,* simply announcing its view of what "[c]ourts have generally held." Only two cases that *Hooks* cited for that broad proposition even applied the Excessive Fines Clause, and both did so in a single, conclusory sentence. The rest of the cases cited did not decide any Excessive Fines Clause issue whatsoever.[14]

*Benjamin v. Clark*, 2021 WL 391987, at *6 (M.D. Pa. Feb. 4, 2021) suffers from the same flaws. Benjamin litigated the Dauphin County Prison's practice of assessing certain fees; the court noted that a prior *pro se* case—relying on *Tillman*—had held the same fees at the same jail to comport with the Clause, thus in its view "foreclos[ing]" Benjamin's litigation. *Id.* The prior *pro se* case simply reiterated *Tillman*'s dicta to conclude that modest daily fees that in part reimburse the government were not 'fines.' *Heim v. Dauphin Cnty. Prison*, 2013 WL 1833777, at *5 (M.D.Pa. May 1, 2013).

---

[14] *See Sickles v. Campbell County*, 501 F.3d 726, 730 (6th Cir. 2007) (deciding only a procedural due process claim); *Slade*, 407 F.3d at 251 (applying *Bell v. Wolfish* 'disability' threshold to due process claim); *Jones v. Clark County*, 2016 WL 1050743, at *5 (E.D. Ky. Mar. 11, 2016) (deciding due process claims).

As none of the cases cited by Defendants displaces *Austin*, *Alexander*, and *Bajakajian*'s teachings nor provides a sufficient rationale to distinguish them, Defendants' motion must be denied.

### d. Connecticut Prison Debt Is *Per Se* Excessive Because It Depends on the Actions of Third Parties, and Is Levied in Enormous Amounts that Dwarf the Maximum Applicable Statutory Fines.

Once the Court concludes—as it must—that Connecticut prison debt is a 'fine,' it proceeds to the final element of Plaintiffs' claim by inquiring whether the amount of the fine is excessive. *E.g.*, *Viloski*, 814 F.3d at 108. Defendants direct very little argument to this point, simply contending that the challenged debt cannot be excessive regardless of the stratospheric amounts involved because it is calculated using a person's sentence length as a multiplicand.

When it comes to excessiveness, the Clause looks to the relationship between the criminal conduct generating the conviction and the penalty the government extracts for it.  In other words, "the touchstone is value of the fine in relation *to the offense*." *Austin*, 509 U.S. at 627 (Scalia, J., concurring) (emphasis added). The Supreme Court has said so in unmistakable terms. *See Bajakajian*, 524 U.S. at 336-37 (directing the lower courts to resolve Clause claims by "compar[ing] the amount of the forfeiture to the gravity of the defendant's offense"); *Alexander*, 509 U.S. at 545 (remanding for consideration of the criminal forfeiture order at issue "in light of the extensive criminal activities the petitioner apparently conducted").

Thus, all subsequent cases applying the Clause to people convicted of crime use the conviction conduct itself as the denominator in the Eighth Amendment analysis—*not* third-party party conduct such as a government's spending habits or the size of its incarcerated population. *See, e.g., Viloski*, 814 F.3d at 113 (gauging forfeiture of funds equaling the amount skimmed through "a multi-year conspiracy . . . of money laundering, mail fraud, wire fraud, and related

offenses"); *United States v. George*, 779 F.3d 113, 123 (2d Cir. 2015) (gauging forfeiture of home against conduct of "harbor[ing] an illegal alien in her home for more than five years in order to secure the alien's unauthorized labor"); *United States v. Castello*, 611 F.3d 116, 118-19, 122 (2d Cir. 2010) (weighing forfeiture of amount equal to the commission made on the transactions for which the defendant should have filed currency transaction reports); *United States v. Sabhnani*, 599 F.3d 215, 225, 262 (2d Cir. 2010) (comparing forfeiture of interest in home with the defendant's having committed "harboring, peonage, forced labor, and document servitude" upon two women held in it); *United States v. Varrone*, 554 F.3d 327, 332 (2d Cir. 2009) (remanding for application of *Bajakajian* factors to defendant's failure to file currency transaction reports); *United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008) (measuring forfeiture amount against defendants' having run a *hawala* without filing currency transaction reports).

The statutes and regulations that Defendants defend do nothing of the sort. Their sole relation to a person's offense conduct is once-removed at best, inasmuch as the statutes impose debt based on the State's spending and incarceration decisions for each year of imprisonment, and each debtor's sentencing judge is presumed to have considered the offense when picking the length of incarceration. Simply because a number is multiplied by the total days of incarceration does not relieve Defendants of justifying the other side of the equation: how many employees, prisoners, and dollars *they* choose to involve in their prison system each year.

Defendants' focus on the mechanics of the debt calculation also obscures the Clause's concern with the substantive relationship between a penalty and the conduct for which it was imposed, however the number is reached. In the simplest form, a hypothetical Connecticut statute straightforwardly imposing a $1 million penalty for each conviction count of the State's lowest-grade larceny offense might be said to appear calculated "in relation to the offense," since one

merely multiplies the counts by $1 million to reach the total penalty for the conduct. *Austin*, 509 U.S. at 627 (Scalia, J., concurring). But the Clause is also concerned with the comparison between the "*amount* of the forfeiture . . . to the *gravity* of the defendant's offense." *Bajakajian*, 524 U.S. at 336-37 (emphases added). And no court is likely to consider a $1 million dollar fine proportional to the theft of less than $500.  *See* Conn. Gen. Stat. § 53a-125b (larceny of $500 or less).

The amounts Plaintiffs are statutorily obligated to pay Connecticut represent multiples of the maximum fines that could have been levied for each of their conviction counts. When the State's prison debt laws began operation, Connecticut indebted prisoners at 1.6 times the maximum allowable felony fine for each year's imprisonment, and 16 times the maximum misdemeanor fine for the same period. Today, a single year of prison costs incarcerated people 4.5 times the maximum felony fine, and 45 times the highest permissible misdemeanor fine. Am. Compl. ¶¶ 96, 97. As such, Defendants' citation to the Third Circuit decision in *Tillman* compares apples to oranges. In that case—which reached only excessiveness—the challenged jail fees totaled just $10 a day, with Tillman contesting the approximately $4,000 in debt he owed by the end of his term. *Tillman*, 221 F.3d at 414. Connecticut's scheme, which currently heaps debt upon incarcerated people *24 times* as quickly, leaves no question about its excessiveness.

As such, it is evident from the allegations of the Amended Complaint that Plaintiffs have sufficiently pled a plausible claim for a violation of the Excessive Fines Clause against Defendants, such that the motion to dismiss should be denied.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss must be denied.

**PLAINTIFFS TERESA BEATTY, MICHAEL LLORENS, AND KARL WEISSINGER**


By:   _/s/ Erica O. Nolan_
      David A. Slossberg (# ct13116)
      Erica O. Nolan (# ct31097)
      HURWITZ SAGARIN SLOSSBERG & KNUFF LLC
      147 North Broad Street
      Milford, CT  06460
      (203) 877-8000
      DSlossberg@hssklaw.com
      ENolan@hssklaw.com


      and


By:   _/s/ Dan Barrett_
      Dan Barrett (# ct29816)
      Elana Bildner (# ct30379)
      ACLU Foundation of Connecticut
      765 Asylum Avenue
      Hartford, CT  06105
      (860) 471-8471
      e-filings@acluct.org