# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| TERESA BEATTY *et al.*,<br>    *Plaintiffs*,<br><br>    v.<br><br>WILLIAM TONG, *Attorney General,*<br>    *Defendant*. | No. 3:22-cv-380 (JAM) |

## ORDER GRANTING MOTION TO DISMISS

Connecticut is one of many States that have what is known as a prisoner "pay to stay" law. The law creates a claim that the State may enforce against a prisoner for some or all of the costs of imprisonment. *See* Conn. Gen. Stat. §§ 18-85a to -85c.[1]

Pay-to-stay laws have proved controversial. On the one hand, proponents argue that they appropriately shift the costs of imprisonment to criminals who have chosen to violate the law and who have chosen to make their costly incarceration necessary.[2] On the other hand, critics argue that such laws unfairly burden prisoners with crushing debt that disproportionately falls on minorities and that makes it even harder for prisoners to rejoin the community without committing a crime again.[3]

---

[1] *See* Kristen M. Haight, Note, *Paying for the Privilege of Punishment: Reinterpreting Excessive Fines Clause Doctrine to Allow State Prisoners to Seek Relief from Pay-to-Stay Fees*, 62 WM. & MARY L. REV. 287, 290–95 (2020); Lauren-Brooke Eisen, *Paying for Your Time: How Charging Inmates Fees Behind Bars May Violate the Excessive Fines Clause*, 15 LOY. J. PUB. INT'L L. 319, 321–23 (2014).

[2] *See* Doc. #31-2 at 36–38 (excerpts of statements by Connecticut State Senators in support of Connecticut's pay-to-stay law at the time of passage in 1995 that it is "fundamental fairness … to get people who are incarcerated in our corrections facilities to help pay some of the way for their own freight" and "[i]t also helps [prisoners] to make them more responsible citizens and learn[] that they have to pay for what – their keep and pay for the crimes that they commit").

[3] *See, e.g.*, Mila Reed-Guevara, Ryanne Bamieh & Jenny E. Carroll of the Arthur Liman Center for Public Interest Law, Testimony submitted for the Record in Support of H.B. 5390 (March 24, 2021), https://www.cga.ct.gov/2022/JUDdata/Tmy/2022HB-05390-R000325-Reed-Guevara,%20Mila,%20Professor-Yale%20Law%20School-TMY.PDF [https://perma.cc/EW8D-2GW3] (last accessed Mar. 2, 2023); Nicholas Scarlett, Robert Silver, Kylee Verrill & Sarah Russell, Testimony of the Civil Justice Clinic, Quinnipiac University School of Law In Support of Connecticut General Assembly H.B. 5390 (March 25, 2022), https://www.cga.ct.gov/2022/JUDdata/Tmy/2022HB-05390-R000325-Scarlett,%20Nicholas-Quinnipiac%20University%20School%20of%20Law-TMY.PDF [https://perma.cc/UD3M-YBQE] (last accessed

But this case is not about whether pay-to-stay laws are good policy. It is about whether Connecticut's pay-to-stay law is unconstitutional because it violates the Excessive Fines Clause of the Eighth Amendment as applied to the plaintiffs in this case.

And—most significantly for present purposes—there are threshold issues of standing. The three named plaintiffs have filed this lawsuit against the Attorney General of Connecticut. But do the plaintiffs allege enough facts to plausibly show that the Attorney General has sought to enforce the pay-to-stay law against them or that there is a meaningful threat he will do so?

The answer is no. Therefore, the plaintiffs have no standing to sue the Attorney General. So I will dismiss the complaint without prejudice to the filing of an amended complaint.

## BACKGROUND

I start by reviewing the particulars of Connecticut's pay-to-stay law and then reviewing how each of the three plaintiffs allege that this law has been unconstitutionally applied to them.

### *Connecticut's pay-to-stay law*

Connecticut's pay-to-stay law endows the State with "a claim" against current and former state prisoners for the costs of their incarceration. Conn. Gen. Stat. § 18-85a(b); Conn. Agencies Regs. § 18-85a-1(b). A prisoner's "assessed cost of incarceration" is based on "the average per capita cost, per diem, of all component facilities within the Department of Correction" for the duration of the prisoner's incarceration. Conn. Agencies Regs. § 18-85a-1(a). According to the complaint, Connecticut's current per diem cost is $249 per day—which means that the State may have an eye-popping claim of more than $90,000 per year against current prisoners for the costs of their imprisonment.[4]

---

Mar. 2, 2023).
[4] Doc. #11 at 1 (¶ 1).

But Connecticut's pay-to-stay law does not automatically require every prisoner to pay for all the costs of their imprisonment. It is not as if every prisoner receives a bill on the day that they "check out" of a prison and that the State deploys an army of debt collectors to chase down every prisoner for payment. Instead, the law prescribes particular procedures by which the State *may* seek to enforce its claim if it chooses to do so. An understanding of these procedures is vital to deciding if the three plaintiffs in this case have standing to maintain their claim against the Attorney General.

First, the law provides that the Attorney General "may" file a court action "to enforce such claim" for the costs of incarceration. *See* § 18-85a(b).[5] But the law does not require the Attorney General to file a lawsuit against every prisoner. And if the Attorney General chooses to file a lawsuit, then he ordinarily must do so while the prisoner is still incarcerated or within two years of the prisoner's release. *Ibid.*; *Williams v. Marinelli*, 987 F.3d 188, 199 (2d Cir. 2021).

According to the plaintiffs, the Attorney General filed just 65 court actions over the course of more than five years from January 2015 to August 2020.[6] This is only about a dozen lawsuits per year that have been filed by the Attorney General to enforce a claim under Connecticut's pay-to-stay law. But the plaintiffs also allege that "since 2017, about 25,000 people have cycled out of Connecticut's prisons."[7] Thus, according to the plaintiffs' own numbers, the probability that the Attorney General will file a court action against any particular prisoner is near vanishingly small.[8]

---

[5] The law states: "In addition to other remedies available at law, the Attorney General, on request of the Commissioner of Correction, may bring an action in the superior court for the judicial district of Hartford to enforce such claim, provided no such action shall be brought but within two years from the date the inmate is released from incarceration or, if the inmate dies while in the custody of the commissioner, within two years from the date of the inmate's death, except that such limitation period shall not apply if such property was fraudulently concealed from the state." § 18-85a(b).

[6] Docs. #31 at 17, #31-7 at 2 (list of cases).

[7] Doc. #11 at 18 (¶ 111).

[8] The Connecticut Office of Policy and Management maintains a website with reports of monthly prison numbers.

Apart from the general two-year limitation on the Attorney General's filing of a court action, the law describes two more circumstances when the State has up to 20 years after a prisoner's release to enforce its claim for the costs of imprisonment.[9] Most significantly for present purposes, neither of the law's provisions governing these two circumstances assigns a role for the Attorney General to enforce any such claim.

The first circumstance is if the prisoner has filed a civil lawsuit and stands to gain a settlement or award of damages. *See* Conn. Gen. Stat. § 18-85b(a).[10] For such cases, the law provides that "the claim of the state shall be a lien against the proceeds therefrom in the amount of the costs of incarceration or fifty per cent of the proceeds received by such person after payment of all expenses connected with the cause of action, whichever is less." *Ibid.* It further provides that "[t]he state's lien shall constitute an irrevocable direction to the attorney for such person to pay the Commissioner of Correction or the commissioner's designee in accordance with its terms." *Ibid.*[11]

---

For the time period that the plaintiffs report that there were 65 actions filed by the Attorney General, these reports reflect the following number of prisoners in Connecticut prisons and jails each year: 16,167 as of January 1, 2015; 15,500 as of January 1, 2016; 14,532 as of January 1, 2017; 13,649 as of January 1, 2018; 13,228 as of January 1, 2019; and 12,285 as of January 1, 2020; as well as 9,648 prisoners as of August 1, 2020. *See* State of Connecticut Office of Policy and Management, Research Unit – Monthly Indicators Report, https://portal.ct.gov/OPM/CJ-About/CJ-SAC/SAC-Sites/Monthly-Indicators/Monthly-Indicators [https://perma.cc/4LHC-QCDU] (last accessed Mar. 2, 2023).

[9] Beyond the two circumstances that I will describe below, the law also includes a third circumstance that allows the State within 20 years of a deceased prisoner's release from imprisonment to proceed against the prisoner's estate "to the extent that the amount which the surviving spouse, parent or dependent children of the decedent would otherwise take from such estate is not needed for their support." Conn. Gen. Stat. § 18-85c. But this aspect of the law is not challenged or at issue in this action.

[10] I need not address at this time the parties' dispute about whether a 2022 amendment to the law has narrowed the application of this provision only to prisoners convicted of murder and sexual assault crimes and thus cannot apply to two of the named plaintiffs in this action.

[11] In *Williams v. Marinelli*, 987 F.3d 188 (2d Cir. 2021), the Second Circuit ruled that the operation of this provision of the law was preempted by the remedial purposes of 42 U.S.C. § 1983 for a case where a prisoner had filed a § 1983 lawsuit against state prison officials. *Id.* at 199–201. The court of appeals' ruling does not appear to affect this case because—as described below—the two plaintiffs who have filed civil lawsuits that may be subject to the State's claim have not filed their lawsuits against prison officials. Additionally, the plaintiffs do not argue that the *Williams* decision means that § 1983 preempts Connecticut's pay-to-stay law more generally.

The second circumstance is if the prisoner has received an inheritance. *See* Conn. Gen. Stat. § 18-85b(b). For such cases, "the claim of the state shall be a lien against such inheritance in the amount of the costs of incarceration or fifty per cent of the assets of the estate payable to such person, whichever is less." *Ibid.* "The Court of Probate shall accept any such lien notice filed by the commissioner or the commissioner's designee with the court prior to the distribution of such inheritance, and to the extent of such inheritance not already distributed, the court shall order distribution in accordance therewith." *Ibid.*

Connecticut's pay-to-stay law authorizes the Commissioner of Correction to issue implementing regulations. *See* Conn. Gen. Stat. § 18-85a(a). The Commissioner's regulations further provide for how the costs of incarceration may be collected. The costs "shall be discharged in part by a 10% deduction from all deposits made to the inmate's individual account," and then "[a]ny balance in the amount owed by an inmate on the assessed cost of incarceration after such deductions shall be collected with the assistance of the Department of Administrative Services and in accordance with a memorandum of understanding between the Department of Correction and the Department of Administrative Services." Conn. Agencies Regs. § 18-85a-4(b).[12]

The Department of Administrative Services ("DAS") is an executive branch agency of the State of Connecticut that carries out multiple and miscellaneous functions with respect to the general administration of state government.[13] Among these many functions, Connecticut law

---

[12] To the extent that the regulations thus provide for 10% deductions from the accounts of prisoners while they are incarcerated, the plaintiffs do not appear to claim that this aspect of the law amounts to an excessive fine in violation of the Eighth Amendment. As described below, their claims instead focus on the collection of the balance of the costs of their incarceration from the proceeds of civil lawsuits and inheritances.

[13] *See* CT.gov, *Connecticut State Department of Administrative Services*, https://portal.ct.gov/das [https://perma.cc/5XYH-243L] (last accessed Mar. 2, 2023). According to the DAS's most recently posted annual report, "DAS houses a number of distinct programs that comprise the business functions of state government, including information technology, human resources, procurement, facilities and real estate, construction services, fleet, workers compensation and more." DAS Annual Report (2021–2022) at 1,

generally authorizes DAS to perform a wide range of "collection services," including to perform collection services for other state agencies pursuant to a memorandum of understanding. *See* Conn. Gen. Stat. § 4a-12(a)(5). For these collection services, the law allows the DAS to refer debts to "a consumer collection agency" or "with the approval of the Attorney General, to an attorney … who practices in the area of debt collection." § 4a-12(b). It is not apparent that the DAS requires the Attorney General to file a lawsuit in order to carry out its collection services responsibilities.

The record also includes a copy of the above-referenced memorandum of understanding between the Department of Correction ("DOC") and the DAS.[14] It provides for the DAS "to provide a range of collection services" to the DOC including "[f]iling claims against proceeds of 'private' causes of action[s] brought by DOC current and former inmates (plaintiffs) through a match of DOC inmate data with Judicial Information Systems data" and "[f]iling claims against interests in estates of DOC current and former inmates."[15] The DOC in turn must furnish to the DAS prisoner identification information as well as statements of the balances owed by current and former prisoners.[16] The memorandum of understanding does not refer to the Attorney General or assign any collection responsibilities to the Attorney General.

### *The plaintiffs*

The three plaintiffs in this action have all previously served state prison sentences in Connecticut. They all allege that they are, or are about to be, subject to Connecticut's pay-to-stay law and that the law as applied to them violates the Excessive Fines Clause of the Eighth

---

https://portal.ct.gov//media/DAS/Communications/Communications-List-Docs/Digest/Digest-2021-2022/Dept-Administrative-Services.pdf [https://perma.cc/CCE8-UH7H] (last accessed Mar. 2, 2023). The annual report goes on to identify all of the DAS's varied statutory responsibilities including for "billing and collection services." *Id.* at 2.
[14] Doc. #23-2 at 20–23.
[15] *Id.* at 20 (¶ 4).
[16] *Id.* at 21 (¶ 5).

Amendment. They do not seek money damages but seek declaratory and injunctive relief against the Attorney General.[17]

### *Teresa Beatty*

The first named plaintiff is Teresa Beatty.[18] Her challenge implicates the part of the pay-to-stay law that involves collecting from a prisoner's inheritance (*i.e.*, § 18-85b(b)).

Beatty was imprisoned on drug charges from 2000 to 2002.[19] Long after Beatty was released from imprisonment, her mother passed away in 2020, and the estate is currently in probate proceedings.[20] The principal asset of the mother's estate is the family home in Stamford where Beatty now lives and that is worth about $590,000.[21] But because Beatty is only one of four sibling beneficiaries to her mother's will, she alleges that the probate court will almost certainly order that the house be sold and that the proceeds be distributed to Beatty and her siblings.[22] As a 40% beneficiary of the will, Beatty expects to inherit about $230,000 before probate administrative expenses.[23]

Beatty alleges that the DAS filed a notice in November 2020 with the administrator of the mother's estate alleging that Beatty owes $83,762.26 for her time in custody.[24] The DAS notice requests that when distribution from settlement of the estate is made payment of the amount due should be mailed to the DAS.[25]

---

[17] Doc. #11 at 21–22 (Prayer for Relief).
[18] *Id.* at 3–4 (¶¶ 14, 17).
[19] *Id.* at 4 (¶ 15).
[20] *Ibid.* (¶¶ 22–23); *see* Doc. #23-2 at 32–43 (documents relating to the mother's estate); *see also In re Estate of Minnie Mills*, PD5320-00478 (Stamford Prob. Ct.), http://www.ctprobate.gov/Pages/Case-Lookup.aspx [https://perma.cc/L4W3-PESE] (last accessed Mar. 2, 2023).
[21] Doc. #11 at 4 (¶ 25).
[22] *Id.* at 5 (¶ 26).
[23] *Ibid.* (¶ 27).
[24] *Ibid.* (¶ 29); *see also* Doc. #31-5 at 2–3 (letters from the state's reimbursement analyst to Deborah Booker, Administrator of Mills' estate).
[25] Doc. #31-5 at 2.

*Karl Weissinger*

The second named plaintiff is Karl Weissinger.[26] His challenge implicates the part of the law involving collection of the costs of incarceration from lawsuit proceeds (*i.e.*, § 18-85b(a)).

Weissinger served almost two years in a Connecticut state prison from 2014 to 2016 for larceny.[27] After he finished serving his sentence, Weissinger was involved in a car accident, and he filed a personal injury lawsuit against the other driver.[28]

In February 2022, the DAS sent a notice to Weissinger's attorney advising that "the State has a claim and lien for repayment" for $115,585 for the costs of Weissinger's incarceration.[29] The letter further advised that "[w]hen the settlement is effected, please send us your itemized settlement sheet with all proposed disbursements, so that a final notice of the State's lien amount may be calculated and provided to you."[30] In addition, the letter advised that Weissinger could contact the DAS with questions and that within 60 days he could also "request an administrative hearing to challenge the validity of the lien filed by the Department of Administrative Services."[31] The complaint alleges that, in late February 2022, Weissinger and the driver reached a settlement but that Weissinger "must now pay half of that settlement amount to the State of Connecticut."[32]

---

[26] Doc. #11 at 7 (¶ 45).

[27] *Ibid.* (¶ 46).

[28] *Ibid.* (¶¶ 48–49); *see* Compl., *Weissinger v. Milkiewicz*, KNL-CV19-6040272-S (New London Super. Ct. Apr. 8, 2019).

[29] Doc. #31-6 at 2. According to the complaint, the letter seeks payment of $118,000 for Weissinger's time in prison. Doc. #11 at 7 (¶ 50). But the letter itself makes clear that it seeks $115,585 for the costs of imprisonment from November 2012 to May 2016, as well as an additional $2,803 incurred by Weissinger for medical expenses from August 2017 to January 2022. Doc. #31-6 at 2. There is a discrepancy between the dates of imprisonment alleged in the complaint (August 2014 to May 2016) and the dates of imprisonment referenced in the letter (November 2012 to May 2016). *Compare* Doc. #11 at 7 (¶ 46), *with* Doc. #31-6 at 2.

[30] Doc. #31-6 at 2.

[31] *Ibid.*

[32] Doc. #11 at 8 (¶ 51).

8

### *Michael Llorens*

The third named plaintiff is Michael Llorens.[33] Like Weissinger, his challenge implicates the part of the pay-to-stay law involving collection of the costs of incarceration from lawsuit proceeds (*i.e.*, § 18-85b(a)).

Llorens was released from prison in September 2022 after serving a three-year sentence for burglary.[34] In August 2021, he filed a still-pending federal civil rights action seeking $7 million in damages against local police officers who allegedly subjected him to a false arrest and used excessive force against him.[35]

According to Llorens, each day of his three-year imprisonment exposed him to a debt of $249 to the State of Connecticut, and he estimates that the State now has a claim against him for $272,655.[36] Although the complaint does not allege facts to suggest that there has been any effort to date to enforce a claim or collect from him, Llorens alleges that all or part of the amount he owes could be subject to recoupment by the State of Connecticut if he wins his lawsuit or gains a monetary settlement.[37]

### *The motion to dismiss*

The plaintiffs filed this complaint against both Governor Ned Lamont and Attorney General William Tong.[38] Both the Governor and the Attorney General moved to dismiss the complaint on numerous grounds including that the plaintiffs lacked standing, that their claims were not ripe, that their claims were moot, that their claims were barred by the Eleventh Amendment, and that on the merits the complaint failed to allege plausible grounds for relief

---

[33] *Id.* at 6 (¶ 35).
[34] *See ibid.* (¶¶ 36–37, 39).
[35] *See* Compl. at 6, *Llorens v. Slavin et al.*, No. 3:21-cv-1096 (D. Conn. Aug. 16, 2021), Doc. #1; *see also Llorens v. Slavin*, 2021 WL 5988632, at *1 (D. Conn. 2021) (describing basis for lawsuit).
[36] Doc. #11 at 6 (¶¶ 40–41).
[37] *Id.* at 7 (¶¶ 43–44).
[38] Docs. #1 (complaint), #11 (amended complaint).

under the Excessive Fines Clause.[39] In response to the motion to dismiss, the plaintiffs conceded

that their claims against the Governor were barred by the Eleventh Amendment, and I have

therefore summarily dismissed all their claims against Governor Lamont.[40]

Accordingly, the only remaining defendant is the Attorney General. The plaintiffs have

not named as defendants either the Commissioner of Correction or the DAS Commissioner.

Those officials' departments, as described above, are integrally involved with the administration

of Connecticut's pay-to-stay law.

DISCUSSION

Article III of the U.S. Constitution limits the jurisdiction of the federal courts to "Cases"

and "Controversies." U.S. Const. art. III, § 2, cl. 1. "To establish Article III standing, a plaintiff

must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the

conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable

decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014); *Picard v. Magliano*,

42 F.4th 89, 97 (2d Cir. 2022).[41] An injury-in-fact must be "concrete and particularized and

actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List*, 573 U.S. at 158.

As the Supreme Court has recently observed, "[f]ederal courts do not possess a roving

commission to publicly opine on every legal question," and therefore they "do not adjudicate

hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

"Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the

defendant and redressable by the court ensures that federal courts decide only the rights of

---

[39] Doc. #23-1.
[40] Docs. #31 at 15 n.5, #42.
[41] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text
quoted from court decisions. Nor do case citations include subsequent history not relevant for present purposes.

individuals, and that federal courts exercise their proper function in a limited and separated government." *Ibid.*

At the motion to dismiss stage, the complaint must allege enough facts to make it plausible to conclude that the plaintiff has standing. *See Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 65–66 (2d Cir. 2021). "[A]lthough the plausibility requirement is most commonly applied in the context of evaluating whether a complaint substantively states a claim for relief, there is little reason to suppose that it should not equally govern the evaluation of factual allegations that support federal subject matter jurisdiction." *Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155 (D. Conn. 2016).

Moreover, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). By the same token, it is not enough for a plaintiff to show that *someone* caused the plaintiff an injury; instead, a plaintiff must show that the injury is fairly traceable to *the named defendant*. In other words, "there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The fact that the named plaintiffs have framed this action as a class action does not relieve them from carrying their burden to plausibly allege that they themselves have standing. *See McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 299 (2d Cir. 2021).

I will start with the first plaintiff—Teresa Beatty. As noted above, the DAS has actively taken steps to enforce the State's claim by filing a lien notice against her for the costs of imprisonment. The statutory language makes clear that this notice imposes no less than a mandatory duty on the probate court: "[t]he Court of Probate *shall* accept any such lien notice

filed by the commissioner or the commissioner's designee with the court prior to the distribution

of such inheritance, and to the extent of such inheritance not already distributed, the court *shall*

order distribution in accordance therewith." § 18-85b(b) (emphasis added).

The Attorney General argues that the probate court proceedings are still pending and that

"it is speculative that the Probate Court will order the house to be sold."[42] But the complaint

alleges enough facts to make it plausible to conclude that the house will be sold because the

house is the principal asset of the estate and because Beatty's right to 40% of the estate cannot be

satisfied absent a sale of the house. Although it appears that the probate proceedings have been

delayed, the Attorney General does not set forth convincing reasons to believe that the house will

not eventually be sold.

The Attorney General cites a probate court filing to suggest that Beatty is "considering

'buying out [her] siblings.'"[43] But the Attorney General does not explain why the State's lien

would be unenforceable against Beatty even if the house is not sold. "Upon death of the owner of

real property, legal title to real property immediately passes to the decedent's heirs, subject to the

right of the executor to administer the estate." *LaFlamme v. Dallessio*, 261 Conn. 247, 251

(2002). Therefore, Beatty—as a 40% heir of her mother's estate—is already a co-owner of the

house by means of inheritance and against which a lien may be filed. Section 18-85b(b)

establishes "a lien against such inheritance," not a lien only against the eventual liquidation of

assets received by means of an inheritance.

"An allegation of future injury may suffice" to establish Article III standing "if the

threatened injury is certainly impending, or there is a substantial risk that the harm will occur.*"*

*Susan B. Anthony List*, 573 U.S. at 158. Beatty has alleged enough to plausibly show that she is

---

[42] Doc. #23-1 at 13.
[43] *Id.* at 13 n.6.

subject to a threatened injury that is certainly impending and also that there is a substantial risk that harm to her will occur by means of the loss of more than $80,000 from her inheritance.

Yet despite the fact that Beatty has adequately alleged an injury-in-fact, she nonetheless lacks standing because she has not alleged that her injury is fairly traceable to the Attorney General. She does not allege any facts to suggest that the Attorney General has taken or is threatening to take action to enforce a claim for prison costs against her. As noted above, the pay-to-stay law allows the Attorney General to file a court action only while a person is still a prisoner or within two years of release from imprisonment. But it has been twenty years since Beatty finished serving her sentence.[44]

To be sure, Connecticut's pay-to-stay law allows the filing of a lien against an inheritance that a former prisoner receives for up to 20 years after the prisoner's release from imprisonment. *See* § 18-85b(b). And Beatty has shown that the DAS—as designee of the Commissioner of Correction—has indeed filed a collection notice with the administrator of her mother's estate. But the DAS is a state agency that is wholly separate from the Office of the Attorney General. And Beatty has not alleged that the Attorney General has anything to do with the DAS's collection efforts or that the pay-to-stay law assigns any role for the Attorney General other than to file court actions to enforce prison-cost collection claims within two years of a prisoner's release.

It is no answer to say that the Attorney General has been sued not only in his individual capacity but also in his official capacity, which functions as a claim writ large against the State. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (describing how official-capacity lawsuits are "only another way of pleading an action against an entity of which an officer in an

---

[44] *See* Doc. #11 at 4 (¶ 15).

agent" and that "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"). Even if an official-capacity claim excuses a plaintiff from having to show that the named defendant was personally involved in the violation of the plaintiff's rights, the plaintiff must nonetheless show that the named defendant has the authority to carry out the relief that has been requested. *See Jones v. Heap*, 2022 WL 2078188, at *2 (D. Conn. 2022). So, for example, if a plaintiff has a complaint about the state tax department's collection of taxes, he cannot then sue the state parks commissioner who lacks any official authority to grant the requested tax relief.

Nor—apart from lack of standing—has Beatty shown that the Eleventh Amendment would not independently bar her particular claim against the Attorney General. Of course, the Eleventh Amendment bars a federal court lawsuit against a State, its agencies, and its state officers in their official capacity, subject to a long-established exception—as recognized by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908)—for lawsuits against a state officer that seek prospective injunctive relief against the officer who is engaged in a continuing violation of the plaintiff's federal constitutional rights. *See Campbell v. City of Waterbury*, 585 F. Supp. 3d 194, 201–03 (D. Conn. 2022).

But for purposes of a claim that is allowed under *Ex parte Young*, "the state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of federal law." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372–73 (2d Cir. 2005) (quoting *Ex parte Young*, 209 U.S. at 154). And so "the *Ex parte Young* exception does not apply to claims against state officials who lack authority to implement the requested prospective injunctive relief." *Campbell*, 585 F. Supp. 3d at 203 (citing cases); *see*

*also Szymonik v. Connecticut*, 2019 WL 203117, at *6 (D. Conn. 2019) (the Eleventh

Amendment barred suit against the Connecticut Attorney General because the plaintiffs failed to

establish that he "took any action to seek or enforce the court orders that caused their injuries").

Beatty's claim is based on the DAS's effort to enforce a claim long beyond the two-year window

for the Attorney General to file a court collection action against her. She does not allege facts to

show that the Attorney General has caused her injury or has authority to grant her requested

relief from collection.

In a further effort to show that the Attorney General has the required enforcement

authority, the plaintiffs argue that "[i]n the course of defending individual state employees who

have been indemnified, [Attorney General] Tong's office routinely collects money from lawsuit

proceeds for carceral debt."[45] But that is not this case. None of the three named plaintiffs has

filed a lawsuit for money damages against a state employee who is represented by the Attorney

General's office. So none of the plaintiffs can claim that they have been injured by reason of the

Attorney General's invocation of the pay-to-stay law to offset money damage awards from

lawsuits against state employees.

Moreover, it is well settled for purposes of a claim under *Ex parte Young* that "[a]n

attorney general cannot be sued simply because of his duty to support the constitutionality of a

challenged state statute." *Doe v. Holcomb*, 883 F.3d 971, 976 (7th Cir. 2018) (citing *Mendez v.*

*Heller*, 530 F.2d 457, 460 (2d Cir. 1976)). Nor can the Attorney General be sued because of his

authority "to defend actions in which the state is interested," because "the Attorney General does

---

[45] Doc. #31 at 18 (citing *Williams*, 987 F.3d at 194–95, in which an assistant attorney general advised a plaintiff prisoner's attorney that the State would pay a jury award against a state correctional officer but that a large part of the judgment would be paid by the State to the DAS pursuant to Conn. Gen. Stat. § 18-85b(a)). Likewise, the complaint similarly alleges that the Attorney General, "as the defense lawyer for the Department of Correction and its employees[,] has been a frequent user of prison debt as a means of offsetting his clients' liabilities for their own unlawful conduct." Doc. #11 at 3 (¶ 13).

so, not as an adverse party, but as a representative of the State's interest in asserting the validity of its statutes." *Mendez*, 530 F.2d at 460 (internal quotations and citation omitted). Therefore, the Attorney General is not properly subject to suit under *Ex parte Young* merely because of his general duty to represent state agencies or employees in lawsuits, including lawsuits like this one that call into question the constitutional validity of a state law. In short, Beatty has no standing for her claim against the Attorney General, and her claim against the Attorney General is barred by the Eleventh Amendment as well.

Turning to the second plaintiff Karl Weissinger, the same reasons foreclose his claim against the Attorney General. It has been seven years since Weissinger was released from imprisonment in 2016.[46] The two-year period for the Attorney General to file a court action against Weissinger has long since elapsed. Although the DAS has taken steps to enforce a claim against the proceeds from Weissinger's car accident lawsuit, Weissinger does not allege any actions by the Attorney General or responsibilities assigned to the Attorney General to assist the DAS's collection efforts. In short, Weissinger has no standing for his claim against the Attorney General, and his claim against the Attorney General is also barred by the Eleventh Amendment.

As to the third plaintiff Michael Llorens, he also lacks standing to sue the Attorney General but for different reasons. He was released from prison in 2022—still within the two-year window under § 18-85a(b) for the Attorney General to file a claim against him.[47] But he does not allege that the Attorney General has filed or threatened to file a lawsuit against him. Nor does he allege—as § 18-85a(b) of the pay-to-stay law requires—that the Commissioner of Correction has requested that the Attorney General file a court action against him.

---

[46] *See id.* at 7 (¶ 46).
[47] *See id.* at 6 (¶¶ 36–37, 39).

16

For that matter, Llorens—unlike Beatty and Weissinger—has not been subject to any demand at all for payment. He has done nothing to show that he—among tens of thousands of current and former prisoners—will be the target of one of the approximately 12 lawsuits that the Attorney General files each year to enforce a claim under Connecticut's pay-to-stay law. And that means he lacks standing because "the Supreme Court has made clear that 'allegations of possible future injury' or even an 'objectively reasonable likelihood' of future injury are insufficient to confer standing." *McMorris*, 995 F.3d at 300 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013)).

Llorens argues, however, that he does not have to wait to see if the Attorney General will seek to enforce a claim against him.[48] He chiefly relies on the Second Circuit's decision in *Tweed-New Haven Airport Authority v. Tong*, 930 F.3d 65 (2d Cir. 2019). The question in that case was whether an airport had standing to challenge a state statute that limited the length of the airport's runway. *See id.* at 68–69. The Attorney General in that case argued that the airport lacked standing because it had not extended its runway beyond the statutory length and because "Connecticut has made no overt threat to enforce the Statute." *Id.* at 70.

Rejecting this argument, the Second Circuit reasoned that "[w]here a statute specifically proscribes conduct, the law of standing does not place the burden on the plaintiff to show an intent by the government to enforce the law against it. Rather, it [has] presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Id.* at 71. The Second Circuit concluded that "an actual ... enforcement action is not a prerequisite to challenging the law; a pre-enforcement challenge is sufficient." *Ibid.*

---

[48] *See* Doc. #31 at 6–8, 10.

The *Tweed* case is plainly distinguishable. In contrast to *Tweed*, this case has nothing to do with a law that "proscribes conduct" or that puts a plaintiff to a Hobson's choice of either having to violate a law as the only way to establish standing or to obey the law and give up the right to pursue a court challenge. Put differently, Llorens has not been put to a "choice between abandoning his rights or risking prosecution." *Id.* at 70; *Picard*, 42 F.4th at 97–98 (making the same point about pre-enforcement challenges to criminal statutes).

Indeed, Connecticut's pay-to-stay law creates no more than an inchoate "claim" against Llorens. *See* § 18-85a(b) ("The state shall have *a claim* against each inmate for the costs of such inmate's incarceration under this section[.]" (emphasis added)). Any such claim has already accrued, and Llorens does not propose to engage in any future course of proscribed conduct that will give rise to a further claim or otherwise violate the law. Absent a lawsuit by the Attorney General or some other demand for payment, Llorens does not violate the law or suffer any other harm if he decides for now not to fork over money to satisfy a claim that he surmises the Attorney General might one day seek to enforce.

As Judge Hall has suggested, "[t]he proper time to raise a challenge to the Connecticut costs of incarceration statute would be when the State of Connecticut is enforcing it against a settlement or award of damages." *Paschal v. Santili*, 2017 WL 2908867, at *2 (D. Conn. 2017). "Unless and until [the plaintiff] receives a settlement or monetary damages from the pending action, and the State of Connecticut enforces the costs of incarceration statute against him, [the plaintiff] has neither an 'actual' or an 'imminent' harm to redress, and therefore does not have standing to bring this claim." *Ibid.*

Despite the fact that there has been no action to enforce a claim against him, Llorens further argues that he has standing "because he is unsure how to value his claim to account for

the looming threat of the lien" that may one day be asserted against his recovery from his

lawsuit.[49] But the first problem with this argument is that Llorens fails to show that the Attorney

General has anything to do with whether a lien will be filed by the DAS. His injury—if any—is

not fairly traceable to the Attorney General.

In any event, the fact that Llorens is "unsure how to value his claim" is at best a

speculative injury.[50] As Judge Rakoff has explained, "while a plaintiff's uncertainty about

whether he will suffer an immediate harm may present a cognizable injury in some

circumstances, subjective fears about future contingencies do not confer standing unless they

have an objectively reasonable basis sufficient to render them more than speculations about non-

imminent events." *Hakim v. Chertoff*, 447 F. Supp. 2d 325, 328 (S.D.N.Y. 2006) (internal

citation omitted); *see also Munns v. Kerry*, 782 F.3d 402, 411 (9th Cir. 2015) (plaintiff had no

standing to challenge the government's hostage response policy on the ground of "his

uncertainty about how the government will respond if he were to be taken hostage" and that this

"deters him from seeking employment as a contractor," because this "feeling of deterrence is

based on a fear of speculative future injury"); *Lanza v. Client Servs., Inc.*, 2022 WL 17787465, at

*5 (E.D.N.Y. 2022) (plaintiff lacked standing to complain about debt collection letter that merely

"caused confusion and uncertainty about her rights" because that "reflect[ed] only hypothetical,

speculative concerns"); *Media Rsch. Ctr. v. Sebelius*, 2014 WL 12917195, at *3 (E.D. Va. 2014)

(plaintiff's "subjective uncertainty over whether [its injury] falls within an exemption" to a

mandatory law "is not Article III injury-in-fact").

On top of all this, Llorens' claim is not ripe. "Constitutional ripeness is a doctrine that,

like standing, is a limitation on the power of the judiciary in that it prevents courts from

---

[49] *Id.* at 10.
[50] *See ibid.*

declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 149 (2d Cir. 2021).

Llorens alleges that he has been subject to an excessive fine. But as the Second Circuit has explained, "constitutional challenges by defendants to a particular punishment are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." *United States v. Quinones*, 313 F.3d 49, 58 (2d Cir. 2002). There has been no imposition or immediately impending imposition of a fine against Llorens here.

The Second Circuit in *Quinones* further advises that "in addressing any and all ripeness challenges, courts are required to make a fact-specific determination as to whether a particular challenge is ripe by deciding whether (1) the issues are fit for judicial consideration, and (2) withholding of consideration will cause substantial hardship to the parties." *Ibid.* For Llorens, the issues are not yet fit for judicial consideration. It is unclear that he will recover anything at all from his lawsuit against the police, much less that he will recover more than the pay-to-stay statute's exemption for up to $50,000 of a prisoner's property. *See* § 18-85a(b). He will not suffer substantial hardship if he has to wait until such time—if ever—that there is an effort to collect from him under Connecticut's pay-to-stay law.

Plenty of precedent rejects unripe Excessive Fines Clause challenges by plaintiffs who have yet to be subject to a demand that they pay any purported "fine" at all. *See, e.g.*, *Stevens v. City of Columbus, Ohio*, 2022 WL 2966396, at *11–12 (6th Cir. 2022) (the "Excessive Fines challenge is not ripe for the simple reason that the City has yet to impose or seek any fine against them"); *Duffner v. City of St. Peters, Missouri*, 930 F.3d 973, 977 (8th Cir. 2019) (plaintiff "cannot establish that her Eighth Amendment [Excessive Fines] claim is fit for judicial decision"

because "it is unknown whether the City will impose sanctions … or, if sanctions are imposed, what they might be"); *Lepper v. Vill. of Babylon*, 2022 WL 939719, at *23 (E.D.N.Y. 2022) (Excessive Fine Clause challenge not ripe as to "fines that have not yet been assessed or paid"). In short, Llorens has no standing for his claim against the Attorney General, and his claim is unripe as well.

Alas, it is a fact of life that we routinely engage in conduct that can be said to generate a "claim" by someone else against us. Does that mean we may sue that someone else even if the someone else does not bother to assert or enforce the claim against us?

Suppose, for example, that a person goes for emergency treatment at a hospital but the hospital does not send a bill. No doubt the hospital has some type of "claim" against the patient for services rendered. Under the plaintiffs' sweeping theory of standing and ripeness, the patient need not wait to see if the hospital will ever try to bill him. Instead, he can sue the hospital now for fear that the hospital might one day send a bill for more than he should pay.

Or suppose that a homeowner cuts across her neighbor's lawn without consent. No doubt the neighbor has some type of "claim" for trespass. Under the plaintiffs' sweeping theory of standing and ripeness, the homeowner need not wait to see if the neighbor will ever make a demand for damages or file a trespass action. Instead, the homeowner can sue the neighbor now for fear that the neighbor might one day assert a claim for excessive trespass damages.

Or suppose that a driver zooms well above the speed limit through a police speed trap, but the police do not pull him over. No doubt the police have some type of "claim" that they could later assert against the driver for speeding. Under the plaintiffs' sweeping theory of standing and ripeness, the driver need not wait to see if the police will ever serve him with a

ticket. Instead, the driver can sue the police now for fear that that the police might one day slap him with a speeding ticket for too much money.

All these examples show the basic problem with the plaintiffs' theory that somehow every prisoner or former prisoner in Connecticut has standing and a ripe claim now to file a lawsuit to challenge Connecticut's pay-to-stay law even if there has been no effort at all to enforce the law against them. Federal courts require more in order to allow a lawsuit to proceed.

To summarize, all three plaintiffs lack standing to pursue their claims against the Attorney General. In addition, the Eleventh Amendment forecloses the claims of Beatty and Weissinger, and Llorens' claim is not ripe for resolution. Because there are multiple reasons why the Court lacks jurisdiction over any of the plaintiffs' claims, there is no need at this time for me to address the Attorney General's other arguments for dismissal.

### Amended complaint

In light of the plaintiffs' request for leave to file an amended complaint, this order granting the motion to dismiss is without prejudice to the filing of an amended complaint that may name additional plaintiffs and defendants as appropriate. I note that Connecticut's pay-to-stay law was amended in May 2022 by Public Act No. 22-118, and these amendments were understood at the time—apparently even by co-counsel for the plaintiffs—to have greatly narrowed the law's application so that the State could only enforce a claim against civil lawsuit proceeds of prisoners who have been convicted of certain murder and sexual assault crimes.[51] The current Westlaw version of the law similarly reflects this narrowing amendment. *See* Conn. Gen. Stat. Ann. § 18-85b(a) (Westlaw through Pub. L. No. 22-118).

---

[51] *See* Kelan Lyons, *CT's right to collect money from former prisoners is curtailed, but not ended*, CT MIRROR (May 5, 2022, 12:46 PM), https://ctmirror.org/2022/05/05/cts-right-to-collect-money-from-former-prisoners-is-curtailed-but-not-ended [https://perma.cc/329D-3GV7] (last accessed Mar. 2, 2023).

If the law was thus amended, it would appear that the challenges of Weissinger and Llorens to § 18-85b(a) may be moot, because both these plaintiffs were convicted of crimes that are no longer within the scope of the statute. But the plaintiffs now surprisingly dispute whether the 2022 amendments were actually effective to restrict this part of the law to only prisoners convicted for murder or sexual assault, arguing that another provision of the law's amendment purportedly "overwrites" and "undoes" the narrowing amendment.[52] The Attorney General disputes this argument, insisting that the law was amended as the General Assembly and all others concerned believed at the time.[53] There is no need now for me to resolve the dispute about the scope of the 2022 amendments.

Nevertheless, in the event that the plaintiffs choose to file an amended complaint, I trust that they will carefully consider whether it serves their interests—and the interests of the class as a whole—to seek to negate an apparent legislative victory not questioned by the Attorney General and that would vastly narrow the application of Connecticut's pay-to-stay law in prisoners' favor. I trust as well that if the law has been narrowed as the Attorney General claims, then the Attorney General—in his capacity as a legal counselor to state agencies and officials such as the Commissioner of Correction and the DAS—will make clear that previously filed liens and other claim enforcement efforts should be withdrawn against those prisoners who are no longer within the scope of the statute. My hope is that counsel will consult to ensure that the future course of this litigation focuses on issues that are genuinely in dispute and that require a court to decide.

---

[52] *See* Doc. #31 at 4.
[53] *See* Doc. #32 at 1–2.

CONCLUSION

For the reasons stated above, the Court GRANTS without prejudice the motion to dismiss (Doc. #23). In view of the plaintiffs' request for leave to file a second amended complaint, the plaintiffs may do so by **April 6, 2023**. In the event that the plaintiffs do not file a timely amended complaint, the Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 6th day of March 2023.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge