## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| **TERESA BEATTY, NATASHA TOSADO, and DOUGLAS JOHNSON,** individually and on behalf of all others similarly situated**,** | Civil Action No. 22-cv-380 |
| *Plaintiffs*, | |
| v. | |
| **MICHELLE GILMAN,** Commissioner of the Connecticut Department of Administrative Services**, AND ANGEL QUIROS,** Commissioner of the Connecticut Department of Corrections**,** in their official capacities**.** | April 20, 2023 |
| *Defendants.* | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Teresa Beatty, Natasha Tosado, and Douglas Johnson bring this action on behalf of themselves, and a putative class of all similarly situated individuals, for relief declaring the oppressive prison debt imposed upon them by the State of Connecticut to be invalid and in violation of the Excessive Fines Clause of the United States Constitution, and permanently enjoining the Commissioners of the Connecticut Department of Administrative Services and Connecticut Department of Correction from ever using or enforcing the challenged laws.

**A.      The nature of this action.**

1.      Since 1997, Connecticut has obligated people who have been incarcerated, and those who are currently incarcerated, to pay exorbitant amounts for each day they spend in prison. Currently, Connecticut charges $249 per day, or $90,885 per year, for incarceration. The resultant prison debt—imposed on people who are almost uniformly destitute, and two-thirds of whom are people of color—is crippling. Even people who are held in custody while awaiting

trial because they cannot afford bail face staggering bills upon sentencing. And, many have no idea of their crushing debt until the State suddenly seeks to claim it.

2.      As Connecticut spends more and more money incarcerating fewer and fewer people, each person's carceral debt spirals upward. Connecticut has gone from charging people $31,755 a year for their own incarceration in 1997, to charging $90,885 today: a roughly 280% increase. By contrast, according to the Consumer Price Index, inflation has only increased 87% during this same time period. A person serving just one year's imprisonment today owes the State for more than what an in-state student would for two and a half years' attendance at the University of Connecticut, including housing, food, and books.

3.      Connecticut's prison debt rates are the highest in the country by far. Meanwhile, some states have abolished prison debt entirely, and others collect rarely, if ever. Even those that do collect, do so for negligible amounts. New York, for example, charges $1 per week, and only if a person is working and paying will not cause a hardship.

4.      While legislative changes in May 2022 narrowed Connecticut's prison debt scheme, they by no means abolished it. The Plaintiffs, unfortunately, are among the thousands of people unaffected by the recent legislative amendment. The Plaintiffs are still on the hook for paying thousands upon thousands of dollars, years—or even decades—after they finish serving their sentences.

5.      Worse yet, they are being forced to pay this money out of property they have inherited from recently deceased loved ones, or savings they have worked hard to leave to their own children.

6.      By robbing people of their ability to inherit or pass on money, Connecticut's prison debt laws punitively and arbitrarily impose an additional sentence on people who have

already served their time. Piling debts of this magnitude on people sentenced to imprisonment inhibits intergenerational wealth transfers and violates the Excessive Fines Clause of the United States Constitution. Accordingly, Ms. Beatty, Ms. Tosado, and Mr. Johnson seek relief on behalf of themselves, and the putative class to have this unlawful statutory scheme stricken.

**B.      Jurisdiction and venue.**

7.      This Court has subject matter jurisdiction over this dispute by virtue of 28 U.S.C. § 1331 because all of the claims arise under the United States Constitution.

8.      Venue properly lies in this district in accordance with 28 U.S.C. § 1391(b)(2), as all events giving rise to the claims occurred within the District of Connecticut.

**C.      Defendants Gilman and Quiros.**

9.      Defendant Michelle Gilman is the Commissioner of the Connecticut Department of Administrative Services ("DAS").

10.     Defendant Gilman is responsible for collecting debts for "other state agencies and departments as shall be agreed to," including the Connecticut Department of Correction ("DOC"). Conn. Gen. Stat. § 4a-12.

11.     As commissioner, Defendant Gilman has authority to refer any debt brought to the attention of DAS to a consumer collection agency. *Id*.

12.     By agreement with the DOC, DAS collects prison debt owed by incarcerated and formerly incarcerated people.

13.     By statute, the Connecticut Probate Court notifies DAS whenever an estate beneficiary has served, or is serving, time in a Connecticut prison.

14.     The probate court also notifies DAS whenever a decedent who left an estate was serving, or had served, time in a Connecticut prison.

3

15.     DAS is notified by the Attorney General's Office, or by a civil plaintiff's legal counsel, whenever an incarcerated or formerly incarcerated person has a lawsuit or legal claim for monetary damages.

16.     For each person owing prison debt to be collected by Defendant Gilman's agency, the DOC supplies DAS with records showing what the DOC contends that the person owes.

17.     Defendant Quiros is the commissioner of the DOC.

18.     As commissioner, Defendant Quiros is tasked with setting the cost of prison stays, and collecting prison debt from those who are, or were, incarcerated. *Id.* § 18-85a.

19.     Defendant Quiros also has authority to request that the Connecticut Attorney General prosecute debt collection actions against people who owe prison debt. *Id.*

20.     Defendant Quiros exercises that authority, directing the Attorney General to do so, or to contest Probate Court proceedings in which prison debt is disallowed.

**D.      Plaintiff Teresa Beatty.**

21.     Ms. Beatty is a fifty-nine-year-old resident of Stamford, Connecticut.

22.     Ms. Beatty was incarcerated by Connecticut between 2000 and 2002 for charges stemming from drug possession.

23.     When it sentenced Ms. Beatty to incarceration, the Connecticut Superior Court declined to impose payment of a fine as part of her sentence, although the state's criminal code would have permitted a fine up to $10,000.  *See id.* § 53a-41(3).

24.     Ms. Beatty is a lifelong resident of Stamford. Like nearly 40% of the people currently held by the DOC, Ms. Beatty is Black.

25.     Ms. Beatty is a certified nursing assistant and helps care for her older brother James, who is disabled.

26.     Ms. Beatty is one of the five children of Minnie and James Mills, Senior.

27.     Mr. and Mrs. Mills worked hard and saved carefully all their lives. They were able to purchase a house in Stamford at 34 Raymond Street.

28.     Ms. Beatty, along with her brother James, lived at the house at 34 Raymond Street for decades.

29.     Ms. Beatty cared for her mother in the years leading up to her death. When Mrs. Mills passed away in 2020, Ms. Beatty knew that her mother had left her a portion of the house.

30.     Following her death, Mrs. Mills's estate was opened for administration in the Connecticut Probate Court located in Stamford.

31.     In her will, Mrs. Mills made a number of specific bequests, and left the balance of her estate to four of her children in varying percentages. Ms. Beatty is to receive 40%.

32.     The house at 34 Raymond Street was the only item remaining in Mrs. Mills's estate.

33.     Because there are four beneficiaries to the house, the probate court authorized the sale of the house at 34 Raymond Street, with the proceeds distributed to Mrs. Mills's children as specified in her will.

34.     In early April 2023, the house was sold for $625,000, and the proceeds will be distributed proportionally to Ms. Mills's heirs after all of the estate's debts and assets are assessed by its fiduciaries.

35.     Ms. Beatty plans to use her share of the house's sale proceeds to cover the costs of substitute housing.

36.     Though Ms. Beatty was briefly incarcerated nearly two decades ago, like many people, she had no idea that she apparently owed thousands of dollars for her stay in prison.

Nevertheless, shortly after her mother's passing, Defendant Gilman's DAS filed a notice in the probate court alleging that Ms. Beatty owes Connecticut $83,762.26 for her time in custody.

37.     The Defendants' purported claim to Ms. Beatty's inheritance includes $55,000 for the 452 days spanning state fiscal years 2000 and 2001, during which she sat in pretrial detention because she could not afford bail. The Defendants continue to press their claim against Ms. Beatty's inheritance, even after the recent legislative amendments.

38.     Quiros and Gilman's demand also includes $33,517 for her post-sentence incarceration, spanning fiscal years 2001 and 2002.

39.     The Defendants' calculations of the cost for each fiscal year in which Ms. Beatty was incarcerated, however, do not match the figures that state officials designated as the assessed costs for those years. For example, the Defendants have calculated Ms. Beatty's debt for the fiscal years 2000 and 2001 at a rate of $123 and $122 per day, rather than at the actual assessed rate for those years, $99 and $96.

40.     Hence, absent relief from this Court, Ms. Beatty will lose $83,762.26 in debt levied in violation of the constitution and calculated in an arbitrary way. While $83,762.26 will not make or break the state of Connecticut's multi-billion-dollar budget,[1] the loss will be devastating to Ms. Beatty. Now out of her childhood home, she wishes to use her share of its sale proceeds to support herself.

**E.     Plaintiff Natasha Tosado.**

41.     Ms. Tosado is a 40-year-old resident of Hamden, Connecticut.

---

[1] Stephen Busemeyer, *Lamont Has Proposed Connecticut's Next Two-Year Budget: What's In It?*, CT Mirror (Feb. 13, 2023), https://ctmirror.org/2023/02/13/ct-budget-income-tax-cut-ned-lamont-uconn-funding (reporting that the governor has proposed a $50.5 billion budget with $440 million in income tax cuts).

42.     Ms. Tosado was incarcerated by the State of Connecticut between July 2016 and April 2018.

43.     On May 9, 2017, while Ms. Tosado was incarcerated, Bridgeport police employee James Boulay shot and killed her son, Jayson. Jayson was 15 years old.

44.     When prison officials informed Ms. Tosado that her son had been killed, they placed her in solitary confinement.

45.     In 2020, the administrator of Jayson's estate, Christopher Goulden, filed a lawsuit in this Court against Boulay, then-police chief Armando Perez, and Bridgeport itself. Among other things, the lawsuit alleged that Boulay used excessive force and acted recklessly, and that the city's police employees had a track record of escalating interactions with the public to violent ends. *See* Complaint, *Goulden v. Boulay*, No. 3:20-cv-00400-JBA (D. Conn. Mar. 25, 2020).

46.     In December 2022, the *Goulden* defendants agreed to pay Jayson's estate to settle the lawsuit. The settlement amount comprised the entirety of Jayson's estate, and as one of two beneficiaries, Ms. Tosado was entitled to receive half.

47.     Shortly after the *Goulden v. Boulay* lawsuit settled, Defendant Gilman's DAS filed a notice in the probate court alleging that Ms. Tosado owes Connecticut for the roughly two years she was incarcerated.

48.     The state calculated Ms. Tosado's total prison debt as $129,641. After factoring in the *Goulden* settlement and number of beneficiaries, DAS notified the probate court that the state sought $44,028.98 to satisfy Ms. Tosado's lien.[2] The probate court finalized and closed Jayson's estate after authorizing distribution of all but that amount. The prison debt amount claimed by

---

[2] To calculate this amount—and in keeping with the May 2022 amendments—DAS took Ms. Tosado's share, subtracted $50,000, and then divided it in half, pursuant to Conn. Gen. Stat. § 18-85b(a).

Defendant Gilman's department is currently being held in escrow by Mr. Goulden's counsel pending the outcome of Ms. Tosado's claim here. The Defendants continue to press their claim against Ms. Tosado's inheritance, even after the recent legislative amendments.

49.     Ms. Tosado is a licensed pharmacy technician. After she was released from prison, she got her license reinstated.

50.     Since 2018, Ms. Tosado has worked at a pharmacy in New Haven. Because she is bilingual and is certified to administer vaccinations, including those for COVID-19, Ms. Tosado has been extremely busy as a first responder throughout the pandemic.

51.     Ms. Tosado continues to work as a pharmacy technician. In addition, Ms. Tosado has been interning with New Reach, a homelessness advocacy organization with offices in New Haven and Bridgeport. There, Ms. Tosado works with women and children affected by homelessness, poverty, and domestic violence. As part of her internship, Ms. Tosado is pursuing a peer mentor certification through the Yale University School of Medicine/FORDD Clinic Formerly Incarcerated Recovery Support Training program.

52.     Ms. Tosado hopes to eventually work full-time in the nonprofit field. Along with her daughter Jazmarie, she has committed to keeping Jayson's memory alive and sharing her personal story widely to help protect "the other Jaysons out there."

53.     Ms. Tosado will never stop grieving Jayson's death. According to Ms. Tosado, her feeling that she was unable to protect her young son while she was incarcerated is "part of the guilt I carry every day."

54.     The state's attempt to collect on the heels of her family tragedy has caused Ms. Tosado tremendous pain, forcing her to relive the traumatic circumstances of Jayson's death. For Ms. Tosado, the proceeds from the family's settlement represent more than money: they are

proof that government authorities were forced to reckon with Jayson's killing, and that his life

mattered. The challenged statutes' insistence that Ms. Tosado pay Connecticut from the proceeds

of litigation over her son's death is hopelessly cruel.

**F.    Plaintiff Douglas Johnson.**

55.    Mr. Johnson is a 43-year-old resident of Branford, Connecticut.

56.    Mr. Johnson was incarcerated for 25 months from February 2002 to March 2004

for drug-related charges.

57.    Mr. Johnson struggled with substance use from a young age. He began his

recovery while incarcerated, taking advantage of every possible program and learning

opportunity he was offered.

58.    As soon as he was released in 2004, Mr. Johnson started attending Alcoholics

Anonymous. He has remained sober for over 20 years.

59.    Now, Mr. Johnson proudly serves as an Alcoholics/Narcotics Anonymous

sponsor, and regularly volunteers to speak to and mentor others in recovery, including people

who have been incarcerated.

60.    In addition to his volunteer efforts with the recovery community, Mr. Johnson

works full-time as a mason at Yale University.

61.    Mr. Johnson is married and has three children. His oldest daughter will be

attending college in the fall.

62.    Mr. Johnson has one brother, who works as a police officer in Branford.

63.    In June 2016, Mr. Johnson's mother passed away. Mr. Johnson's mother left him

and his brother a small sum of money. Mr. Johnson's understanding is that Defendant Gilman's

DAS asserted a lien and took a portion of that money to partially fulfill his carceral debt.

64.     Then, in August 2021, Mr. Johnson suffered the loss of his father, Richard Johnson.

65.     In January 2022, Richard Johnson's estate was admitted for administration in the Branford-North Branford District of the Connecticut Probate Court.

66.     Immediately after the estate's opening, Defendant Gilman's DAS filed a Notice of Lien for the full amount of Douglas Johnson's incarceration: $74,652.58.

67.     Based on this amount, Defendants did not account for any sum of money that Mr. Johnson has already paid from his mother's estate.

68.     Mr. Johnson's father left him and his brother $10,000 and a few, cherished items: a boat that's been in their family since 2007, land and a cabin in North Guilford that has been passed on for over fifty years, and a truck that their father used to drive.

69.     Mr. Johnson was going to use his share of $10,000 to help pay for his daughter's college tuition. He and his brother continue to use his father's boat, truck, and land to remember their father and to make new memories with their own families.

70.     However, because of Defendants' lien, Mr. Johnson and his brother will be forced to sell their father's cherished possessions in order to convert them into funds to pay the Defendants.

71.     The fiduciary of Richard Johnson's estate has completed her work and notified the probate court that she will delay filing the final accounting until this Court resolves Douglas's federal claim, similar to how fiduciaries handle ancillary disputes like litigation in the United States Tax Court or appeals of taxes demanded by the Connecticut Department of Revenue. The Defendants continue to press their claim against Mr. Johnson's inheritance, even after the recent legislative amendments.

72.    While Mr. Johnson is mourning the death of both of his parents, he is now also confronting immense guilt for imposing his carceral debt onto his brother. Mr. Johnson regrets that his brother is being penalized for mistakes that Mr. Johnson made as a young teenager.

73.    In the decades since Mr. Johnson's incarceration, he has worked hard to have a career, support his family, and stay sober. Defendants' actions to satisfy a 20-year-old lien are nothing short of punishment.

   **G.    October 1997 – May 2022: Connecticut automatically imposes prison debt upon everyone its courts sentence to incarceration.**

74.    Every person imprisoned by Connecticut after October 1997 owes the state "for the costs of such [person]'s incarceration." *Id.* § 18-85a(b).

75.    Each person's debt encompasses costs accrued in the past, as well as those that "the state will reasonably incur to incarcerate the [person] until [their] maximum release date." Conn. Agencies Regs. § 18-85a-1(a). Hence, on their first day of incarceration, a person subject to the challenged statutes already owes the state for their entire sentence.

76.    From October 1, 1997 until May 7, 2022, Connecticut was entitled to collect a person's prison debt by:

>   (a) taking any property the person owns during their incarceration, Conn. Gen. Stat. § 18-85a(b);
>
>   (b) if the person is involved in a lawsuit, taking either the full debt amount, or 50% of any judgment or settlement that the person obtains, whichever is less, *id.* § 18-85b(a);
>
>   (c) taking the same from the person's inheritance, *id.* § 18-85b(b);
>
>   (d) seizing the entire debt from the person's estate upon their death, *id.* § 18-85c; or

(e) taking the person's lottery winnings after securing a debt collection

judgment against them.  *Id.* § 18-85a(b)(2).

**H.      May 2022—present: Connecticut narrows its prison debt statutes, but Plaintiffs and the putative class remain indebted.**

77.     In May 2022, after significant advocacy by many people and organizations in

Connecticut, the Connecticut General Assembly passed a budget bill that narrowed the groups of

people from whom the state can collect prison debt. *See* 2022 Conn. Pub. Acts 118 §§ 457, 458.

78.     The amendments went into effect on May 7, 2022, making two relevant changes

that apply prospectively and retrospectively.

79.     First, the new law exempts up to $50,000 of a person's assets from a given

collection attempt—but does not apply to people convicted of certain crimes. *See id.* §§ 18-

85a(b) (denying the exemption to those convicted of certain listed offenses).

80.     Second, the new law exempts most people from the state's lien against lawsuit

proceeds. *See id.* § 18-85b(a). However, the 2022 statutory amendments did not extend the same

exemption to the state's liens against inheritances, *id.* § 18-85b(a), or estates, *id.* § 18-85b(b).

Therefore, beneficiaries who are or were incarcerated, as well as the estates of such people,

remain on the hook for prison debt regardless of conviction offense.

81.     Accordingly, these legislative changes do not change much for the named

Plaintiffs and those similarly situated. Because Plaintiffs are beneficiaries of an estate, their liens

remain.

82.     Meanwhile, Defendants appear to be applying the $50,000 exemption arbitrarily.

For certain Plaintiffs—Ms. Tosado—Defendants have exempted $50,000 from their collection

attempt. For others—Ms. Beatty—they have not.

83.     In fact, notwithstanding the initial filing of this lawsuit on March 14, 2022, as well as the change in law on May 7, 2022, nothing has changed about the amount the state has demanded Ms. Beatty pay for her prison debt. It was, and remains, $83,762.26.

84.     Connecticut's prison debt scheme is an extreme outlier. Some states have abolished prison debt entirely. Others collect rarely, if ever. Even those that do collect, do so for negligible amounts. New York, for example, charges $1 per week, and only if a person is working, and paying will not cause undue hardship to their family.

85.     Meanwhile, Connecticut continues to charge the highest rates in the country.

**I.     Connecticut prison debt is calculated by multiplying two factors: the state's daily cost of incarceration, and the number of days that the debtor was, and will be, confined.**

86.     Defendant Quiros' DOC is charged with calculating the amount of money owed by those it has imprisoned. *Id.* § 18-85a.

87.     Quiros's department calculates the amount owed by each incarcerated person by multiplying two components: (1) "the average per capita cost, per diem, of all component facilities within the Department of Correction" for each state fiscal year in which the person was confined, and (2) the duration of the person's confinement during each fiscal year. Conn. Agencies Regs. § 18-85a-1(a).

88.     For example, to determine the prison debt owed by a person who served a sentence from June 1, 2017 to August 1, 2019, Defendant Quiros or one of his employees would first locate the state's designated "average per capita cost, per diem" of imprisonment for each of the four fiscal years that the person's incarceration spanned: 2017 (June 1, 2017 to June 30, 2017), 2018 (July 1, 2017-June 30, 2018), 2019 (July 1, 2018 – June 30, 2019), and 2020 (July 1, 2019 to their release on August 1, 2019). Quiros would then multiply the relevant daily rate by

each day in the corresponding fiscal year that the person was incarcerated: 30 days in FY2017,

365 days in FY2018, 365 days in FY2019, and 30 days in FY2020.

89.     The incarcerated person "shall be responsible to pay" the resulting figure. *Id.*

§ 18-85a-2.

90.     Notably, Connecticut charges people for time spent in pretrial detention on a

charge resulting in a conviction. So, a person who spends a year in prison awaiting trial because

they could not afford to make bail will, upon conviction, immediately owe the state money for

the year in which they were jailed because they didn't have enough money to bail out.

**J.      The state's daily assessed cost of incarceration for each fiscal year is
          calculated in hindsight, after the state closes its books.**

91.     The "average per capita cost, per diem, of all component facilities within the

Department of Correction" for any given fiscal year, *id.* § 18-85a-1(a), is frequently shorthanded

as the state's "assessed cost" of incarceration, and will be so here.

92.     The assessed cost is designated by Defendant Quiros's DOC for each fiscal year

after its close, when all expenditures may be tallied. The tallying is not done promptly, however:

it has taken Quiros or his predecessors a year or more to fulfill their duty to affix an assessed

cost.

93.     For example, Defendant Quiros has still not set an assessed cost for fiscal year

2020, two years and five months after it ended.

94.     Hence, although a person automatically becomes obligated to pay "for the costs of

such [person]'s incarceration" upon reporting to prison, Conn. Gen. Stat. § 18-85a(b), the person

cannot know the *amount* of their debt until some future point at which the correction

commissioner sets an assessed cost for each fiscal year in which the person was incarcerated.

14

95.     Quiros's department designates the assessed cost for each fiscal year with the assistance of Connecticut's bookkeeper, the Office of the State Comptroller.

96.     To arrive at a fiscal year's suggested assessed cost for Defendant Quiros's approval, the Comptroller (1) sums all Department of Correction expenditures at the state's prisons during the fiscal year, (2) divides that sum by the daily average population of Connecticut's prisons during the fiscal year, and (3) divides that amount by 365 to arrive at a per-person, per-day cost.

97.     When calculating the number, the DOC's total expenditures include all money spent on its 6,000 or so employees and its archipelago of prisons statewide. The annual figure includes the wages of its employees, the operating costs of every program or service at each prison, and the construction, maintenance, and renovation of buildings and grounds.[3]

98.     The second element in a fiscal year's assessed cost is the daily average population of Connecticut's prisons. This number determines the average per-person cost to be borne by people imprisoned during the fiscal year.

99.     The daily average population of Connecticut's prisons is reached by summing each prison's daily population count for all days of the fiscal year, and then dividing that number by 365 to arrive at an average number of people behind bars, systemwide, on any given day.

100.    In addition to being both automatic and inchoate at the time of sentencing, Connecticut prison debt has a further infirmity: the amount of the debt does not depend on the actions of the debtors themselves, but on those of third parties. People obligated to pay for their

---

[3] The annual figure does not include Connecticut's present or future pension and healthcare liabilities to current employees, which the state tracks as a single line item for all executive branch employees.

incarceration have no say in either factor—expenditures or population—driving their future debt levels.

**K.      Prison spending is the product of third-party decision making, by Connecticut's executive and legislative branches.**

101.    The first assessed cost factor, spending, is a political decision by the executive and legislative branches.[4]

102.    The state's legislature allocates an annual budget for the DOC before the start of each fiscal year, and Defendant Quiros decides whether and how to keep expenditures within that allocation.

103.    He and his predecessors usually fail to do so. The DOC has been historically unable or unwilling to restrain corrections overtime spending, which has outsized effects on the people saddled with carceral debt.

104.    This outsized effect has been exacerbated during the COVID pandemic. Between July 2020 and June 2021, overtime expenditures jumped by $13 million,[5] as coverage was needed for the swaths of prison employees who contracted the virus and were entitled to fourteen days' paid time off under a labor agreement between Connecticut's government and its correction employees' labor union.[6]

---

[4] Connecticut has stripped those imprisoned for a felony conviction of the ability to vote, Conn. Gen. Stat. § 9-46(a). Approximately 74% of people held in the state's prisons are there for such a conviction.  Accordingly, about three-quarters of the people imprisoned do not even have indirect, democratic influence over how much the legislative and executive branches decide to spend on incarceration.

[5] Conn. Office of Fiscal Analysis, FY 21 Agency Overtime Report (Aug. 25, 2021), *available at* https://cga.ct.gov/ofa/Documents/year/OT/2021OT-20210824_Agency%20Overtime%20Report%20FY%2021%20Q4.pdf).

[6] Conn. Office of Policy and Mgmt., General Notice No. 2020-03 ¶¶ 2, 4, 6 (June 18, 2020), *available at* https://portal.ct.gov/-/media/OPM/OLR/Notices/2020-03-Mandatory-COVID-19-Testing.pdf

105.    Those expenditures, alone, added around $1,500 to the debt of each person imprisoned during fiscal year 2020.

106.    The overtime expenditure problem is likely to be worse when the books close on the current fiscal year. For example, the DOC reported to the public on its website that roughly one of every six of its employees contracted COVID in January 2021 alone. The people incarcerated during this fiscal year can only watch helplessly as their debt mounts.

107.    Overtime spending is only one example of how executive and legislative branch political decisions drive prison debt for those having no control over those decisions. Another comes in the form of staffing levels.

108.    Between 2008 and the beginning of 2020, Connecticut's prison population fell by 48%. But year after year, the DOC has kept the number of statutorily authorized correction employee positions roughly the same, decreasing them by just 12% over the same period. People incarcerated during those years are stuck with the bill for those decisions.

**L.    The number of people imprisoned—and hence, the number of debtors who must share the daily cost of prison—is also controlled by the third parties who administer the criminal justice system in Connecticut.**

109.    Third parties, rather than prison debtors themselves, are also responsible for the second factor used to tot up the debts: the number of people in prison.

110.    When those administering the criminal justice system in Connecticut–police, prosecutors, and judges—increase or decrease the number of people they charge with and sentence to imprisonment-bearing offenses, the assessed cost borne by every incarcerated person falls or rises proportionally.

111.    For example, during the first year of the COVID pandemic, the criminal division of Connecticut's Superior Court pushed off sentencings of convicted persons until 2021 and

made unspoken adjustments to bail criteria that cut bond amounts and thus remanded far fewer people to pre-trial detention.

112.    As a result, the number of people held in prison by Connecticut declined each month. People reaching the end of their sentences were released from prison, but convicted people and pretrial detainees stayed out. Over the course of calendar year 2020, the number of people held in prison fell by about half.

113.    Those decisions by police, prosecutors, and judges—while unquestionably beneficial to the people who avoided the rampant COVID spread in Connecticut's prisons— materially increased the carceral debt of each person who was imprisoned during that time. Even as the number of people in prison was *falling* by 50%, correction expenditures during that period *rose* by at least $13 million.

114.    For fiscal year 2020, the comptroller has calculated the assessed cost of incarceration at $249 a day. That daily rate is 11.3% higher than fiscal year 2019—as a direct result of the "significant reduction" in the number of people in Connecticut's prisons. Memorandum from the Office of the State Comptroller to the Department of Correction 2 (Jan. 6, 2022).

115.    Hence, although the challenged statutes obligate them to pay for it, Connecticut's prison debtors have no control over the actions of those in the criminal justice system that drive their bills higher and higher.

**M.    The magnitude of each person's prison debt.**

116.    The result of Connecticut's having carte blanche to charge people for their own punishment is staggering.

117.    For fiscal year 2015, the assessed cost is $145 per day, or $59,925 per year.

118.   For fiscal year 2016, the assessed cost is $181 per day, or $66,065 per year.

119.   For fiscal year 2017, the assessed cost is $185 per day, or $67,525 per year.

120.   For fiscal year 2018, the assessed cost is $204 per day, or $74,460 per year.

121.   For fiscal year 2019, the assessed cost is $224 per day, or $81,760 per year.

122.   For fiscal year 2020, the assessed cost is $249 per day, or $90,885 per year.

123.   Connecticut has not yet calculated the assessed costs for fiscal years 2021, 2022, or 2023.

124.   These numbers generate almost unthinkable indebtedness figures for each day of incarceration, saddling people with bills in the thousands and even millions.

125.   At the same time, the debt levels generated by the scheme have always dwarfed the maximum fines permitted by Connecticut's criminal code: $20,000 for the state's top-grade felonies, and $2,000 for the top-grade misdemeanors. *See* Conn. Gen. Stat. §§ 53a-141, -142.

126.   At the inception of Connecticut's prison debt revenue grab in 1997, its assessed cost for just one year of prison was 1.6 times the maximum allowable felony fine, and 16 times the maximum misdemeanor fine.

127.   Today, the assessed cost for a single year of prison is *4.5 times* the maximum felony fine, and *45 times* the highest permissible misdemeanor fine.

**N.     How Connecticut collects and uses prison debt.**

128.   With the efforts of the defendants, Connecticut has collected an average of $5.8 million annually from prison debtors over the last five fiscal years.

129.   The amount extracted from Connecticut's prison debtors does not go back into the prison system. Instead, it is funneled into the State's general fund, for use in the state government's annual operating expenditures.

130.    In other words, the amounts clawed back from people like Ms. Beatty do not directly "pay" for their prison stays, and nonetheless represent a drop in the bucket for the state's multi-billion-dollar annual expenditures.

131.    Defendant Gilman's department is integral to collecting prison debt.

132.    For those in prison, Defendant Gilman is notified by Defendant Quiros whenever a person who is incarcerated has a significant sum of money transferred to their prison trust account.

133.    After verifying the amount of a person's debt from Defendant Quiros, Defendant Gilman department may immediately attempt collection, and even places a freeze on a person's prison trust account while it attempts to secure a court order forcing payment.

134.    Defendant Gilman's agency also monitors actions in the Connecticut Superior and Probate Courts for lawsuits and inheritances against which to attempt collection.[7]

135.    Defendant Gilman's department is informed by Connecticut Probate Courts of decedents or beneficiaries to an estate. Defendant Gilman's department then checks with Defendant Quiros's department to determine if any of those people were incarcerated or formerly incarcerated in Connecticut, and if so, how much they owe.

136.    Once Defendant Gilman's department determines that a decedent or beneficiary to an estate owes prison debt, it files a notice of lien in Probate Court. The lien notices and proofs of claim that Defendant Gilman's department are non-negotiable; they dictate a person "is liable" to Connecticut and demand that the executor or administrator of the estate pay.

---

[7] *Windfalls of former inmates targeted by Connecticut: Collections grew to $5.1 million last year,* New Haven Register (Aug. 2, 2014) https://www.nhregister.com/connecticut/article/Windfalls-of-former-inmates-targeted-by-11384579.php.

137.    In addition to using DAS as a collection agent, the DOC extracts prison debt from incarcerated and formerly incarcerated people by requesting that the Attorney General file debt collection actions in the state's court system.

138.    Quiros's debt collections suits are not just trifling. Quiros can—at any time— request that the Attorney General sue an imprisoned debtor who has not yet finished their sentence for the anticipated costs of incarceration. And once Quiros transforms the state into a judgment creditor, Connecticut may execute on the judgment at any time in the future, as any times as it wishes, for the rest of the debtor's life, with post-judgment interest. *See* Conn. Gen. Stat. § 52-350f.

139.    By way of illustration, in 2019, the Attorney General filed a debt collection action against an incarcerated person for all future assessed costs of their imprisonment, securing a $362,362 judgment. Judgment, *State v. Heard*, No. HHD-CV18-5051049-S (Conn. Super. Ct. Apr. 22, 2019). Having made Connecticut a judgment creditor of the incarcerated person, the state may now execute against the person's assets again and again in the future on behalf of Defendant Quiros, even though the person is currently penniless, which is arbitrarily punitive.

140.    For those whose offenses make them subject to liens on lawsuit proceeds, Defendant Quiros may also use prison debt to shield the Department of Correction from the financial consequences of its own wrongdoing.

141.    For example, when Quiros or any other Department employee are sued for injuring an incarcerated person, Quiros may direct that prison debt be collected or held back from any recovery. *See, e.g.*, *Williams v. Marinelli*, 987 F.3d 188, 194 (2d Cir. 2021) (recounting how the state indemnified the tortfeasor but held back $142,430 of the judgment against him to pay the Department of Administrative Services for his prison debt); Memorandum in Opposition

to Plaintiff's Application for Prejudgment Remedy 5, *Baltas v. Frenis*, No. 3:18-cv-01168 (D. Conn. Nov. 13, 2018) (reciting the Attorney General's Office's contention that "the plaintiff owes the State of Connecticut for the costs of his incarceration and would need to recover at least half of $722,906 at trial in order to receive any money from the State of Connecticut"), Am. Compl. ¶ 108 (describing defense counsel's use of prison debt as leverage in settlement talks for civil rights claim).

142.    The May 2022 amendments to the prison debt laws do not eliminate this practice. The plaintiff in *Baltas*, for example, is in the group of people from whom the state may still collect lawsuit proceeds under Conn. Gen. Stat. § 18-85b(a).

143.    Hence, by virtue of its unconstitutional prison debt scheme, Connecticut is still able to give itself up to a 50% discount on the damages awards and settlement amounts that it pays on behalf of its tortfeasor employees, even those who commit serious civil rights violations.

**O.    Class allegations.**

144.    Ms. Beatty, Ms. Tosado, and Mr. Johnson, on behalf of themselves and those similarly situated (the "Class"), bring this action pursuant to Federal Rule of Civil Procedure 23 for declaratory relief that Connecticut's prison debt scheme violates the Eight Amendment of the United States Constitution and a permanent injunction against the scheme's future use.

145.    This Class is defined as all probate beneficiaries against whom DAS and/or DOC has asserted a carceral lien pursuant to Conn. Gen. Stat. §§ 18-85a through -85c. As such, Class members stand to be deprived of their inheritance.

**P.    Numerosity and ascertainability: Fed. R. Civ. P. 23(a)(1).**

146.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The Class is so numerous that joinder of all Class members is impracticable. According to logs obtained from

DAS, the Defendants have asserted carceral liens against about 1,000 people or estates since May 1, 2022, and a substantial number of those fall within the class's definition. The class also includes additional plaintiffs, like Ms. Beatty, who had the liens asserted against their inheritance before the legislative amendments.

147.    Joinder is impracticable given the large number of class members.

148.    The Class is ascertainable because its members can be readily identified using information kept by the Defendants in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each Class member, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Q.    Commonality: Fed. R. Civ. P. 23(a)(2).**

149.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because it involves common questions of law and fact, including, without limitation, whether the prison debt imposed by the challenged statutes and regulations comprises an excessive fine prohibited by the Excessive Fines Clause of the United States Constitution. Further, although the statutory scheme affects incarcerated individuals and certain individuals expecting to receive lawsuit proceeds, this Class has been narrowed to only include probate beneficiaries that are affected by one of the provisions of the statute.

**R.    Typicality: Fed. R. Civ. P. 23(a)(3).**

150.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because the Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants. The Class members all had DAS and/or DOC assert a lien in a probate

proceeding. Accordingly, the relief the Plaintiffs seek is identical to the relief sought for the Class members.

**S.      Adequate representation: Fed. R. Civ. P. 23(a)(4).**

151.    The Plaintiffs will fairly and adequately represent and protect the interests of the Class. They have retained counsel with substantial experience in prosecuting class actions and civil rights litigation.

152.    The Plaintiffs and their counsel are committed to vigorously prosecuting this action and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to those of the Class.

**T.      The Defendants having acted or failed to act on generally applicable grounds: Fed. R. Civ. P. 23(b)(2).**

153.    This action satisfies the requirement of Fed. R. Civ. P. 23(b)(2) because Defendants Gilman and Quiros have acted or failed to act on grounds generally applicable to the Class, thereby making final injunctive and/or corresponding declaratory relief to the Class as a whole, appropriate.

154.    In the alternative, this action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members.

155.    The Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of the Plaintiffs or on its own determination, certify a class for claims sharing common legal questions, and utilize Rule 23(c)(5) to divide the Class into subclasses if need be.

U.     **The Plaintiffs' count against the Defendants for violation of the Excessive Fines Clause.**

156.   The imposition and collection of carceral debt by Defendants is grossly disproportionate to the gravity of the offenses for which the Plaintiffs, and those similarly situated in the Class, were convicted because the debt amounts depend on post-conviction occurrences, on the actions and decisions of third parties, and on future actions and decisions unknowable at the time of sentencing.

157.   The Defendants' conduct in imposing the cost of incarceration against, and collecting it from, those it imprisons also offends the public policy of the United States in ways including, but not limited to:

> (a) Rendering illusory the concept of having paid one's debt to society fair and square by lawfully serving a prison sentence;
>
> (b) Disproportionally robbing wealth from people of color;
>
> (c) Actively impeding people from building wealth after lawfully completing incarceration;
>
> (d) Creating a wall against return to society for those leaving prison, and thus fostering a cycle of poverty that is difficult to escape;
>
> (e) Negating the effect of state and federal tort and constitutional mandates by substantially reducing any incentive to seek legal recompense for injuries; and
>
> (f) Reinforcing to state employees that they will be held harmless for breaking the law.

158.   Thereby, the challenged statutes and regulations violate the Excessive Fines Clause. U.S. Const. amend. 8, cl. 3.

**Prayer For Relief**

Accordingly, on behalf of themselves and the putative class, the plaintiffs respectfully request entry of a judgment:

(a)    declaring that the Plaintiffs' and the Class members' prison debt is invalid, null, void and unenforceable;

(b)    declaring Conn. Gen. Stat. §§ 18-85a through -85c and their implementing regulations to be unconstitutional and void;

(c)    enjoining Defendant Gilman, and anyone working for or in concert with her or her successors, from enforcing the challenged statutes through any means, including but not limited to, her: collecting such debts, issuing any notice, demand, or lien for such debts, or, representing to any person or court that a debt imposed via the challenged statutes exists or is valid;

(d)    enjoining Defendant Quiros, and anyone working for him or in concert with him or his successors from enforcing the challenged statutes through any means, including but not limited to, his: calculating prison debt, directing Defendant Gilman or any other person or entity to collect such prison debt, or, representing to any person or court that a debt imposed via the challenged statutes exists or is valid;

(e)    ordering the Defendants to reimburse the Plaintiffs their reasonable litigation costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(f)    granting any other relief it deems just and proper.

Respectfully submitted,

By:    */s/ David A. Slossberg*
           David A. Slossberg (# ct13116)
           Erica O. Nolan (# ct31097)
           Kyle A. Bechet (# ct31299)
           HURWITZ SAGARIN SLOSSBERG & KNUFF LLC
           147 North Broad Street
           Milford, CT  06460
           (203) 877-8000
           DSlossberg@hssklaw.com
           ENolan@hssklaw.com
           KBechet@hssklaw.com


By:    */s/ Dan Barrett*
           Dan Barrett (# ct29816)
           Elana Bildner (# ct30379)
           Sapana Anand (# ct31422)
           ACLU Foundation of Connecticut
           765 Asylum Avenue
           Hartford, CT  06105
           (860) 471-8471
           e-filings@acluct.org