# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TERESA BEATTY *et al.*,<br>    *Plaintiffs*, | |
| v. | No. 3:22-cv-00380 (JAM) |
| MICHELLE GILMAN *et al.*,<br>    *Defendants*. | |

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Does requiring a convicted prisoner to pay for their costs of imprisonment violate the prisoner's right to be free from an excessive fine under the Eighth Amendment? That is the main question in this case. The case involves Connecticut's "pay-to-stay" law—a law that allows the State of Connecticut to seek reimbursement from convicted state prisoners for the costs of their imprisonment.[1]

According to the plaintiffs, Connecticut's pay-to-stay law violates the Excessive Fines Clause of the Eighth Amendment on its face and as applied to them. I do not agree. Although the plaintiffs raise important public policy concerns about the purpose and operation of Connecticut's law, they fail to show for purposes of their facial challenge that requiring a convicted prisoner to pay the costs of imprisonment amounts to a *per se* violation of the Excessive Fines Clause. Nor do they show for purposes of their as-applied challenge that the pay-to-stay law authorizes the State to collect amounts from them that are no less than grossly disproportional to the gravity of their crimes. In short, they fail to show that Connecticut's pay-to-stay law violates the Excessive Fines Clause of the Eighth Amendment.

---

[1] *See, e.g.*, Sarah McClure, Comment, *Get Out of Jail Free? A Survey of Pay-to-Stay Statutes Through a Constitutional Lens*, 16 EST. PLANNING & CMTY. PROP. J. 219, 221 (2023); Patrick McGlasson, Note, *Paying for the Privilege: Pay-to-Stay Incarceration After the Incorporation of the Excessive Fines Clause*, 2021 U. ILL. L. REV. 1135, 1137 (2021).

On the other hand, to the extent that two of the plaintiffs allege that the defendants seek to make them pay even more than what the pay-to-stay law itself allows, these two plaintiffs have plausibly alleged a violation of the Excessive Fines Clause to this limited extent. Accordingly, I will grant in part and deny in part the defendants' motion to dismiss.

## BACKGROUND

I have previously issued a ruling that describes at length the operation of Connecticut's pay-to-stay law. *See Beatty v. Tong*, 659 F. Supp. 3d 219 (D. Conn. 2023). The law endows the State of Connecticut with "a claim" against current and former state convicted prisoners for the costs of their incarceration. *See id.* at 224 (citing Conn. Gen. Stat. § 18-85a(b); Conn. Agencies Regs. § 18-85a-1(b)).

As I explained in my prior ruling: "Connecticut's pay-to-stay law does not automatically require every prisoner to pay for all the costs of their imprisonment. It is not as if every prisoner receives a bill on the day that they 'check out' of a prison and that the State deploys an army of debt collectors to chase down every prisoner for payment. Instead, the law prescribes particular procedures by which the State may seek to enforce its claim if it chooses to do so." *Ibid.*

As relevant here, the law allows the State to seek to enforce a claim for the costs of imprisonment against a current or former prisoner who is about to receive an inheritance. *See id.* at 225-26 (citing Conn. Gen. Stat. § 18-85b(b)).[2] When an estate is in probate proceedings and a

---

[2] The law also allows for enforcement of claims in multiple contexts other than when a current or former prisoner has received an inheritance, such as if a prisoner stands to win money from a lawsuit. *See* Conn. Gen. Stat. § 18-85b(a). Although the amended complaint purports to challenge all of the law's potential applications, the three plaintiffs in this action seek to challenge the law solely in the context of the defendants' efforts to enforce the law against their inheritances, and their class allegations state an intent to proceed only as to "probate beneficiaries that are affected by one of the provisions of the statute." Doc. #49 at 23 (¶ 149). The plaintiffs lack standing to challenge the operation of the law outside the inheritance context. *See Brokamp v. James*, 66 F.4th 374, 389 (2d Cir. 2023) (plaintiff who had standing "to challenge New York's requirement that mental health counselors be licensed to practice in that state" did not also have standing to challenge parts of the licensing law that did not injure her).

current or former prisoner is in line to benefit from the estate, the Department of Correction (DOC) through its designee the Department of Administrative Services (DAS) may file a notice of lien against the inheritance with the probate court. The lien may be for the lesser of the prisoner's costs of imprisonment or half of the assets of the estate that are payable to the prisoner. *See* Conn. Gen. Stat. § 18-85b(b).

According to the amended complaint, "the Connecticut Probate Court notifies DAS whenever an estate beneficiary has served, or is serving, time in a Connecticut prison," and "the DOC supplies DAS with records showing what the DOC contends that the person owes."[3] When DAS "determines that a … beneficiary to an estate owes prison debt, it files a notice of lien in Probate Court," which "dictate[s] a person 'is liable' to Connecticut and demand[s] that the executor or administrator of the estate pay."[4]

This litigation began nearly two years ago when three former state prisoners—Teresa Beatty, Karl Weissinger, and Michael Llorens—filed a class action suit for injunctive relief against the Governor of Connecticut and the Attorney General of Connecticut. *See Beatty*, 659 F. Supp. 3d at 227-29. In response to the defendants' motion to dismiss, the plaintiffs abandoned their claim against the Governor and sought to proceed solely against the Attorney General. *Id.* at 229. I dismissed the action against the Attorney General on multiple grounds: (1) that the plaintiffs lacked standing to pursue their claims against the Attorney General, (2) that Beatty and Weissinger's claims against the Attorney General were foreclosed by the Eleventh Amendment, and (3) that Llorens' claim was not ripe for resolution. *See id.* at 232-34.

---

[3] Doc. #49 at 3-4 (¶¶ 13, 16).
[4] *Id.* at 20 (¶ 136); *see also* Conn. Gen. Stat. § 18-85b(b) (directing probate court to "accept any such lien notice" and "to the extent of such inheritance not already distributed, the court shall order distribution in accordance therewith").

Much of my ruling was devoted to explaining how—in essence—the named plaintiffs had sued the wrong defendants. They had sued the Governor and the Attorney General despite those defendants' lack of any apparent involvement in enforcing the law against them. But they had not sued the Commissioner of the DOC or the DAS, who were directly responsible under the law for enforcing any claims against the named plaintiffs.

My ruling, however, granted the plaintiffs' request for leave to file a second amended complaint. *See id.* at 236. And they have now done so. They no longer name the Governor or the Attorney General as defendants. Instead, they name as defendants the DAS Commissioner (Michelle Gilman) and the DOC Commissioner (Angel Quiros).

The second amended complaint also involves a change in the named plaintiffs. Beatty has stayed on as a plaintiff, but Weissinger and Llorens have dropped out. And two more plaintiffs— Natasha Tosado and Douglas Johnson—have been added.

According to the complaint, the first named plaintiff—Teresa Beatty—was imprisoned "between 2000 and 2002 for charges stemming from drug possession."[5] When Beatty's mother passed away in 2020, she left Beatty a 40% interest in her house.[6] The house later sold for $625,000, but there has been no distribution of proceeds to Beatty.[7] In the meantime, DAS has filed a notice with the probate court seeking to recover $83,762.26 against Beatty's inheritance for the costs of Beatty's imprisonment.[8]

The complaint alleges that the amount sought of $83,762.26 is based on a miscalculation. "[T]he Defendants have calculated Ms. Beatty's debt for the fiscal years 2000 and 2001 at a rate

---

[5] Doc. #49 at 4 (¶ 22).
[6] *Id.* at 5 (¶¶ 29, 31).
[7] *Id.* at 5 (¶ 34).
[8] *Id.* at 5-6 (¶ 36). The parties have since filed a somewhat confusing joint notice stating that "discovery has conclusively shown that any amount will be less than $83,762.26" but not stating how much less or explaining why. Doc. #103 at 2.

of $123 and $122 per day, rather than at the actual assessed rate for those years, $99 and $96."[9]

Moreover, the defendants have not afforded Beatty the benefit of a $50,000 exemption that was

enacted with retroactive application into Connecticut law in 2022.[10]

The second named plaintiff—Natasha Tosado—served nearly two years in prison

between 2016 and 2018.[11] The complaint does not disclose her crime of conviction. It goes on to

allege that she now stands to inherit a substantial sum of money from the estate of her son, who

was shot and killed by the police and whose estate has received payment of a settlement.[12]

According to the complaint, DAS notified the probate court that it sought $44,028.98 to

satisfy Tosado's lien for the costs of her imprisonment.[13] The probate court finalized and closed

the estate after authorizing distribution of all but that amount, which is now being held in escrow

by an estate attorney.[14] The complaint states that the amount sought by DAS is less than

Tosado's assessed cost of imprisonment of $129,641, because it accounts for a 2022 amendment

to the pay-to-stay law that exempts the first $50,000 of assets and that caps the amount to be

sought at not more than 50% of the prisoner's share of the estate.[15]

The third named plaintiff—Douglas Johnson—"was incarcerated for 25 months from

February 2002 to March 2004 for drug-related charges."[16] After his father passed away in 2021,

DAS filed a notice of lien for $74,652.58, which is alleged to be the "full amount" of the cost of

his imprisonment and does not credit Johnson for a prior amount that was collected against him

---

[9] Doc. #49 at 6 (¶ 39).
[10] *Id.* at 12 (¶ 82). By contrast, the defendants claim that all three plaintiffs are eligible for the $50,000 statutory exemption. *See* Doc. #103 at 2 n.1.
[11] Doc. #49 at 7 (¶ 42).
[12] *Id.* at 7 (¶¶ 43-46).
[13] *Id.* at 7-8 (¶ 48).
[14] *Ibid.*
[15] *Id.* at 7 (¶ 48 & n.2).
[16] *Id.* at 9 (¶ 56).

after his mother passed away in 2016.[17] The administrator of his father's estate has notified the probate court that she will delay the filing of a final accounting until Johnson's claim against the defendants in this action is resolved.[18]

The complaint describes how each prisoner's cost of imprisonment is calculated. First, DOC sums all its expenditures at state prisons for each fiscal year while the prisoner was serving his or her sentence. Then it divides that sum by the daily average number of prisoners and divides it again by 365 to arrive at a daily cost of imprisonment that is attributable to each prisoner for the number of days they were imprisoned during the applicable fiscal year.[19] Because DOC does not calculate its annual or per diem costs until a year or more after the close of each fiscal year, a prisoner does not know when they are sentenced or serving their sentence how much they will be assessed for the cost of imprisonment.[20]

The plaintiffs allege a single claim for relief under the Excessive Fines Clause of the Eighth Amendment. The complaint describes how the assessed cost of imprisonment has nearly tripled from about $31,755 per year in 1997 to $90,885 in 2020.[21] These assessed costs "have always dwarfed the maximum fines permitted by Connecticut's criminal code: $20,000 for the state's top-grade felonies, and $2,000 for the top-grade misdemeanors."[22] "Today, the assessed cost for a single year of prison is 4.5 times the maximum felony fine, and 45 times the highest permissible misdemeanor fine."[23]

---

[17] *Id.* at 9-10 (¶¶ 63-67).
[18] *Id.* at 10 (¶ 71).
[19] *Id.* at 13, 15 (¶¶ 87, 96); Conn. Agencies Regs. § 18-85a-1(a).
[20] Doc. #49 at 14 (¶¶ 92-93).
[21] *Id.* at 2 (¶ 2), 18-19 (¶¶ 117-22). DOC has yet to calculate the assessed costs for fiscal years 2021, 2022, and 2023. *Id.* at 19 (¶ 123).
[22] *Id.* at 19 (¶ 125).
[23] *Id.* at 19 (¶ 127) (emphasis deleted).

The complaint further alleges that the assessed cost of imprisonment is based on numerous events that have nothing to do with a prisoner's own criminal conduct but that depend instead on the actions of third parties beyond a prisoner's control. To begin, the total prison cost figure turns on "the wages of [DOC] employees, the operating costs of every program or service at each prison, and the construction, maintenance, and renovation of buildings and grounds."[24] So, for example, a prisoner who served time during the COVID-19 pandemic was subject to a higher assessed cost of imprisonment because of a dramatic increase in DOC's payment of overtime wages.[25]

Moreover, each prisoner's assessed cost of imprisonment turns in part on the "average daily population" of Connecticut's prisons—again, a figure beyond a prisoner's control.[26] So, for example, a prisoner who served time during the COVID-19 pandemic was subject to a higher assessed cost of imprisonment because there was a dramatic reduction in the total number of prisoners but without a corresponding reduction in total costs.[27]

Thus, according to the plaintiffs, "the amount of the debt does not depend on the actions of the debtors themselves, but on those of third parties," and prisoners "have no say in either factor—expenditures or population—driving their future debt levels."[28] The assessed costs of imprisonment are allegedly "grossly disproportionate to the gravity of the offenses" for which the plaintiffs were convicted "because the debt amounts depend on post-conviction occurrences, on the actions and decisions of third parties, and on future actions and decisions unknowable at the time of sentencing."[29]

---

[24] *Id.* at 15 (¶ 97).
[25] *Id.* at 16 (¶ 104).
[26] *Id.* at 15 (¶¶ 98-99).
[27] *Id.* at 17-18 (¶¶ 111-13).
[28] *Id.* at 15-16 (¶ 100).
[29] *Id.* at 25 (¶ 156).

The defendants have moved to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). I will address the defendants' numerous procedural objections before turning to an evaluation of the merits of the plaintiffs' claims.

### DISCUSSION

The standard that governs a motion to dismiss under Rules 12(b)(1) and 12(b)(6) is well established. Under Rule 12(b)(1), a complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds to sustain the Court's subject matter jurisdiction. *See Brownback v. King*, 141 S. Ct. 740, 749 (2021). Similarly, under Rule 12(b)(6), a court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022).[30]

### *Leave to amend*

My prior ruling granted leave to file "an amended complaint that may name additional plaintiffs and defendants as appropriate." *Beatty*, 659 F. Supp. 3d at 236. Still, however, the defendants argue that the amended complaint is improper in two ways.

First, the defendants object that the amended complaint alleges certain facts that post-date the original complaint. They argue that this is improper because I granted the plaintiffs leave to file an *amended* complaint rather than a *supplemental* complaint.

Rule 15 of the Federal Rules of Civil Procedure governs the filing of amended and supplemental pleadings. As to an amended complaint, the rule instructs that "a party may amend its pleading only with the opposing party's written consent or the court's leave" and that "[t]he

---

[30] Unless otherwise indicated, this ruling for ease of reading omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). As to a supplemental complaint, the rule instructs that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented," and that "[t]he court may permit supplementation even though the original pleading is defective in stating a claim or defense." Fed. R. Civ. P. 15(d).

"District courts in this circuit have construed motions made under Rule 15(a), but which should have been made under Rule 15(d) (or vice versa), as if they had been brought under the correct rule." *Wertzberger v. Shapiro, DiCaro & Barak LLC,* 2021 WL 327619, at *4 (E.D.N.Y. 2021). This is in keeping with the overarching principle that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

Even though the plaintiffs did not use the word "supplement" rather than "amend" when they sought leave to file a new complaint, I certainly contemplated that they would allege updated facts when I granted leave to file an amended complaint. After all, the pay-to-stay law was amended after the plaintiffs had filed their initial complaint in 2022, and so I certainly expected the amended complaint to account for the amendment of the law. Moreover, because the plaintiffs seek prospective injunctive relief, I would have been surprised if they had not included updated facts in their complaint to show that they are suffering an ongoing injury for which injunctive relief continues to be warranted. Notwithstanding the defendants' highly technical objection, the plaintiffs were well within the leave I granted when they filed an

amended complaint that includes allegations of facts occurring subsequent to the date of the original complaint.

In a similar vein, the defendants further argue that because I dismissed the initial complaint on jurisdictional grounds, it was improper for me to grant leave for the plaintiffs to file an amended complaint that includes new plaintiffs and defendants. But they never raised this concern when I granted leave for the filing of an amended complaint. And they do not cite any provision of the Federal Rules of Civil Procedure that forbids a district court from granting leave to file an amended complaint including new plaintiffs and/or new defendants after the original complaint has been dismissed for lack of jurisdiction.

Instead, they rely on statements from the Second Circuit that "'if jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim.'" *Disability Advocs., Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 160 (2d Cir. 2012) (quoting *Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assur. Co.*, 700 F.2d 889, 893 (2d Cir. 1983)). But the facts here do not involve a plaintiff who has moved to intervene pursuant to Federal Rule of Civil Procedure 24. The issue here is whether a court may allow an amended complaint to add new parties and new defendants.

Indeed, the Second Circuit in *Pressroom* acknowledged that "an amendment adding a party that brings the case within a district court's jurisdiction can be granted." *Id.* at 893 n.9. The court of appeals relied on its prior decision in *Hackner v. Guaranty Trust Co.*, 117 F.2d 95 (2d Cir. 1941), which affirmed the allowance of an amended complaint early in the litigation to substitute one plaintiff in place of two others, noting that "whether the matter is treated as one of amendment ... or of commencement of a new action," the action can continue "without the delay

and expense of a new suit, which at long last will merely bring the parties to the point where they now are." *Id.* at 98.

     *Hackner* remains good law. *See Disability Advocs., Inc*, 675 F.3d at 161. And it has been cited to justify the allowance of an amendment to substitute new plaintiffs and defendants even when the original complaint was subject to dismissal for lack of jurisdiction. *See Staggers v. Otto Gerdau Co.*, 359 F.2d 292, 296 (2d Cir. 1966) (citing *Hackner* for the proposition that "Rule 15(a) may be used to substitute new plaintiffs" and characterizing its holding as a "new plaintiff [is] allowed to come into a case by amendment, although [the] action [was] dismissed as to all original plaintiffs because of lack of jurisdictional amount"); *Bd. of Elections of City of New York v. Lomenzo*, 365 F. Supp. 50, 53-54 (S.D.N.Y. 1973) (three-judge court decision applying *Hackner* to conclude that complaint could be amended to properly substitute Attorney General in place of Secretary of State as defendant; "dismissal for want of jurisdiction due to lack of a case or controversy based on the ground that plaintiffs have named the wrong defendant would be improper and, under other circumstances, we would allow plaintiffs the opportunity to amend their complaint to substitute a proper defendant").

     More recently, the Second Circuit has expressed well-founded skepticism about "the so-called 'nullity doctrine,'" the notion "that a case initiated in the name of a plaintiff that lacks standing is an incurable nullity," and it has concluded that "neither Article III nor our Court's past precedent requires us to adopt this doctrine." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021). "The central conceit of the nullity doctrine is that an action commenced in the name of a plaintiff who lacks Article III standing is rendered an

incurable nullity even where a real party in interest both has standing and is willing to join the suit." *Id.* at 387.

In declining to adopt the nullity doctrine, the Second Circuit cited with approval various decisions of other federal appeals courts that have allowed a plaintiff whose initial complaint had been dismissed for lack of standing to file an amended or supplemental complaint that relied on facts post-dating the filing of the initial complaint in order to establish the plaintiff's standing. *Id.* at 390-91. "[R]equiring the plaintiff to file a new case would be needlessly formal." *Id.* at 391.[31]

But the defendants insist on such needless formality. In arguing that it was improper to allow the filing of an amended complaint to include new plaintiffs and new defendants, the defendants do not dispute that the plaintiffs could simply file an identical new federal lawsuit to challenge the defendants' ongoing enforcement of the pay-to-stay law. The defendants do not explain how they are prejudiced by being named as defendants in this action rather than by being named as defendants in a separate but identical lawsuit. Accordingly, I conclude that the plaintiffs did not exceed the scope of leave that was granted to file an amended complaint and that it was not error to grant leave to file a new complaint that included additional plaintiffs and new defendants.

### *Standing*

The defendants argue that two of the three plaintiffs—Beatty and Johnson—lack standing. To establish Article III standing, a plaintiff must show (1) an injury in fact that is concrete, particularized, and actual or imminent, not conjectural or hypothetical; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that

---

[31] Among the cases cited with approval by the Second Circuit in *Fund Holdings* is the Ninth Circuit's decision in *Northstar Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036 (9th Cir. 2015). Rather than citing or acknowledging the Second Circuit's approval of this decision or the force of the Ninth Circuit's reasoning, the defendants cite and rely instead on a dissent from the Ninth Circuit's decision. Doc. #59-1 at 19.

the injury will be redressed by a favorable decision. *See Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023).

The defendants argue that Beatty lacks standing because she has not established an injury in fact. But I rejected that argument in my prior ruling. *See Beatty*, 659 F. Supp. 3d at 230. I concluded that "Beatty has alleged enough to plausibly show that she is subject to a threatened injury that is certainly impending and also that there is a substantial risk that harm to her will occur by means of the loss of more than $80,000 from her inheritance." *Ibid.*

The defendants argue that because the second amended complaint alleges that Beatty has still not received a distribution from the estate, Beatty did not have an injury in fact at the time this lawsuit was filed or at any later time. I do not agree, because the defendants overlook the principle that the law of standing allows for plaintiffs to proceed if they plausibly allege a future injury. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l. USA*, 586 U.S. 398, 414 n.5 (2013)).

DAS has maintained its lien against Beatty's share of her mother's estate, and by law the probate court is required to comply with the lien when distributing funds from the estate. *See* Conn. Gen. Stat. § 18-85b(b) ("The Court of Probate shall accept any such lien notice filed by the commissioner or the commissioner's designee with the court" and "shall order distribution in accordance therewith."). The defendants do not question that the probate court must eventually distribute the estate. Nor do they suggest any scenario in which the probate court could distribute the estate without complying with the dictates of the lien to pay part of the estate to DAS instead of to Beatty. Therefore, despite the fact that the probate court has yet to make a distribution of

the estate, Beatty has plausibly alleged an injury that remains "'certainly impending'" and for which "there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 586 U.S. at 414 n.5); *see also Adam v. United States*, 532 F. App'x 730, 731 (9th Cir. 2013) (taxpayer had standing to challenge IRS lien on taxpayer's property).

The defendants similarly argue that Johnson has not alleged facts demonstrating that he has sustained an injury in fact. But Johnson—like Beatty—is also subject to a notice of lien filed with the probate court by DAS, and this lien stops him from inheriting $74,652.58 from his father. His injury is concrete in terms of the loss of tens of thousands of dollars. His injury is particularized to him and not to any other person. And his injury—though not yet actual—is imminent because the administrator of his father's estate has delayed the filing of a final accounting with the probate court until Johnson's challenge to the lien in this action is resolved. With the DAS lien lurking over his ability to inherit from his father, Johnson has plausibly alleged a future injury that is certainly impending and for which there is a substantial risk that the harm will occur. Accordingly, I will deny the defendants' motion to dismiss to the extent that the defendants argue that Beatty and Johnson lack standing.

### *Ripeness*

The defendants next argue that Beatty and Johnson's claims are not ripe for resolution. The doctrine of ripeness is designed to ensure that courts do not resolve disputes prior to when they are ready for a judicial resolution. Courts recognize a distinction between constitutional ripeness and prudential ripeness. *See generally Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 99-100 (2d Cir. 2021).

Constitutional ripeness "'overlaps with the standing doctrine, most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'"

*Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 149 (2d Cir. 2021) (quoting *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013)). "In most cases, that a plaintiff has Article III standing is enough to render its claim constitutionally ripe." *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 110. Because I have already decided for constitutional standing purposes that both Beatty and Johnson have an injury in fact in terms of the liens on their inheritances, their claims are constitutionally ripe as well.

Prudential ripeness presupposes that a plaintiff has suffered a constitutional injury in fact but nonetheless "'allows a court to determine that the case will be better decided later.'" *Revitalizing Auto Cmtys.*, 10 F.4th at 100 (quoting *In re MTBE Prods. Liab. Litig.*, 725 F.3d at 110). Yet courts should be reluctant to abstain. "[T]he Supreme Court has recently cast doubt on the reach of the prudential ripeness doctrine," and its "cautious approach to prudential ripeness is a reminder that the doctrine constitutes a narrow exception to the strong principle of mandatory exercise of jurisdiction." *Id.* at 102.

For purposes of prudential ripeness, a court must ask two questions. First, it asks "whether the claim is fit for judicial resolution." *Id.* at 100. Second, it asks "whether and to what extent the parties will endure hardship if decision is withheld." *Ibid.*

As to the first question (whether the claim is fit for judicial resolution at this time), the defendants do not point to any further factual development or contingency that would suggest that Beatty's and Johnson's challenges to the pay-to-stay law would be better decided at some future time. They suggest that there may be taxes or other expenses for Beatty's mother's estate that must be deducted from any inheritance that Beatty will receive. But they do nothing to substantiate or quantify these taxes and expenses. It is no more than speculation to suggest that Beatty's inheritance of approximately $250,000 will be materially affected by any taxes or other

expenses. And it is pure conjecture to assume that the taxes and expenses would be so large that the amount paid to the defendants from Beatty's $250,000 share of the estate would drop significantly below the defendants' demand for more than $80,000.[32] Thus, the question of whether it amounts to an excessive fine for the defendants to demand that Beatty pay more than $80,000 for her two years of imprisonment is ready for judicial resolution at this time.

The same goes for Johnson. The defendants have demanded payment of more than $70,000 of his inheritance, and the most that they can do is speculate that his inheritance will not be worth that much or that they will ultimately collect less.[33]

As to the second prudential ripeness question (whether and to what extent the parties will endure hardship if a decision is withheld), it is clear to me that—to the extent that their claims have substantive merit—both Beatty and Johnson will endure substantial financial hardship if they are prevented from obtaining an adjudication at this time of the large claims made by the defendants against their inheritances. The defendants do not point to any countervailing hardship that they will suffer if the plaintiffs' claims are addressed now rather than at some later date.

Moreover, when evaluating hardship in the context of prudential ripeness, a court may take into account whether a plaintiff's litigating position will be adversely affected if an adjudication is delayed. *See United States v. Villafane-Lozada*, 973 F.3d 147, 152 (2d Cir. 2020) (sentenced defendant's challenge to supervised release condition ripe for review on direct appeal

---

[32] The parties have recently filed a joint statement in which the defendants assert that "discovery has conclusively shown that any amount will be less than $83,762.26." Doc. #103 at 2. But the statement does not specify how much less or provide any additional detail. Moreover, it is not clear that the plaintiffs agree with the defendants' contention. *Id.* at 1-2. Accordingly, I have no basis to conclude that Beatty's claim is substantially or materially less than $83,726.26 or that any change in amount makes Beatty's claim unripe for resolution at this time.

[33] The defendants wonder if the "share of the estate after all relevant fees and expenses are accounted for will be of sufficient size that he will have to reimburse the full $74,652.58 after receiving the benefit of the $50,000" exemption that is part of the 2022 amendment to the pay-to-stay law. Doc. #59-1 at 23. But for present purposes I must credit the well-pleaded allegations of the complaint concerning the amount of the lien that was filed against Johnson's father's estate in January 2022, and I cannot simply assume that the defendants intend to seek less than the lien that they have filed.

in part because of hardship to defendant given that he could not raise such a challenge at a later time in the context of seeking a modification of his supervised release conditions).

If I were to delay adjudicating the plaintiffs' claims until the defendants succeed in obtaining the funds they have demanded, then the plaintiffs would likely have far greater difficulty overcoming the defendants' Eleventh Amendment defense. The Eleventh Amendment ordinarily bars a plaintiff from seeking relief against the State or its officers in federal court, subject to a narrow exception that allows a plaintiff to proceed against a state officer for prospective injunctive relief to prevent an ongoing violation of federal law. *See Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020) (citing *Ex parte Young*, 209 U.S. 123 (1908)). By contrast, when a plaintiff seeks "relief that is tantamount to an award of damages for a past violation of federal law, even though styled as something else, [it] is barred" by the Eleventh Amendment. *Id.* at 282. If I were to wait to resolve the plaintiffs' claims until the defendants succeed in obtaining a large share of the plaintiffs' inheritances, then the plaintiffs will be forced to seek relief that the Eleventh Amendment does not allow: the payment of damages for a completed violation of law.

The Second Circuit has observed that Eighth Amendment challenges are "'generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine.'" *United States v. Quinones*, 313 F.3d 49, 58 (2d Cir. 2002) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995)). Beatty and Johnson's claims are also ripe under this claim-specific standard. By filing a notice of lien with the probate court for sums certain that the probate court is required by law to obey before distributing assets of the estates, the defendants have made an "imposition" or "immediately impending imposition" of a financial obligation on Beatty and Johnson that is no different in burden or effect than if a judge at sentencing had

formally imposed a fine on them for the same amounts. Accordingly, I conclude that Beatty and Johnson's claims are ripe for review.

### Eleventh Amendment

The defendants next argue that the Eleventh Amendment bars plaintiffs' claims. As discussed above, the Eleventh Amendment generally bars lawsuits in federal court against the State, agencies of the State, or state government officials, but it is subject to an exception under *Ex parte Young* for claims against state government officials in their official capacities that seek prospective declaratory or injunctive relief for an ongoing violation of federal law. *See Reed v. Goertz*, 598 U.S. 230, 234 (2023); *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253-54 (2011).

According to the defendants, the plaintiffs seek monetary relief that falls outside the scope of the *Ex parte Young* exception. I do not agree. The plaintiffs seek an order for declaratory and injunctive relief to prevent the defendants from diverting a share of the plaintiffs' rightful inheritances. The plaintiffs do not seek money damages for a past wrongful act. Instead, they seek to stop the defendants from taking their money in the future.

In the context of another challenge to Connecticut's pay-to-stay law, Judge Bolden has previously rejected the same Eleventh Amendment argument that the defendants raise here. *See Bonilla v. Semple,* 2016 WL 4582038, at *3 (D. Conn. 2016). He reasoned that the prisoner "does not seek the equivalent of a monetary award from the State of Connecticut," but rather seeks relief "before any money has changed hands" and in the form of "an order restraining state officials from enforcing a statute that is allegedly inconsistent with federal law, which is prospective." *Id.* at *4. "Here, it is [the prisoner] who allegedly owes money to the State. He

does not seek a refund or payment from the State of Connecticut, but rather an order finding that requiring him to pay would violate federal law." *Id.* at *5.

More generally, other courts have interpreted the *Ex parte Young* exception to apply to lawsuits that seek to enjoin state officials from wrongfully collecting funds from a plaintiff or funds owed by a third party to a plaintiff. *See Cardenas v. Anzai*, 311 F.3d 929, 937-38 (9th Cir. 2002) (action seeking to prevent state officials from accepting payments from a settlement fund without remitting overage that plaintiffs contended should be paid to them under federal law); *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1044, 1049 (9th Cir. 2000) (action seeking to prevent state officials from collecting accrued taxes); *Osage Nation v. Oklahoma ex rel. Oklahoma Tax Comm'n*, 260 F. App'x 13, 14 (10th Cir. 2007) (action seeking to prevent state officials assessing and collecting state income tax).

The same reasoning applies here. Therefore, I conclude that the Eleventh Amendment does not bar the plaintiffs' claims.

### *Excessive Fines*

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'" *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609-610 (1993)).

In order for the plaintiffs to prevail on their claim under the Excessive Fines Clause, they must first show that the defendants' demand for the plaintiffs to pay their costs of imprisonment constitutes a "fine." They must then show that this fine is "excessive." *See United States v.*

*Viloski*, 814 F.3d 104, 109-110 (2d Cir. 2016). The defendants argue that the plaintiffs have failed to satisfy either of these requirements.

As to the threshold issue of whether the amounts demanded for the costs of imprisonment are a "fine," the law is clear that not every imposition or demand for payment by the government constitutes a "fine" that is subject to review under the Excessive Fines Clause. A "fine" means "'a payment to a sovereign *as punishment* for some offense.'" *United States v. Davis*, 648 F.3d 84, 96 (2d Cir. 2011) (emphasis added) (quoting *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)). Thus, as the Second Circuit has recently noted, "[t]he Excessive Fines Clause applies only to protect against 'punitive,' rather than 'remedial,' payments to the government." *Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582, 589 n.2 (2d Cir. 2024).

Importantly, the Excessive Fines Clause applies even if an imposition or demand for payment is made *only in part* for punishment. *See Austin*, 509 U.S. at 610; *Viloski*, 814 F.3d at 109. Thus, the Excessive Fines Clause applies to impositions or demands for payment that may be described as sharing both a punitive and a remedial character or purpose. "'A civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.'" *Kokesh v. SEC*, 581 U.S. 455, 467 (2017) (quoting *Austin*, 509 U.S. at 621).

Statutes do not always make clear on their face whether they intend to impose a payment as punishment. In this context, the Second Circuit has looked to two factors in order to infer whether an imposition or demand for payment is punishment: (1) whether the demand for payment "was imposed at the culmination of a criminal proceeding that required a conviction of the underlying felony and could not have been imposed upon an innocent party," and (2) "the

nature of the statute that authorizes [the demand for payment]." *United States v. An Antique Platter of Gold*, 184 F.3d 131, 139-140 (2d Cir. 1999); *see also Viloski*, 814 F.3d at 109.

Here, the first factor weighs in the plaintiffs' favor. The pay-to-stay law demands payments only from prisoners who have been convicted of a crime. The law does not apply to prisoners who are acquitted or whose charges are otherwise dismissed.[34]

True enough, the pay-to-stay law is remedial at least in part. It seeks to compensate the State for costs of imprisonment. But the law's additional punitive character is evident from the fact that only convicted prisoners must pay for their costs of imprisonment—prisoners who are not convicted are not required to pay despite the fact that the State has incurred costs for their imprisonment. The pay-to-stay law demands payment "'at the culmination of a criminal proceeding that required a conviction of the underlying felony, and it could not have been imposed upon an innocent party.'" *Viloski*, 814 F.3d at 109 (quoting *An Antique Platter of Gold*, 184 F.3d at 139).

The second factor also weighs in the plaintiffs' favor. When the pay-to-stay law was originally proposed, its purpose was described as "to help defray the costs of incarceration *and make the criminal responsible for his crime*." H.R. Journal, 1995-1996 Sess. (Conn. 1995) (journal of Jan. 19, 1995) (emphasis added). Similar language occurs in other parts of the legislative record. *See* H.R. Journal, 1995-1996 Sess. (Conn. 1995) (journal of Mar. 30, 1995) (using identical language); Conn. Senate, Transcript of June 5, 1995, General Assembly Sess. 1995-1996 (statement of Sen. McDermott) (observing that the bill will teach inmates that they

---

[34] *See* Conn. Gen. Stat. § 18-85a(b) (granting the State a claim against "inmates"); Conn. Agencies Regs. § 18-85a-1(b) (defining "inmate" as "an individual confined, or formerly confined, in a correctional facility *serving a sentence imposed by any Connecticut state court*") (emphasis added); *see also* Conn. House of Representatives, Transcript of June 1, 1995, General Assembly Sess. 1995-1996 (statement of Rep. Lawlor) (noting in connection with the law that "it's important to add that anyone found not guilty of a crime obviously wouldn't be responsible for reimbursement of the costs of their incarceration").

must "pay for the crimes that they commit"); Conn. Senate, Transcript of June 5, 1995, General

Assembly Sess. 1995-1996  (statement of Sen. Kissel) ("the Department of Corrections… is

trying to establish a system… where the prisoners actually understand, to some extent, what it's

like having to pay some of the bills"). Thus, notwithstanding the extent to which the pay-to-stay

law may in part serve a compensatory remedial purpose, the law is imbued as well with a parallel

punitive purpose of retribution and deterrence.

In *Wright v. Riveland*, 219 F.3d 905 (9th Cir. 2000), the Ninth Circuit considered whether

a Washington law imposed a "fine" for purposes of the Excessive Fines Clause by requiring

convicted prisoners to pay a percentage of their income from outside sources to cover the costs

of incarceration. *Id.* at 909-10, 914-15. The court concluded that the law was punitive for

purposes of the Excessive Fines Clause because imposing "the costs society must undertake to

punish the convict for the offense satisfies the goal of 'just punishment' and forcing a criminal to

internalize the costs of such conduct satisfies the goal of 'adequate deterrence.'" *Id.* at 916.

The same reasoning applies here. Accordingly, I conclude that the payments demanded

by the defendants constitute a "fine" within the meaning of the Excessive Fines Clause.[35]

The next question is whether the plaintiffs have plausibly alleged that the amounts sought

by the defendants are "excessive" under the Excessive Fines Clause. As the Supreme Court has

explained, "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the

---

[35] Not to the contrary is the Second Circuit's unpublished ruling in *United States v. Leone,* 813 F. App'x 665 (2d Cir. 2020), in which the court of appeals concluded without discussion or analysis that requiring a federal criminal defendant to pay the costs of monitoring services constitutes "reimbursement for services rendered [which is not] properly labeled a 'fine.'" *Id.* at 669. Here, by contrast, the record reflects that the pay-to-stay law has a punitive character or purpose.

principle of proportionality." *Bajakajian*, 524 U.S. at 334. More specifically, "[t]he amount of [a fine] must bear some relationship to the gravity of the offense that it is designed to punish." *Ibid.*

Thus, a fine "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Ibid.* Although "'any judicial determination regarding the gravity of a particular offense will be inherently imprecise,'" a court "may invalidate [a fine] only if it 'is <u>grossly</u> disproportional to the gravity of the offense.'" *Reese*, 91 F.4th at 590 (quoting *Bajakajian*, 524 U.S. at 337).

What makes a fine grossly disproportional to the gravity of an offense? Courts must apply what are known as the "*Bajakajian* factors" by considering: "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct." *Id.* at 589 (quoting *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015)).

The *Bajakajian* factors are not exhaustive. So, for example, the Second Circuit has recognized that courts may also consider "whether the forfeiture would deprive the defendant of his livelihood, *i.e.*, his future ability to earn a living." *Viloski*, 814 F.3d at 111. Still, however, courts are not free to altogether disregard the *Bajakajian* factors. *See United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009) (Sotomayor, J.) ("the district court's failure to adequately consider the *Bajakajian* factors leaves us unable to conduct the required proportionality analysis in order to determine whether the forfeiture amount constitutes an excessive fine"). And regardless of what specific factors a court may take into account, it must "heed the Supreme Court's instruction that 'the test for the excessiveness of a punitive forfeiture involves solely a

proportionality determination.'" *Viloski*, 814 F.3d at 111 (quoting *Bajakajian*, 524 U.S. at 333-34).

The plaintiffs allege few facts that would allow for a reasoned evaluation of the four *Bajakajian* factors. As to the first factor ("the essence of the crime of the defendant and its relation to other criminal activity"), the complaint alleges that Beatty was in prison for "charges stemming from drug possession" and that Johnson was in prison for "drug-related charges."[36] The complaint says nothing else about the underlying conduct of Beatty and Johnson or about the relationship (if any) of this conduct to other criminal activity. Even worse, the complaint is completely devoid of information about Tosado's crime. Only by taking judicial notice of online court records have I learned that Tosado was convicted of some serious crimes, including possession of an assault weapon and possession of a weapon in a motor vehicle, as well as breach of peace and two charges of failure to appear.[37] Therefore, I conclude that the first *Bajakajian* factor weighs against the plaintiffs based on the limited information concerning the essence of the plaintiffs' crimes and their relation to other criminal activity.

As to the second *Bajakajian* factor ("whether the defendant fits into the class of persons for whom the statute was principally designed"), it appears that the plaintiffs are within the class of persons targeted by the pay-to-stay law. Therefore, the second factor also weighs against the plaintiffs.

As to the third *Bajakajian* factor ("the maximum sentence and fine that could have been imposed"), the complaint alleges that the amounts demanded from the plaintiffs exceed "the maximum fines permitted by Connecticut's criminal code: $20,000 for the state's top-grade

---

[36] Doc. #49 at 4, 9 (¶¶ 22, 56).
[37] Doc. #59-2 at 30-31.

felonies, and $2,000 for the top-grade misdemeanors."[38] The complaint alleges that Beatty's maximum statutory fine was $10,000.[39] The complaint fails to allege Johnson's maximum fine amount, and there is no way to know what his maximum fine would be because the complaint fails to allege the number of counts on which he was convicted. It appears that Tosado was subject to multiple counts of conviction and that her maximum fine amount was $21,500.[40]

Overall, the third factor weighs in plaintiffs' favor insofar as it appears that the costs of imprisonment that the defendants demand is likely far more than the amounts that the plaintiffs could have been formally fined by a state court judge at sentencing. Still, however, "a forfeiture that exceeds the statutory maximum fine is not necessarily constitutionally excessive, and the ultimate question … is how the amount of the forfeiture compares to the gravity of the [party's] offense." *Varrone*, 554 F.3d at 333 n.4.

As to the fourth factor ("the nature of the harm caused by the defendant's conduct"), the plaintiffs again fail to allege necessary facts. The pleadings do not allow me to evaluate whether Beatty and Johnson's drug crimes resulted in fatal overdoses or involved firearms or other dangerous activity as drug crimes often do. Nor does the complaint allow me to evaluate whether Tosado's possession of an assault weapon and a weapon in a motor vehicle resulted in any harm. Therefore, the fourth factor weighs against the plaintiffs, again primarily because of the plaintiffs' failure to allege sufficient facts concerning the nature of the harm from their crimes.

In short, as judged by reference to the *Bajakajian* factors, the plaintiffs have not alleged enough facts to plausibly show that their costs of imprisonment are no less than grossly disproportional to the gravity of their crimes. A court may dismiss a complaint that claims a

---

[38] Doc. #49 at 19 (¶ 125).

[39] *Id.* at 4 (¶ 23).

[40] Doc. #59-1 at 39. $21,500 represents the sum of the maximum fines for each of Tosado's convictions. *See* Doc. #59-2 at 30-32; *see also* Conn. Gen. Stat. §§ 53a-41–42.

violation of the Excessive Fines Clause if the plaintiff fails to allege the facts that are necessary to evaluate the *Bajakajian* factors. *See Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 200 (S.D.N.Y. 2019) (dismissing Excessive Fines Clause claims of plaintiffs who failed to allege necessary facts to make it "possible to undertake the four-factor analysis" and that "foreclose an analysis of the four-factor *Bajakajian* test"); *see also Leon v. Hayward Bldg. Dep't*, 2017 WL 3232486, at *4 (N.D. Cal. 2017) (dismissing a complaint when the plaintiff "offer[ed] nothing that would allow a fact-finder to decide whether these fines were constitutionally excessive").

Rather than making a serious effort to address the *Bajakajian* factors, the plaintiffs argue that this case involves no less than a *per se* violation of the Excessive Fines Clause. They argue that "a fine like the one imposed by the [pay-to-stay law] can never be proportional if it depends on nonconviction conduct" such as the accumulation of imprisonment costs after the prisoner has committed a crime.[41] For this reason, the plaintiffs insist that requiring a convicted prisoner to pay *any* costs of imprisonment—even a single dollar or as little as 50 cents per day—violates the Excessive Fines Clause.[42]

But the plaintiffs cite no precedent for their "nonconviction conduct" theory of a violation of the Excessive Fines Clause. And their theory overlooks that the touchstone for a violation of the Excessive Fines Clause is whether a fine is grossly disproportional to the gravity of a person's crime. The fact that a fine may be based to some degree on acts or events that are

---

[41] Doc. #101 at 47; *see also id.* at 59 (counsel's response to a query whether the Court must evaluate the *Bajakajian* factors that "I don't think the Court has to" and even "if [the Court] goes through the exercise of attempting to apply the factors, it's difficult for me to understand how it would ever arrive at a useful conclusion from the application of those factors").
[42] *Id.* at 48-50.

distinct from a person's criminal conduct does not necessarily signify that the fine must be grossly disproportional to the gravity of the person's crime.

 Relatedly, the plaintiffs argue that a fine is *per se* excessive "if it depends on the acts of third parties."[43] They complain that the amounts convicted prisoners must pay for their incarceration turn on third-party-determined factors such as how much the State has chosen to budget and spend on its prisons each year and—for purposes of calculating each convicted prisoner's *per capita* share of prison costs—how many people the State chooses to incarcerate each year.

This is all true. But the argument overlooks that the amount that a convicted prisoner must pay also depends on the prisoner's own criminal conduct. A prisoner is liable to pay only if they have committed a crime in the first place. And the pay-to-stay law requires a convicted prisoner to pay more money the longer that they remain incarcerated. The murderer pays more than the petty thief. Thus, because a longer sentence ordinarily reflects a more serious crime, the pay-to-stay law imposes a fine in an amount that, in this respect, is proportional to the gravity of the crime.

The fact that the cost of imprisonment *also* depends in part on the actions of third parties does not matter unless these third-party actions render the cost no less than grossly disproportional to the gravity of a convicted prisoner's crime. The actions of third parties might lead to higher costs—or they might lead to lower costs. If they lead to higher costs, the costs may still not be so high that they are grossly disproportional to the gravity of a convicted prisoner's

---

[43] *Id.* at 47-48.

crime. The mere involvement of third parties does not establish a *per se* violation of the Excessive Fines Clause as the plaintiffs claim.

Consider as well that the Excessive Fines Clause applies to criminal restitution orders. *See, e.g.*, *Wright*, 219 F.3d at 915. The purpose of a restitution order is to compensate a victim for the harm resulting from a defendant's crime (just as the pay-to-stay law serves in part to compensate the State for the imprisonment costs it lawfully incurred because of a defendant's crime). The amount of restitution due to a victim may permissibly depend on nonconviction events that occur after the crime has occurred (such as the costs of ongoing medical treatments) and involve decisions made by third parties (such as what course of medical treatment the victim chooses to pursue and how much the victim happens to be charged by the hospital, by doctors, and by pharmaceutical companies for these treatments). The fact that the total restitution amount may depend on nonconviction events or be affected by the actions of third parties does not signify that a restitution order requiring a criminal defendant to pay the costs incurred by the victim is grossly disproportional to the defendant's crime.

The plaintiffs further argue that their fines are excessive because the defendants did not calculate the assessed cost of imprisonment until months or years after they finished serving their sentences. But even though there is no contemporaneous calculation of a specific imprisonment cost amount while a prisoner is still serving a sentence, the plaintiffs cannot claim surprise because the pay-to-stay law has long made clear what calculation formula will be applied. The simple fact of the passage of time between when a convicted prisoner serves a sentence and

when the State calculates the prisoner's cost of imprisonment says nothing about whether the assessed cost is grossly disproportional to the gravity of a prisoner's crime.

Applying the correct standard of gross proportionality, multiple courts have concluded that requiring prisoners to pay costs for their incarceration does not violate the Excessive Fines Clause. In *Wright v. Riveland*, for example, the Ninth Circuit considered an Excessive Fines Clause challenge to a statute that allowed prison officials to deduct amounts from prisoner accounts for the cost of their incarceration. The Ninth Circuit reasoned that "the amount of the deduction appears to be directly proportional to the average cost of incarceration that the inmate will incur during his or her minimum or actual term of confinement, whichever is longer." 219 F.3d at 917. It further concluded that "[b]y definition, it seems that a fine based on a criminal's cost of incarceration *will always be proportional* to the crime committed." *Ibid.* (emphasis added); *see also Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 413, 420-21 (3d Cir. 2000) (a fee of $10 per day, in addition to half the funds an inmate received and half the money in his wallet, was not excessive); *Waters v. Bass*, 304 F. Supp. 2d 802, 804, 806, 809 (E.D. Va. 2004) (a charge of $1 per day was not excessive).

In addition, I note that federal law expressly authorizes federal courts to impose criminal fines that include a component reflecting a defendant's expected costs of imprisonment and supervision. *See* 18 U.S.C. § 3572(a)(6); *see also* U.S.S.G. § 5E1.2(d)(7). But, of course, if the plaintiffs are correct that requiring a prisoner to pay for the costs of imprisonment amounts to a *per se* violation of the Excessive Fines Clause, then this federal law must be invalid as well.

I doubt that. At least two federal appeals courts have rejected Excessive Fines Clause challenges to this federal law. *See United States v. Hines*, 88 F.3d 661, 664 (8th Cir. 1996); *United States v. Price*, 65 F.3d 903, 908 (11th Cir. 1995). Other federal appeals courts have

rejected due process challenges to requiring a federal prisoner to pay the costs of imprisonment. *See United States v. Zakhor*, 58 F.3d 464, 467-68 (9th Cir. 1995); *United States v. May*, 52 F.3d 885, 891 (10th Cir. 1995); *United States v. Hagmann*, 950 F.2d 175, 186-87 (5th Cir. 1991).

And the Second Circuit has rejected the argument that requiring a prisoner to pay the costs of imprisonment "contravenes the language in 18 U.S.C. § 3553(a) that criminal sentences imposed under the guidelines must be 'sufficient, but not greater than necessary, to comply' with the purposes of the Sentencing Reform Act" and that it "results in punishment 'greater than necessary' to effectuate the purposes of the Sentencing Reform Act." *United States v. Leonard*, 37 F.3d 32, 40 (2d Cir. 1994). According to the Second Circuit, imposing the costs of incarceration and supervision "will often be necessary to achieve the sentencing purposes set forth by Congress in 18 U.S.C. § 3553(a)" and that "as long as [such a] fine is authorized by the Sentencing Reform Act, imposition of it *is not excessive*." *Ibid* (emphasis added). Thus, the Second Circuit affirmed the imposition of fines against two criminal defendants for $96,850.80 and $77,606.40 for the costs of their incarceration and supervision. *Id.* at 35, 40-41.

In another case, the Second Circuit invited a district court to impose a fine that included the full cost of a criminal defendant's imprisonment. *See United States v. Park*, 758 F.3d 193, 199 n.25 (2d Cir. 2014) (*per curiam*) (noting that "[t]o the extent the Court wishes to consider the cost of imprisonment at resentencing, it of course may do so through the imposition of a fine, as permitted under 18 U.S.C. § 3572(a)(6)" and that "[a]s the government rightly notes, given that Park has net assets of approximately $1.1 million and income of $11,000 per month, the District Court would be well within its discretion to impose a fine that covered the full costs of incarceration"). All this additional precedent concerning the authority of federal courts to impose

fines that include the cost of imprisonment casts further doubt on the plaintiffs' claim that a state law requiring a prisoner to pay for imprisonment violates the Excessive Fines Clause.

In short, by reference to the *Bajakajian* factors, the plaintiffs have failed to sustain their as-applied challenge under the Excessive Fines Clause to Connecticut's pay-to-stay law. Nor have the plaintiffs shown that Connecticut's pay-to-stay law amounts to a *per se* violation of the Excessive Fines Clause, and therefore they have failed to sustain their facial challenge to Connecticut's pay-to-stay law.

All that said, there is one more issue that is evident from the allegations of the complaint but overlooked by both sides in their briefing on the motion to dismiss. Two of the plaintiffs— Beatty and Johnson—have alleged that the defendants seek to make them pay more for their costs of imprisonment than what the pay-to-stay law permits. Beatty claims that the defendants overcharged her during the years 2000 and 2001, assessing daily rates of $123 and $122 rather than the correct rates of $99 and $96. Meanwhile, Johnson claims that the defendants now seek to impose on him the full costs of his imprisonment without crediting him, as the law requires, with a previous payment towards his cost of imprisonment that was made from his mother's estate.

To be sure, a violation of state law does not automatically mean that there has been a violation of the federal constitution. *See Torcivia v. Suffolk Cnty., New York*, 17 F.4th 342, 368 (2d Cir. 2021). But the Eighth Amendment does not allow the government to impose punishment that is more than the maximum sentence established by an authorizing statute. "'A sentence that exceeds the statutory maximum has traditionally been viewed as a violation of the [E]ighth [A]mendment's prohibition against cruel and unusual punishment.'" *Ford v. Moore*, 296 F.3d 1035, 1037 n.6 (11th Cir. 2002) (quoting *Ralph v. Blackburn*, 590 F.2d 1335, 1337 (5th Cir.

1979)); *see also Woods v. Ryan*, 2015 WL 4555251, at *7-8 (D. Ariz. 2015) (granting habeas relief for an Eighth Amendment violation when defendant's sentence slightly exceeded the statutory maximum).

Similarly, the Second Circuit recognizes that "unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude" under the Eighth Amendment's Cruel and Unusual Punishments Clause. *See Hurd v. Fredenburgh*, 984 F.3d 1075, 1085 (2d Cir. 2021). "The Eighth Amendment prohibits 'the unnecessary and wanton infliction of pain,' including punishments that are 'totally without penological justification,'" and "[t]here is no penological justification for incarceration beyond a mandatory release date because 'any deterrent and retributive purposes served by the inmate's time in jail were fulfilled as of that date.'" *Id.* at 1085 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976) and *Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989)). Put differently, incarceration beyond what is legally authorized by statute or by a court's sentence serves none of the legitimate purposes of punishment, and so it runs afoul of the Eighth Amendment's Cruel and Unusual Punishments Clause.

What is true for the Cruel and Unusual Punishments Clause is also true for the Excessive Fines Clause. Both clauses "place 'parallel limitations' on 'the power of those entrusted with the criminal-law function of government.'" *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (quoting *Browning-Ferris*, 492 U.S. at 263). And the Supreme Court has explicitly imported the standard of "gross disproportionality" from the Cruel and Unusual Punishments Clause into the Excessive Fines Clause. *See Bajakajian*, 524 U.S. at 336.

The Excessive Fines Clause, like the Cruel and Unusual Punishments Clause, is concerned with punishment. *See, e.g.*, *Austin*, 509 U.S. at 609-10. The Eighth Amendment

requires that penal sanctions be justified by one or more of the "goals … that have been

recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation." *Graham v.

Florida*, 560 U.S. 48, 71 (2010). But when the government seeks to punish by extracting

payment of a fine greater than what is allowed by the statute that authorizes the government to

impose the fine, then the government has no legitimate penological justification for its action.

And "[a] sentence lacking any legitimate penological justification is by its nature

disproportionate to the offense." *Id.* at 71.

Both Beatty and Johnson have alleged facts to plausibly suggest that the defendants seek

to enforce a fine against them that exceeds the amount that the defendants are allowed to impose

under Connecticut's pay-to-stay law. To this limited extent only, they have plausibly alleged a

violation of the Excessive Fines Clause.

CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part the

defendants' motion to dismiss. The Court GRANTS the motion to dismiss as to all three

plaintiffs to the extent that they raise facial and as-applied challenges to Connecticut's pay-to-

stay law under the Excessive Fines Clause of the Eighth Amendment. The Court DENIES the

motion to dismiss as to the plaintiffs Teresa Beatty and Douglas Johnson solely to the limited

extent that they allege that the defendants seek to enforce a fine exceeding the amount that may

be lawfully imposed under the Connecticut pay-to-stay law.

It is so ordered.

Dated at New Haven this 27th day of February 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge